## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-10264-cgb |
| | § | |
| RIC (AUSTIN), LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| Panache Development | § | |
| & Construction, Inc., *et al.,* | § | |
|    *Plaintiffs and Counter-Defendants,* | § | |
| *v.* | § | |
| | § | |
| Romspen Mortgage Limited Partnership, | § | ADV. NO. 24-01061-cgb |
|    *Defendant, Counter-Plaintiff and Third-* | § | |
|    *Party Plaintiff* | § | |
| and | § | |
| Romspen (Reomaster) Holdings Inc., | § | |
|    *Defendant.* | § | |
| *v.* | § | |
| | § | |
| | § | |
| Adam Zarafshani, an individual, | § | |
|    *Third-Party Defendant.* | § | |

---

## PANACHE PARTIES' REVISED POST-TRIAL BRIEF
## ON EQUITABLE SUBORDINATION AND RECHARACTERIZATION

---

Plaintiffs Panache Development & Construction, Inc. ("Panache"), AFMN Investments, LLC ("AFMN"), and Vesta Texas, LLC ("Vesta Texas," together with Panache and AFMN, the "Plaintiffs"), and Third-Party Defendant Adam Zarafshani ("Zarafshani," and together with Plaintiffs, the "Panache Parties"), submit this Post-Trial Brief on the Panache Parties' claims for equitable subordination under 11 U.S.C. § 510(c) and recharacterization under 11 U.S.C. § 502 against Romspen Mortgage Limited Partnership ("RMLP") and Romspen (Reomaster) Holdings Inc. ("Reomaster," and together with RMLP, "Romspen"), and respectfully show the following:

## I. SUMMARY

Plaintiffs do not ask the Court to credit their characterization of Romspen's conduct; rather, the Court need only credit Romspen's own contemporaneous record. In August 2023, Romspen partner and Debtor managing member Richard Weldon wrote to his colleagues that his partners were "preparing for the funeral without trying to save the patient," "destroying value," and preparing to "blame Adam."[1] The same week, Peter Oelbaum stated Romspen's priority in one sentence: "We need to do what's best for the Fund and maximize value here."[2] By September 2023, Weldon conceded "the RIC Austin take-over of this project has been an unmitigated disaster."[3] Those are Romspen's words, not Plaintiffs', and they describe exactly what Romspen did: buried the patient and blamed the Panache Parties.

From October 19, 2020 forward, the relationship and obligations among Romspen, Panache, and Zarafshani was governed by the Binding Term Sheet, PX-324 (the "BTS"). The BTS resolved the Zen Garden bankruptcy[4] disputes globally, transferred operational control and decision-making authority over the Project exclusively to Romspen as lender, imposed unlimited fiduciary duties on the Romspen-controlled managing member, and bound all parties to work in good faith to advance the Project to completion. Repayment of every party's claim depended on a single outcome: completion of Buildings F, H, and J; lease-up; and refinancing or sale. Panache's consideration was substantial and immediate: it deferred prosecution of over $11.8 million in unpaid claims, dismissed its pending claims against Romspen, and continued performing as general contractor in reliance on the BTS framework. Romspen—a sophisticated lender with billions under management—accepted unlimited fiduciary duties to the Debtor under BTS ¶ 6 as

---

[1]   PX141.
[2]   PX-100 at 1–2; PX-141 at 2; PX-256; Day 2 Tr. 47:1–8; Day 3 Tr. 26:1–24; Day 4 Tr. 13:21–14:18, 22:1–23:23, 26:15–17.
[3]   PX-21 at 1; PX-55; PX-128 at 1; PX-247 at 1–2; PX-324 ¶ 16; Day 1 Tr. 113:6–114:6; Day 3 Tr. 158:4–11, 164:9–16, 167:8–25, 168:19–24, 176:9–178:13.
[4]   *In re 3443 Zen Garden, L.P.*, No. 20-10410-hcm (Bankr. W.D. Tex.).

a core consideration for those concessions.[5] That fiduciary protection proved illusory.

The trial record establishes that Romspen did not honor that framework. Romspen controlled every funding, draw, and budgetary decision; reviewed and approved every draw against full subcontractor invoices and lien waivers; matched and certified Panache's $32 million completion budget through Nuveen's own quantity surveyors; then unilaterally imposed a $350,000 monthly funding cap driven by Romspen-side liquidity issues Weldon admitted in writing he "kept that to myself" rather than disclose to the borrower.[6] Construction slowed, payables accumulated, and the value Romspen had committed to advance eroded. Romspen now invokes that erosion as a defense to its own misconduct.

Romspen now defends its conduct by attacking the work it directed and the witnesses it controlled, while invoking pre-RIC (Austin) structural issues it expressly waived in BTS ¶ 9 and ignoring the offsets it agreed to in BTS ¶ 12. *See infra* Sections II.A, II.F.

As a controlling insider, Romspen had the burden to prove good faith and inherent fairness. It did not. Romspen offered no conflict analysis, no fairness opinion, no evidence of any default by Panache, no notice to cure, and no allegation of breach justifying the funding cap. The contemporaneous record instead establishes—in Romspen's own words—that Romspen placed the Fund ahead of the Debtor and ahead of Romspen's BTS obligations. As shown in Sections II and III below, Plaintiffs have carried their burden on every element of equitable subordination and on recharacterization, and Romspen has not carried the rigorous-scrutiny burden *Pepper v. Litton* and *Herby's Foods* place on it. Plaintiffs respectfully request the relief set forth in Section IV.

## II. EQUITABLE SUBORDINATION IS WARRANTED

Section 510(c) authorizes the Court to subordinate any allowed claim to any other allowed

---

[5]    PX-324 at 2 & ¶¶ 1, 5; Day 2 Tr. 238:21–239:5, 256:11–15; PX-324 ¶¶ 6, 13; PX-54 § 6.6; Day 5 Tr. 8:11–14, 9:16–22.
[6]    PX-30 at 1; Day 1 Tr. 99:24–100:4, 181:21–182:10; Day 2 Tr. 36:5–37:18; Day 4 Tr. 14:19–22.

claim so that "fraud will not prevail, that substance will not give way to form, [or] that technical considerations will not prevent substantial justice from being done."[7] Plaintiffs must show (1) inequitable conduct by the claimant; (2) injury to creditors or unfair advantage to the claimant; and (3) consistency with the Bankruptcy Code.[8] Actual fraud is not required, and less egregious conduct suffices when the claimant is an insider.[9] The undercapitalization inquiry is objective; the insider "need not have intended harm for subordination to be an appropriate remedy."[10] Romspen's conduct satisfies each *Herby's Foods* category.

### A. The Binding Term Sheet Governed the Parties' Conduct from October 19, 2020 Onward.

On October 19, 2020, Romspen, Panache, and Zarafshani executed the BTS as a resolution of the Zen Garden disputes.[11] The BTS dictated ownership; designated Panache the general contractor; and committed the parties to advance the Project to completion together. Three features of the BTS frame this dispute.

*First*, Paragraph 6 placed "operational control and decision-making authority for the New Owner and the Construction Project . . . exclusively" with Romspen as lender and expressly prohibited any limitation on the fiduciary duties of the New Owner or its managing member.[12] RIC (Austin)'s LLC Agreement § 6.6 implemented that requirement, imposing on Reomaster duties equivalent to a Texas general partner. Roitman conceded on the stand that he is a fiduciary, that fiduciary duty is "the highest duty in law," and that "there's no limitations" on his fiduciary duty.[13]

*Second*, Paragraph 9 expressly waived any liability of Panache or Zarafshani for pre-RIC

---

[7]   *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977); *In re Herby's Foods, Inc.*, 2 F.3d 128, 130–31 (5th Cir. 1993).
[8]   *Herby's Foods*, 2 F.3d at 130–31; see also 11 U.S.C. § 510(c).
[9]   *Herby's Foods*, 2 F.3d at 131.
[10]  *Herby's Foods*, 2 F.3d at 133–34; *In re Herby's Foods, Inc.*, 134 B.R. 207, 211 (Bankr. N.D. Tex. 1991), aff'd, 2 F.3d 128 (5th Cir. 1993); cf. *In re Equip. Equity Holdings*, 491 B.R. 792 (Bankr. N.D. Tex. 2013).
[11]  PX-324.
[12]  PX-324 ¶ 6; PX-54 § 6.6; Tex. Bus. Orgs. Code §§ 152.203–152.206; Day 3 Tr. 169:13–19.
[13]  PX-054; Day 5 Tr. 24:4–26:5, 32:1–35:7.

(Austin) plans, damage, or deterioration: "The parties expressly agree that Panache and Zarafshani will not be liable for any current construction plans or damage or deterioration that occurred during the period the Construction Project was unfunded, in receivership, or in the bankruptcy estate."[14] That waiver forecloses Romspen's reliance on the A1 Engineering plans and structural-remediation issues now cited to argue that RIC (Austin) received no value.

*Third*, Paragraphs 11, 15, and 18 repeatedly imposed mutual good-faith obligations to advance the Project to completion, obtain financing on the most commercially favorable terms, and maximize Project value "for the best interests of the Construction Project, Romspen, Panache and Zarafshani, collectively and without exclusion to the respective interests of any individual party."[15] Completion was not aspirational; it was the contractual mechanism by which all parties would be repaid.

Paragraph 12 reinforces the same point from the lender's side. The Romspen Deficiency Claim was defined as Romspen's claim net of "recovery from other debtors or guarantors on Romspen's pre-bankruptcy loan agreement (for clarity including Dan White)" and any other "just and lawful offsets and credits" received from other sources.[16] The BTS thus contemplated—and the parties agreed—that Romspen's recovery on its Zen Garden debt was not dependent on the Austin Project alone. Recoveries from other Romspen collateral, including the Edmonton, Alberta property guaranteed by Dan White, would reduce the Romspen Deficiency Claim. Romspen's litigation posture—treating the Austin Project as its sole recovery source and justifying aggressive Project control on that basis—is inconsistent with the bargain it struck.

*See supra* Section I (summarizing Panache's BTS consideration and the 25% equity stake

---

[14] PX-324 ¶ 9.
[15] PX-324 ¶¶ 11, 15, 18.
[16] PX-324 ¶ 12; PX-324, Ex. A.

exchanged for those concessions). The BTS was not a gratuitous accommodation. The Zen Garden Trustee's Liquidating Plan conditioned confirmation on Romspen obtaining "the subordination of the Panache deficiency and other General Unsecured Claims," which is the very subordination Romspen extracted through the BTS.[17]

The BTS text confirms the mutual-effort structure: Paragraph 11 binds the parties to "work together in good faith"; Paragraph 15 commits Romspen and Panache to "work together in good faith to obtain and/or provide new capital"; Paragraph 18 requires the parties to "work together in good faith" to maximize Project value collectively. Amanda Woodham testified that Panache deployed its own capital into the Project—"Romspen, at no time, gave us working capital. We had to create our own over time"—and devoted "100 percent" of its time and resources to the Debtor in reliance on the BTS framework.[18] Romspen did not extend a gratuitous accommodation; it received reciprocal consideration for the obligations the Panache Parties now seek to enforce.

Paragraph 15, in particular, imposed an affirmative duty on Romspen to pursue third-party financing in good faith and to subordinate its position to favorable refinancing.[19] Romspen breached that duty in writing. In July 2023, Weldon told a Nuveen Green Capital senior director that Romspen had "instituted a new policy . . . [that] each project should be third party financed" once equity exceeded $100 million, and conceded in the same email that this internal policy "slowed down construction" on the Austin Project. Weldon also wrote that Romspen had "held off discussions with a Schedule A lender because we wanted to move ahead with Green Pace because of our good history together." After June 6, 2023, Romspen took no documented steps to pursue financing—not PACE financing through Nuveen, not a Schedule A refinancing, not the RCLCO-

---

[17]  R-19 p. 34.
[18]  PX-324 ¶¶ 1, 5; PX-324 ¶ 13; PX-324 ¶¶ 11, 15, 18; Day 1 Tr. 82:11–12, 82:24–83:12; Day 1 Tr. 105:19–106:4, 114:7–24.
[19]  PX-324 ¶¶ 8, 15; Day 5 Tr. 183:18–23.

underwritten refinancing that would have provided substantial paydown.[20] Where Paragraph 15 required Romspen to work with Panache in good faith to obtain new capital and to subordinate to favorable third-party financing, Romspen instead used the SIA to entrench its position.

### B. Romspen Is a Controlling Insider Subject to Rigorous Scrutiny.

Romspen's organizational chart and the testimony of Peter Oelbaum, corporate representative for both RMLP and Reomaster, conclusively establish insider status. Reomaster manages the Debtor as its sole managing member and owns 75%; RMLP holds Proofs of Claim Nos. 6 and 7 (the "RMLP Claims"). Reomaster and RMLP have no employees and no separate office; Romspen Investment Corporation ("RIC") personnel administer both entities out of one RIC office. The same six RIC managing partners control RIC, Romspen Fund GP Inc. ("Fund GP"), Reomaster, and RMLP, and each has personally invested at least $2 million in the Romspen Mortgage Investment Fund (the "Fund")—the fund that ultimately receives every dollar RMLP recovers from the Debtor. Further, Joel Mickelson, who signed both sides of the June 2023 Loan Agreement, simultaneously serves as RIC's general counsel, RIC's chief compliance officer, and Reomaster's secretary.[21]

Oelbaum's admissions confirm the absence of corporate separateness: RIC managers staff Reomaster's board and officer ranks and "wear multiple hats"; Reomaster has "no formal procedure to ask RIC to approve its decisions because the same people are in the same room"; Romspen has no policies for navigating multiple hats; and, in Oelbaum's own words, "it is impossible to tell at any given moment which entity an individual is acting for."[22] Richard Weldon admitted the same conflict: he simultaneously "act[ed] on behalf of RIC (Austin)" and "in the best

---

[20] RMLP-111854; PX-141; ECF 178 ¶ 24.
[21] Day 2 Tr. 171:5–8; Day 3 Tr. 149:21–150:16, 152:15–18, 152:22–153:14, 153:3–7, 154:13–157:8, 158:4–11, 162:8–13, 171:16–172:12; PX-93.
[22] Day 3 Tr. 160:5–16, 162:14–21, 164:17–23, 169:25–170:2, 170:4–15.

interest of RMLP," and "a conflict" existed between those positions.[23]

Once dealings between a debtor and a controlling insider result in a claim in the insider's favor, the burden shifts to the insider to prove good faith and inherent fairness.[24] Romspen has conceded the predicate: it admits RMLP and Reomaster "have some common management." The trial record shows far more than common management. Romspen cannot point to arm's-length negotiation—the same person signed both sides of the June 2023 Loan Agreement. Romspen cannot point to independent counsel—it retained none. And Oelbaum confirmed: "I am not aware of a formal [conflict-of-interest] analysis that took place."[25]

Roitman supplied the plain-English admission. He described the Romspen organizational chart as "a bowl of spaghetti"; conceded he is one of the largest owners of the asset manager (RIC) at "roughly 30 percent"; acknowledged that each managing partner is "directly or indirectly an investor in the Romspen Mortgage Investment Fund," that he personally owns Fund units; and that Romspen advised its investors that "management and employees of Romspen collectively have more than $100 million invested in the fund." Every dollar RMLP recovers from the Debtor flows up that "spaghetti" structure to Roitman and his fellow managing partners as personal investment returns. That is identity of interest in Romspen's own words.[26]

**C. Romspen Breached Its Fiduciary Duties to the Debtor and Vesta Texas.**

Reomaster, as the Debtor's sole managing member, owed the Debtor and its 25% minority member, Vesta Texas, fiduciary duties of loyalty, care, and good faith. Paragraph 6 of the BTS prohibited any limitation on those duties, and § 6.6 of the LLC Agreement imposed on Reomaster duties equivalent to a Texas general partner under §§ 152.203–152.206 of the Texas Business

---

[23] Day 2 Tr. 105:17–106:5.
[24] *Herby's Foods*, 2 F.3d at 131; *Gernsbacher v. Campbell (In re Equip. Equity Holdings, Inc.)*, 491 B.R. 792, 842 (Bankr. N.D. Tex. 2013); ECF 178 ¶¶ 19(2), 19(3) n.3.
[25] Day 3 Tr. 158:4–11, 176:9–178:13, 178:14–20, 179:3–6; PX-55.
[26] Day 5 (Roitman) Tr. 8:1–12:25; Day 5 (Roitman) Tr. 13:7–10; PX-93.

Organizations Code.[27] Under Texas law, a director is "interested" when she transacts business in a director capacity with a second entity in which she also has a director or significant financial role; once interested, the transaction is set aside unless it "carries the earmarks of an arm's length bargain," and the burden shifts to the fiduciary to prove fairness or to establish a § 21.418 safe harbor.[28] When the subsidiary is insolvent, *Bestfoods'* presumption of subsidiary-side action wanes for conduct "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent," and *ASARCO* makes clear that an insolvent subsidiary's directors may not permit it to be "plundered for the benefit of its parent."[29]

Reomaster's officers transacted business in their director capacities with RMLP and the Fund, in which the same six RIC partners had significant financial interests through their personal Fund investments. No § 21.418 safe harbor applies: neither Reomaster nor the Debtor has disinterested directors; Romspen gave no notice to and obtained no approval from Vesta Texas; and Romspen offered no evidence that the structure was fair to the Debtor when authorized. The contemporaneous record removes any doubt about which hat Reomaster's officers wore. In August 2023 Oelbaum directed that Romspen's restructuring must "represent[] our fiduciary obligations to the Fund" and that "we need to do what's best for the Fund and maximize value here." Weldon spoke of Romspen's "huge responsibility to the Fund as good managers to manage" and its "fiduciary responsibility to protect and preserve our assets." Two days after his "Fund" email, Oelbaum proposed: "We can show him as a fool from day one."[30] Not a single contemporaneous statement evidences any consideration of Reomaster's admitted duties to the Debtor or Vesta

---

[27] PX-324 ¶ 6; PX-54 § 6.6; Tex. Bus. Orgs. Code §§ 152.203–152.206; Day 3 Tr. 169:13–19.

[28] *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719–20 (5th Cir. 1984); *Estate of Poe*, 648 S.W.3d 277, 286–87 (Tex. 2022); Tex. Bus. Orgs. Code § 21.418.

[29] *United States v. Bestfoods*, 524 U.S. 51, 69–70 (1998); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 412–16 (S.D. Tex. 2008); accord *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 678 (Bankr. S.D. Tex. 2009); *In re Draw Another Circle, LLC*, 602 B.R. 878, 911–13 (Bankr. D. Del. 2019); *Roth v. Mims*, 298 B.R. 272, 287 (N.D. Tex. 2003).

[30] PX-100 at 1–2; PX-141 at 2; PX-256; Day 2 Tr. 47:1–8; Day 3 Tr. 26:1–24; Day 4 Tr. 13:21–14:18, 22:1–23:23, 26:15–17.

---

Texas. Romspen's response at trial was not to defend its officers' words but to disclaim them: Roitman characterized those emails as "stream of consciousness . . . often not thoroughly thought through."[31] Regardless, the emails speak for themselves, demonstrate intent, and establish Romspen's breach. Decisions of fiduciaries owing the highest duties recognized in Texas law cannot be both considered deliberation and unguarded venting; Romspen cannot have it both ways.

The structural breach manifested at every conflict point. Within weeks of the Debtor's acquisition of the Project for $45 million in October 2020, Reomaster caused the Debtor to incur and assume more than $104 million in related-party debt to RMLP — against Reomaster's $750 capital contribution — resulting in a loan-to-value ratio of approximately 231% at inception.[32] No independent fiduciary would layer over $100 million of debt on top of a credit-bid obligation on day one. No conflict analysis preceded it; no third-party valuation supported it; no structure provided notice or independent approval.[33] Romspen later imposed a funding cap driven by Romspen-side liquidity, backdated the June 2023 Loan Agreement signed by a single Romspen insider on both sides without conflict analysis, asserted more than $1.47 million in Alberta-Canada legal fees expressly prohibited by the BTS, unreasonably restricted Vesta Texas's and Zarafshani's books-and-records access prohibited by the BTS, and suspended funding altogether in August 2023.[34] RMLP amended its proofs of claims several times, continuously decreasing wrongfully asserted amounts and has since informally withdrawn the Alberta charges in Romspen's Trial Brief, but that does not cure the prior inequitable conduct.[35]

Romspen's "delegation" defense fails on its own facts. Weldon's admission that he

---

[31] Day 5 Tr. 30:5–14.
[32] R-3; R-6.
[33] Day 3 Tr. 178:24–179:6, 179:11–180:3, 180:17–20; PX-54 §§ 4.1, 4.3.
[34] PX-21 at 1; PX-55; PX-128 at 1; PX-247 at 1–2; PX-324 ¶ 16; Day 1 Tr. 113:6–114:6; Day 3 Tr. 158:4–11, 164:9–16, 167:8–25, 168:19–24, 176:9–178:13.
[35] R-3; R-6; *Herby's Foods*, 2 F.3d at 134; *In re Dickinson of San Antonio, Inc.*, 2020 WL 3443920, at *12 (Bankr. W.D. Tex. June 23, 2020), aff'd, 2021 WL 3500781 (W.D. Tex. Aug. 9, 2021).

simultaneously acted "on behalf of RIC (Austin)" and "in the best interest of RMLP" establishes a retained, conflicted role—not delegation.[36] Oelbaum confirmed in writing that he "took over management of Tech 3443" through Romspen Development Group ("RDG"), the internal Romspen name for REO; Roitman called managing the Project the principal responsibility of asset management; and Weldon admitted in September 2023 that "[t]he RIC Austin take-over of this project has been an unmitigated disaster."[37] Romspen cannot avoid responsibility for its actual control over the Debtor with the false narrative that is delegated control to the Project's contractor.

### D. The Debtor Was Undercapitalized From the Beginning, and Romspen's Funding Decisions Caused the Project to Fail.

The *Herby's Foods* undercapitalization inquiry is objective: capitalization is inadequate where it would be insufficient to support a business of the Debtor's size, or where the Debtor could not have borrowed comparable funds from an informed outside source.[38] Reomaster contributed $750 in equity to a single-asset entity formed to develop more than 100 acres in East Austin. Oelbaum confirmed at trial that "$750 was Reomaster's entire equity capitalization of the project," that "RIC (Austin) needed funding in excess of $750 in order to operate," and that "at the time of its formation, RIC (Austin)'s only source of capital was RMLP."[39] By June 2023, the Debtor carried more than $100 million in loans against a Project recently sold for $45 million; Romspen performed no loan-to-value analysis.[40] The June 2023 Loan Agreement placed all funding within Romspen's "sole, absolute, unfettered and unqualified discretion." Woodham confirmed the practical consequence: "Romspen, at no time, gave us working capital. We had to create our own over time."[41]

---

[36] Day 2 Tr. 105:17–106:5.
[37] PX-21 at 1; PX-55; PX-128 at 1; PX-247 at 1–2; PX-324 ¶ 16; Day 1 Tr. 113:6–114:6; Day 3 Tr. 158:4–11, 164:9–16, 167:8–25, 168:19–24, 176:9–178:13.
[38] *Herby's Foods*, 2 F.3d at 133–34; *Herby's Foods*, 134 B.R. at 211; cf. *Equip. Equity Holdings*, 491 B.R. at 842.
[39] Day 3 Tr. 178:14–20, 178:24–179:6, 179:11–180:3, 180:17–20; PX-55, Schedule II ¶(k).
[40] Day 3 Tr. 180:17–20.
[41] Day 1 Tr. 82:11–12, 82:24–83:12.

---

The funding cap was driven by undisclosed Romspen-side liquidity. *See supra* Section I (Weldon "kept that to myself"). Oelbaum confirmed at trial there was "a lack of liquidity at the fund level" and that "redemptions in the fund had been halted"—a Romspen-internal event, not the market-wide observation Romspen now claims.[42] Mark Aber confirmed Romspen imposed the $350,000 cap in mid-Q2 2022, intended only to cover "real estate taxes, insurance, utilities," and emergencies—after months in which Romspen had approved monthly draws averaging nearly $2 million for the parties' "shared goal[] of closing in the building, completing FH&J."[43]

Romspen's contemporaneous emails defeat its defense that Panache spent without a coherent plan, a reliable budget, or meaningful oversight in three ways. *First*, Romspen knew exactly what completion would cost. In August 2023, Weldon wrote: "We should be receiving the Partner's budget confirming the building out of F, H and J at $32m and we will be asking for around $40m. . . . Note our priority is to get the loan—how we spend it will be subject to RDG and Romspen partners. . . . This loan will take 60–90 days so we will need a short term line of credit of around $6m to $8m to pay bills, and keep the project moving forward."[44] *Second*, Romspen received third-party quantity surveyor validation of that budget. The next morning, Weldon wrote internally: "Nuveen's expert quantity surveyors will be delivering their certification of the cost complete budget for F, H and J and it matches Adam's budget of $32m." Weldon also conceded in that same exchange that "the RDG team perceives no value in this asset and seem to be constantly talking it down—amplifying rumours of major problems."[45] *Third*, Weldon's "how we spend it will be subject to RDG and Romspen partners" admission confirms that Romspen— not Panache—controlled funding, prioritization, and execution. Romspen cannot simultaneously

---

[42] PX-30 at 1; Day 1 Tr. 99:24–100:4, 181:21–182:10; Day 2 Tr. 36:5–37:18; Day 4 Tr. 14:19–22.
[43] Day 1 Tr. 90:9–17, 93:5–12; Day 3 Tr. 73:9–13; Day 4 Tr. 86:12–20, 87:5–23.
[44] PX-100 at 3.
[45] PX-141 at 1–2.

hold ultimate control over "how we spend it" and blame Panache for the spending that was advancing buildings FH&J to completion and monetization anticipated in the BTS.

Aber's draw-process testimony forecloses any concealment narrative. Every draw between November 2020 and January 2023 was "reviewed by [Aber], by accounting, by Weldon, [and] sent up the food chain with a recommendation for approval"; each draw included subcontractor invoices, lien waivers, and backup summaries allocating work by building; Romspen had "the ultimate authority to deny funding requests"; aside from very small amounts in 2022, no draws were denied; and Aber personally reviewed and recommended for approval more than twenty draw requests.[46] Aber also admitted that Romspen identified no fraud, conducted no investigation, and issued no default notice to Panache—despite the years of litigation that followed.[47]

Weldon's August 2023 internal email confirms what really happened: "We've choked them down to 350,000 a month, but they're now getting bills on things that we ordered a year ago, and that's not enough to pay it"; the $3.9 million in payables "apparently was approved by Aber, not all at once, but over time, because when we said stop, we had already ordered long delivery items for MECP."[48] The post-cap payables buildup reflects Romspen's decision to fund less than its own asset manager had pre-approved—not concealment by Panache.

The cap caused the slowdown. Romspen introduced no evidence of any defective work or other cause for withholding payment on Panache draw requests. Nevertheless, Romspen redirected Woodham to cut a $900,000 draw to fit the cap, which resulted in subcontractors stopping work, payables ballooning and cessation of all construction by late 2023.[49] The Project had no independent revenue; its sole path to repayment was completion, lease-up, and refinancing or

---

[46] Day 4 Tr. 101:14–103:1, 105:1–19, 105:22–106:9, 106:10–20, 106:25–107:6.
[47] Day 4 Tr. 119:7–120:23, 170:10–173:5.
[48] PX-166; Day 2 Tr. 238:13–240:11.
[49] PX-212; Day 1 Tr. 92:25–93:4, 103:18–23, 105:19–106:4, 112:2–18, 230:4–7, 262:18–24.

sale—the very mechanism the BTS contemplated. While throttling funding, Romspen continued accruing 10% interest (approximately $1.7 million per month[50]). Project value collapsed from $45 million in October 2020 to approximately $32.8 million today, while Romspen's asserted claims grew to over $200 million.[51] Such a result is the signature of insider equity contributions deployed under the label of debt.

### E. Romspen Used the Debtor as Its Own REO Asset.

The trial record satisfies the third *Herby's Foods* category. Under Texas law, alter ego applies where unity between entities is such that separateness has ceased and recognizing it would work an injustice.[52] The structural facts establishing that unity appear in Section II.B *supra*: common ownership and control by the same six RIC partners; absence of employees, separate offices, and independent directors at RMLP, Reomaster, and Fund GP; the same Romspen employee signing both sides of every loan document; and Oelbaum's admission that "it is impossible to tell at any given moment which entity an individual is acting for."

Operationally, Romspen ran the Debtor as its own REO asset. Roitman characterized the Project as Romspen's REO; Oelbaum admitted that RDG—the internal Romspen name for REO— "took over management of Tech 3443"; and Weldon described the "RIC Austin take-over of this project" as "an unmitigated disaster."[53] Romspen approved the Debtor's accounts payable, directed treasury wires to the Debtor's contractors, and imposed proprietary CSI cost coding mid-Project on the Debtor as part of its portfolio. Romspen's own witnesses confirmed the operational unity. Ryan Stoltz, Romspen's engineer, testified that all work from 2020 through end of 2023 "improved the deficiencies and condition of the buildings"—the testimony of an REO manager protecting an

---

[50]    R-3 pp. 206-209.
[51]    PX-326; PX-327.
[52]    *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).
[53]    PX-21 at 1; PX-37; PX-38; PX-40; PX-128 at 1; PX-207; PX-247 at 1–2; Day 2 Tr. 127:25–128:7; Day 3 Tr. 164:9–16, 167:8–24, 168:19–24.

asset, not a lender policing an arm's-length borrower. Gregory Milligan conceded Reomaster "would have had some say" in how Romspen spent the more than $37 million on the Project.[54]

### F. Romspen's "No Value" Defense Fails on Its Own Terms.

Romspen's principal defense—that Romspen acted in good faith while the Debtor received no value—cannot be reconciled with the record. Substantial construction occurred, Romspen contemporaneously funded it, the only engineering testimony from Stoltz confirms it improved the buildings, and Paragraph 9 of the BTS forecloses reliance on the construction issues Romspen now invokes.

Milligan's testimony does not support a "no value" finding. He admitted he is not a construction expert, did not inspect structural components or interview prior consultants, did not evaluate remediation work, and did not review the draw documentation he conceded could demonstrate value.[55] He further disclaimed the very position Romspen advances—testifying he did not believe the Debtor's position was that it received "no value," but rather that there was a dispute about the amount.[56] The record affirmatively establishes that substantial work was performed and there is no evidence of wrongdoing. Romspen's own dedicated asset manager confirmed as much under oath: Aber testified that RMLP never identified a single fraudulent document, never identified any overbilling, never conducted any investigation into subcontractor billings, and funded the entire $38 million in draws "in good faith."[57] The Project involved the expansion of Buildings F, H, and J from two to four stories, materially increasing square footage and development potential. Romspen reviewed, approved, and funded dozens of draws supported by invoices, lien waivers, and detailed backup documentation; Panache maintained a centralized

---

[54] Day 4 Tr. 198:18–199:1, 296:22–297:3.
[55] Day 4 Tr. 272:20–273:8; 274:1–4; 288:3–18; 289:23–25.
[56] Day 4 Tr. 272:20–275:1.
[57] Day 4 Tr. 163:24–164:17; 173:23–175:18.

document repository to which Romspen personnel had full access; and Romspen funded those draws consistently through mid-2022, often within ten days to two weeks. Panache devoted 100% of its resources to the Project and advanced its own funds to maintain progress when Romspen funding lagged.[58]

Romspen's own witness, Weldon, undermines the "no value" theory. Weldon testified the Project had "great potential" and was "very valuable . . . even in its current state"; he repeatedly advocated internally for allowing Panache to continue construction, warning that stopping work would cost "millions" and reduce value; he acknowledged that Zarafshani provided critical services Romspen "could not do on our own," including leasing, lobbying, and litigation support; and Weldon's contemporaneous email confirmed that Zarafshani was capable of obtaining $40 million in financing from Simmons Bank based on his "successful track record."[59] Weldon further testified that over five years he found Zarafshani "honest and candid" and Woodham "completely candid and responsive."[60]

Stoltz, Romspen's sole engineering witness, identified no construction defect attributable to the RIC (Austin) ownership period, and testified that all work from 2020 through end of 2023 "improved the deficiencies and condition of the buildings."[61] Stoltz further established that the remediation work was continuously inspected: a third-party steel inspector was "there almost every time," "constantly providing reports for the active work that was going on," and Stoltz and his team relied on those inspectors as their "eyes and ears in the field" for "more in-depth, close-up review of the . . . quality of work."[62] The work was so thoroughly documented that Stoltz

---

[58] Day 1 Tr. 80:8–14, 81:6–12, 82:8–14, 83:6–13, 90:9–11, 96:5–6, 114:23–25, 115:5–7; Day 2 Tr. 66:11–18, 112:1–8, 112:23–113:3.
[59] PX-141 at 2; Day 1 Tr. 100:1–4; Day 2 Tr. 14:7–12, 48:22–24, 53:12–17.
[60] Day 2 Tr. 56:14–57:9.
[61] Day 4 Tr. 198:18–199:1.
[62] Day 4 Tr. 198:13–17, 203:9–13.

confirmed it would be possible "to go back and look to see where there was a deficiency and a correction"—a level of contemporaneous documentation that Romspen, having had full access to those reports, cannot now disclaim.[63]

Romspen's position is foreclosed by Paragraph 9 of the BTS, which expressly waived liability for pre-RIC (Austin) plans and damage.[64] Having contractually forgiven those issues, Romspen cannot now use them to argue no value was received. The pattern is inequitable as a matter of law: Romspen directed and funded the work, benefited from it, contractually waived liability for alleged deficiencies, and now seeks to use the same forgiven issues as both shield and sword. That is precisely the conduct equitable subordination remedies.

### G. Inequitable Conduct Injured Creditors, Conferred a Substantial Unfair Advantage on Romspen, and Subordination Is Consistent with the Bankruptcy Code.

Insider conduct that injures creditors or confers an unfair advantage satisfies the second *Mobile Steel* element.[65] By the time Romspen removed Panache from the Project in January 2024, Panache had advanced approximately $3.8 million of its own funds and devoted 100% of its time and resources to the Debtor, it also paid approximately $1.4 million for three removable HVAC chillers in place when the Debtor acquired the property, and Panache turned down other work in reliance on the BTS framework.[66] By the time the Debtor went into bankruptcy, Romspen had effectively wiped out Vesta Texas's 25% equity interest and impaired AFMN's collateral through the destruction of Project value caused by Romspen's funding decisions. Romspen's argument that, because RMLP "is the only creditor who provided financing," no injury exists inverts cause and effect: RMLP's capacity to fund did not relieve it of its insider duty to fund what its own asset manager had already approved. That argument dismisses the $5.2 million contributed by Panache

---

[63] Day 4 Tr. 201:21–202:4, 203:14–18.
[64] PX-324 ¶ 9.
[65] *Herby's Foods*, 2 F.3d at 130–31, 134.
[66] D-75 at 4.

and the injury to both Panache and Vesta Texas.

On the unfair-advantage side, the arithmetic is dispositive. Romspen continued to accrue 10% interest on its claims and ultimately filed proofs of claim totaling more than $200 million (including $55,797,154 in accrued interest since 10/16/20[67]) against an asset most recently appraised at approximately $32.8 million—a Project that sold for $45 million in 2020 and is worth less now. Romspen's own conduct enlarged its claims: insider lending at 10%, restricted funding that destroyed Project value, allowed interest accruals, and improper fee charges. That self-inflicted inflation—at the expense of every other stakeholder—supplies the textbook unfair advantage *Herby's Foods* identifies.

Romspen has conceded the third *Mobile Steel* element. In its Trial Brief, Romspen acknowledged that "the language in Section 510(c) appears to meet this third prong."[68] That concession is correct. Section 510(c) operates "notwithstanding subsection (a)" of § 510, and contractual subordination provisions enforceable under § 510(a) do not preclude equitable subordination of a senior contractual position.[69] The Subordination and Intercreditor Agreement (the "SIA") does not change the analysis: Plaintiffs Panache, Vesta Texas, and Zarafshani are not signatories; the SIA's "Enforcement Action" definition does not reach statutory claim challenges; § 3(a) is a narrow validity-of-collateral clause; and § 3(d) is silent on §§ 510(c) and 502.[70]

Independently, Romspen's prior material breach of the BTS—which Section 6 of the SIA expressly incorporates—excuses any subsequent enforcement obligation under the SIA.[71] Nor was the SIA an arm's-length transaction: it was executed on June 6, 2023, the same day the Loan

---

[67] R-3 pp. 206-209.
[68] ECF 178 ¶ 21(3).
[69] *In re AIG Fin. Prods. Corp.*, 660 B.R. 603, 618–19 (Bankr. D. Del. 2024); accord *In re NESV Ice LLC*, 661 B.R. 427 (Bankr. D. Mass. 2024).
[70] PX-58 §§ 1, 3(a), 3(d), 6.
[71] *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); PX-58 § 6.

Agreement was backdated and signed by a single Romspen insider on both sides without conflict analysis, when the Debtor held more than $100 million in asserted insider debt against $750 of equity, with no independent revenue and no working capital.[72]

*Herby's Foods* directs that subordination be ordered "only to the extent necessary to offset the harm," but here the harm is pervasive and the remedy must match. The misconduct was not a single transaction; it was a continuous course of conduct from formation through the funding cap, the books-and-records restrictions, the backdated documents, and the Alberta charges. The Panache Parties accordingly request full subordination of the RMLP Claims to all other creditors, with corresponding subordination of Reomaster's 75% equity behind Vesta Texas's 25%.[73]

### III. ALTERNATIVELY, RECHARACTERIZATION IS WARRANTED

Bankruptcy courts have authority under § 502 to determine that a purported debt is, in substance, an equity contribution. The Fifth Circuit in *Lothian Oil* adopted a multi-factor analysis—drawing from federal tax cases including the *Fin Hay* factors as imported into Texas law through *Arch Petroleum*—to distinguish debt from equity, in which no single factor is dispositive and the totality of the circumstances controls.[74] *Lothian Oil* also confirms that recharacterization is distinct from equitable subordination, and some courts treat it as a no-fault inquiry not requiring misconduct.[75] The ultimate question is whether the transaction reflects a bona fide debtor-creditor relationship with a reasonable expectation of repayment, or a risk-bearing capital contribution dependent on enterprise success.

Romspen's own Trial Brief concedes much of the *Lothian Oil* analysis. Romspen expressly

---

[72] PX-58; PX-55; Day 3 Tr. 178:14–20, 178:24–179:6, 179:11–180:3, 180:17–20; Day 3 Tr. 158:4–11, 178:14–20.

[73] *Herby's Foods*, 2 F.3d at 134.

[74] *In re Lothian Oil, Inc.*, 650 F.3d 539, 543–44 (5th Cir. 2011); *In re Mangia Pizza Invs., L.P.*, 480 B.R. 669, 706–07 (Bankr. W.D. Tex. 2012); *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. App.—Austin 1997, no writ); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).

[75] *Lothian Oil*, 650 F.3d at 543–44; *Equip. Equity Holdings*, 491 B.R. at 848.

---

admits that the thinness-of-capital-structure factor (Factor 5) "FAVORS RECHARACTERIZATION," acknowledging that the Debtor's ownership of the Property and development of the Project "relies entirely on loan funding provided by RMLP." Romspen concedes Factor 8 (relative position of obligees) is "NEUTRAL," Factor 11 (contingency) is "NEUTRAL" as to the RMLP Junior Claim, Factor 12 (source of interest payments) is at best "NEUTRAL" because the Property has not generated revenue and no interest payments have been made, and Factor 16 (timing of advance) is "NEUTRAL." Romspen admits, on Factor 2, that there is "a relationship between RMLP (lender) and Reomaster (equity holder), given they have some common management."[76] One factor affirmatively favors recharacterization, several are neutral, the identity-of-interest factor reflects an admitted creditor-equity relationship, and every other factor that turns on the trial evidence weighs for recharacterization.

### A. Identity Between Creditor and Equity Holder Is Total.

The *Lothian Oil* identity-of-interest factor signals equity where the alleged creditor is also the equity holder. The same six RIC managing partners simultaneously controlled the Fund (source of capital), RMLP (asserted lender), and Reomaster (the Debtor's managing member); each personally invested in the Fund. RMLP and Reomaster have no employees and operate under one roof with RIC. Oelbaum admitted that "every dollar that this Court permits for RMLP to recover from RIC (Austin) is going to flow up that structure to the fund to which you and your fellow managers are personally going to get investment returns on."[77]

### B. The Debtor Had No Outside Funding Source and Its Capital Structure Was Severely Thin.

Romspen concedes this factor "FAVORS RECHARACTERIZATION." The trial evidence

---

[76] ECF 178 ¶¶ 19(2), 19(5), 19(8), 19(11), 19(12), 19(16).
[77] *Mangia Pizza*, 480 B.R. at 707, 712; Day 3 Tr. 172:2–6.

confirms why: "$750 was Reomaster's entire equity capitalization of the project"; "at the time of its formation, RIC (Austin)'s only source of capital was RMLP"; and by June 2023 the Debtor carried "at least $100 million of loans" against a Project recently sold for $45 million, with no Romspen loan-to-value analysis. No informed outside lender would advance funds to a single-asset entity with $750 of equity, no working capital, and existing debt of more than twice the asset's purchase price.[78]

### C. Romspen Bore Equity-Like Risk and the Formal Indicia of Arm's-Length Lending Are Absent.

In March 2022, Roitman wrote he did not think Romspen should "go as far as treating our REO as arms-length borrowers," placing Tech 3443 squarely within Romspen's REO portfolio for management purposes. Oelbaum confirmed at trial that RDG—the unit through which he "took over management of Tech 3443"—is the internal name for what other lenders call REO. The repayment risk Romspen bore was enterprise success itself: the Debtor had no independent revenue from which to service debt; repayment depended entirely on completion, lease-up, and refinancing or sale. *See supra* Sections I, II.C (Oelbaum and Weldon contemporaneous statements confirming Romspen managed the Project as Fund-owned risk capital, not arm's-length collateral).[79]

Where parties operate without traditional loan formalities—no contemporaneous written loan agreement, no independent counsel, no conflict analysis, no arm's-length negotiation—the formal-indicia factor weighs heavily toward equity. Romspen advanced more than $33.6 million between December 2020 and June 2023 before any written loan agreement existed. The Debtor's own counsel conceded the underlying fact on the trial record: when the Court asked whether "Romspen advanced at least $33.68 million to the debtor before any loan agreement was

---

[78] ECF 178 ¶ 19(5); *Mangia Pizza*, 480 B.R. at 707, 711; Day 3 Tr. 178:14–20, 178:24–179:6, 179:3–6, 179:11–180:3, 180:17–20.
[79] *Mangia Pizza*, 480 B.R. at 707; PX-100 at 1–2; PX-128 at 1; PX-247 at 1; Day 2 Tr. 47:1–8; Day 3 Tr. 164:9–16.

executed," counsel for the Debtor responded "I think that's right" and "What they're saying is accurate."[80] Oelbaum confirmed that things "were not papered contemporaneously since RIC (Austin)'s creation" and that, other than a promissory note and deed of trust, he could identify no prior formal loan agreement. The 2023 Loan Agreement was backdated; Mickelson signed it on both sides without conflict analysis, on terms that placed funding in Romspen's "sole, absolute, unfettered and unqualified discretion." Romspen set no fixed draw schedule, accepted handwritten invoices on a $40 million Project, conducted no third-party verification, conducted no audits during construction, and rejected no draw for inadequate hour reporting; Panache and the Debtor had no written construction contract under Romspen's ownership; Reomaster kept no minutes and produced no required annual reviewed financial statements.[81]

### D. Repayment Was Contingent on Enterprise Success and Sourced from Future Project Value.

Romspen concedes the underlying facts. Romspen admits "the Property has not generated revenue" and "there have been no interest payments to any secured creditor"—the textbook profile of an equity contribution. Romspen also concedes Factor 11 is "NEUTRAL AS TO THE RMLP JUNIOR CLAIM." The Debtor had no independent operating revenue; its ability to service the asserted RMLP debt depended entirely on speculative future value derived from completion. Oelbaum admitted "without any additional funding, [the Debtor] could not meet obligations" and that RMLP's advances were the Debtor's only source of capital at formation. As in *Lothian Oil*, repayment depended not on operations, which did not exist, but on speculative future enterprise value—the hallmark of equity.[82]

---

[80] Day 5 Tr. 139:21–140:14; Day 3 Tr. 176:9–177:10, 178:5–13; PX-58.
[81] *Mangia Pizza*, 480 B.R. at 713; PX-55, Schedule II ¶(k); Day 1 Tr. 78:18–21, 79:8–13, 169:25–170:2, 170:4–15, 223:17–22, 223:23–224:13, 227:14–22; Day 3 Tr. 169:25–170:2, 170:4–15, 176:9–177:10, 178:5–13.
[82] ECF 178 ¶¶ 19(11), 19(12); *Mangia Pizza*, 480 B.R. at 707; *Lothian Oil*, 650 F.3d at 544; Day 3 Tr. 180:1–3, 180:8–9.

### E. The Substance of Romspen's Advances Was Equity.

Where parties' chosen labels conflict with how they actually behaved, conduct controls. Adding Romspen's own concessions to the trial evidence, every applicable *Lothian Oil* factor weighs for recharacterization. In addition or in the alternative to equitable subordination under § 510(c), the Court should recharacterize the RMLP Claims as equity under § 502.[83]

### IV. CONCLUSION AND REQUESTED RELIEF

On the trial record, the Panache Parties have carried their burden on every § 510(c) element of equitable subordination and on factors of recharacterization under § 502; Romspen has not carried the rigorous-scrutiny burden *Herby's Foods* placed on it. The Panache Parties respectfully request judgment granting the relief set forth in their First Amended Proposed Findings of Fact and Conclusions of Law filed at ECF No. 183. To the extent the inequitable conduct discussed herein gives rise to direct claims and causes of action by the Panache Parties against Romspen, such claims cannot be released or discharged in the bankruptcy.[84] Nothing in this adversary proceeding shall be construed as a waiver. All such claims and causes of action are expressly reserved.

---

[83] *Lothian Oil*, 650 F.3d at 543–44; *Mangia Pizza*, 480 B.R. at 706–07; *Arch Petroleum*, 958 S.W.2d at 477 n.3; *Fin Hay*, 398 F.2d at 697.
[84] *In re Zale Corp.*, 62 F.3d 746, 760–61 (5th Cir. 1995); 11 U.S.C. § 524(e).

Date: May 18, 2026.                          Respectfully submitted,

                                             */s/ Catherine A. Curtis*
                                             Jason M. Rudd, Tex. Bar No. 24028786
                                             Catherine A. Curtis, Tex. Bar No. 24095708
                                             **WICK PHILLIPS GOULD & MARTIN, LLP**
                                             3131 McKinney Avenue, Suite 500
                                             Dallas, Texas 75204
                                             Phone: (214) 692-6200
                                             Email:   jason.rudd@wickphillips.com
                                                      catherine.curtis@wickphillips.com

                                             Jacob T. Fain, Tex. Bar No. 24053747
                                             Sydney E. Dumas, Tex. Bar No. 24149194
                                             **WICK PHILLIPS GOULD & MARTIN, LLP**
                                             100 Throckmorton Street, Suite 1500
                                             Fort Worth, Texas 76102
                                             Phone: (817) 332-7788
                                             Email: jacob.fain@wickphillips.com
                                                      sydney.dumas@wickphillips.com

                                             ***COUNSEL FOR PANACHE DEVELOPMENT &
                                             CONSTRUCTION, INC., AFMN INVESTMENTS,
                                             LLC, AND ADAM ZARAFSHANI***

                                             */s/ B. Russell Horton*
                                             B. Russell Horton, Tex. Bar No. 10014450
                                             **GEORGE BROTHERS KINCAID & HORTON, LLP**
                                             114 W 7th St., Suite 1100
                                             Austin, Texas 78701
                                             Phone: (512) 495-1400
                                             Email: rhorton@gbkh.com

                                             ***COUNSEL FOR AFMN INVESTMENTS, LLC***

                                             */s/ J. Casey Roy*
                                             J. Casey Roy, Tex. Bar No. 00791578
                                             **KANE RUSSELL COLEMAN LOGAN PC**
                                             401 Congress Avenue, Suite 2100
                                             Austin, Texas 78701
                                             Phone: (512) 487-6572
                                             Email: croy@krcl.com

                                             ***COUNSEL TO VESTA TEXAS, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I electronically filed the foregoing with the clerk of the court using the CM/ECF system and have served a copy of the same to the following parties or their counsel via the method(s) indicated below:

| | | |
|---|---|---|
| Jay Ong, jong@munsch.com | _____ | Hand Delivery |
| Thomas Berghman, tberghman@munsch.com | _____ | Regular Mail |
| Munsch Hardt Kopf & Harr, P.C. | _____ | Facsimile |
| 1717 West 6th Street, Suite 250 | _____ | E-mail |
| Austin, TX 78703 | X | CM/ECF |

**Counsel for Debtor RIC (Austin) LLC**

| | | |
|---|---|---|
| Kyle S. Hirsch, kyle.hirsch@bclplaw.com | _____ | Hand Delivery |
| Luke Graham, luke.graham@bclplaw.com | _____ | Regular Mail |
| Justin Hanna, justin.hanna@bclplaw.com | _____ | Facsimile |
| Bryan Cave Leighton Paisner LLP | _____ | E-mail |
| 2200 Ross Ave., Suite 4200W | X | CM/ECF |
| Dallas, TX 75201 | | |

**Counsel for Romspen Mortgage Limited Partnership and Romspen (Reomaster) Holdings, Inc.**

/s/ Catherine A. Curtis
Catherine A. Curtis