**Dated: May 21, 2026.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 24-10264-cgb** |
| **RIC (AUSTIN), LLC,** | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |
| **PANACHE DEVELOPMENT & CONSTRUCTION, INC., et al.,** *Plaintiffs and Counter-Defendants,* | § | |
| **v.** | § | |
| **ROMSPEN MORTGAGE, LP, ROMSPEN (REOMASTER) HOLDINGS, INC.,** *Defendants and Counter-Plaintiffs.* | § | **Adv. No. 24-01061-cgb** |
| **v.** | § | |
| **Adam Zarafshani, an individual,** *Third-Party Defendant.* | § | |

## COMBINED OPINION ON PLAN CONFIRMATION
## AND ADVERSARY PROCEEDING

1

On February 26, 2026, RIC (Austin), LLC (the "Debtor") filed its *Combined Disclosure Statement and Second Amended Chapter 11 Plan* (the "Plan").[1] The Court held a hearing on the Plan, along with trial of the related adversary proceeding,[2] from April 22, 2026 to April 28, 2026. At the conclusion of the hearing, the Court took confirmation and the adversary proceeding under advisement.

In this opinion, the Court explains why it will confirm the Plan, deny the Panache Parties' claims for equitable subordination and recharacterization as well as their objection to the Romspen Parties' claims, and find a breach of the Subordination and Intercreditor Agreement contract by AFMN. The Court will withhold a ruling on remedies for breach of contract at this time pending further briefing and proceedings.

## Summary/Preliminary Statement

Because it is easy in a case of this complexity to "lose the forests for the trees," and because the Court is producing this opinion under some time pressure but feels that a ruling on a case as vigorously litigated as this deserves a fulsome explanation, the Court includes this preliminary statement intended to provide an overview of the Court's view of this case as a whole together with some facts and observations that apply to all of the findings below.

This matter has been on the Court's docket, and has been a lot of work for all of the attorneys as well as the Court, for well over a year. Although the Court has had to make this ruling fairly soon after trial because the estate is running out of money, there is nothing in this ruling that has not been considered carefully and at length based on everything in the record and all of the manifold arguments made by the parties. Below, the Court has tried to explain its views as to the most substantive arguments, but in any case, even arguments that have not been specifically addressed here have, in fact, been considered carefully, and this ruling disposes of them.

The group that the Court is going to call the Panache Parties (or sometimes "Mr. Zarafshani," since they are all effectively his) are going to lose on the key issues, but not for want of effort. They have left no stone unturned. They brought a very large number of theories (some now abandoned) and engaged in a remarkably broad discovery, which, even over forceful objection, the Court largely permitted.

---

[1]     *In re RIC (Austin), LLC*, No. 24-10264 (the "Main Case"), ECF No. 288 (Plan).
[2]     *Panache v. Romspen (In re RIC (Austin), LLC)*, Adv. No. 24-01061 (the "Adversary Proceeding").

2

Ultimately, they tried this case with a large team of skilled and experienced and well-prepared counsel, airing many of Romspen's internal documents, cross-examining numerous high-ranking executives at length, and so on.

This case is about a troubled commercial development in East Austin sometimes called the Motorola site. Romspen had loaned a large amount of money to this development, under the name Zen Garden, before a prior bankruptcy, in which Mr. Adam Zarafshani was also involved as part owner and developer.

In the Zen Garden bankruptcy, in order to avoid a lengthy court fight about allegations Mr. Zarafshani brought that were notably similar to those brought here, the parties reached a deal pursuant to which Mr. Zarafshani and Romspen would split the equity in a new ownership entity, Romspen's existing debt would be prior to Mr. Zarafshani's existing debt, and construction debt funded by either Romspen or another lender would come in at higher priority than either.

Fundamentally, this case is about Mr. Zarafshani trying to get out of the deal he made back in the Zen Garden bankruptcy. That deal has not worked out well for either party, and the property remains in sad shape to this day despite the immense sums that have been sunk into it.

As noted, the Zen Garden deal put Mr. Zarafshani's equity interest, as well as the debt owed him, junior to a very large chunk of Romspen debt as well as new construction debt to be incurred. In other words, he would only come into the money if the project was successful enough at least to pay Romspen's existing debt and the construction loan back.

Romspen itself ended up funding the construction; the parties were never able to bring in another lender, in part because the project, and even the plans for the project, were never in good enough shape. (The Panache Parties claim Romspen prevented other lenders from coming in, but the Court did not find this claim credible. [3]) In any case, the new construction debt *was* incurred: Romspen

---

[3]    Much credible testimony in the record demonstrates that there were numerous bars to financing, including the condition of the property and the lack of detailed budgets, and most of the bars were due directly to the Panache Parties. Even Mr. Weldon indicated Romspen's support of financing. Adversary Proceeding, ECF No. 187, Trial Tr. (Day 2, April 23, 2026) at 107:6-9 ("Was RMLP supportive of obtaining third-party financing so that -- as set forth in the binding term sheet? MR. WELDON: Yes."). *See also id.* at 13:12-16 (third-party lender would want the information Romspen was requesting but had not received, "if not

infused more than $37 million in additional funds into the property, largely spent at Mr. Zarafshani's discretion with little oversight and little demonstrable progress, including no ability to attract any actual tenants.[4] Despite this new money loaned and the passage of time, the property remained far away from the goals the parties had for it. Romspen understandably lost faith in the project and asked Mr. Zarafshani to curtail spending sharply and ultimately to step back from his construction role while preserving other roles, for instance in marketing the project. Faced with Romspen's decision to remove him from his role in construction of the project, he walked from the remaining roles that Romspen wanted him to play.[5]

Ultimately one of his affiliates filed this involuntary bankruptcy case. Panache/Zarafshani didn't put any money on the table to make the case a success or to preserve the bankruptcy estate's property, however—they left that, again, to Romspen, which funded another $5+ million into this bankruptcy case, money that was used to hire estate professionals who have managed the property and proposed a plan of reorganization. They held an auction for the equity in the project. The Panache Parties chose not to participate in that auction, but Romspen again put its money into the plan and won the auction.

Despite Romspen's immense investments that have not shown much by way of results, Mr. Zarafshani strenuously argues that Romspen's fiduciary duty required it to infuse *another* $37 million or more into the property. In filing the adversary proceeding against Romspen and in opposing confirmation of the Debtor's plan, Mr. Zarafshani seeks to put his interests above Romspen's interests—both new and old. He and his affiliate entities and their large legal team have litigated to that effect, throwing up a large number of theories and angles to try to overturn the effect of the legal arrangements to which Mr. Zarafshani knowingly consented and to unseat the realities of this failed project.

---

more"); ECF No., 191, Trial Tr. (Day 4, April 27, 2026) at 7-11 (third party financing unlikely without information).

[4] Adversary Proceeding, ECF No. 187, Trial Tr. (Day 2, April 23, 2026) at 122:7-13 ("So by the time early 2022 came about, had you gotten to any more level of certainty as to when space would be available at FH&J to be available for leasing? MR. WELDON: We had brought on more people into the team, and they all came to the same conclusion, that we didn't have any certainty as to the dates that we would be able to get this property ready for leasing."). *See also id.* at 142:7-23 (lack of completion estimates, meeting expectations concerning leasing, resolution of steel and foundation issues).

[5] *See generally* Adversary Proceeding, ECF No. 187, Trial Tr. (Day 2, April 23, 2026) at 170:25-177:9-76.

4

As with most trials, the Court came into this one not knowing what to expect. The parties' statements of facts and allegations left a very wide gulf between them. The stories they told were very, very different. Both were reasonably plausible. The Court had taken each party to task at various points in the litigation, but it also thought both teams of lawyers would do an excellent job (and that proved correct). Still, the Court didn't know which story was likely to be borne out once it had the facts before it, once it had heard from witnesses, once it had scrutinized exhibits.

But in the end, the Court came away with a very firm conviction that on all of the core issues, Romspen and the Debtor must prevail.

The plan is certainly confirmable, and the Court will confirm it. Mr. Milligan, his team, and his lawyers have steered the Debtor through a difficult course. The Court credits their testimony that they tried to obtain consensus, that they gave Panache every chance to participate more actively in this proceeding, and that they sought the best and most neutral outcome they could for the benefit of this estate. They didn't bring the difficulties into this case—and of course it was actually Panache-affiliated parties who filed the bankruptcy case in the first place—but they did their best to untangle those difficulties sufficiently to get this plan confirmed and reach a workable resolution for the estate.

The Court has dealt with legal arguments and made factual findings below, but as a matter of practicality it is worth noting that none of the Panache Parties sought to fund this case, to keep the property taken care of as this case dragged on— nor did they bid on the equity at the auction that was held. In that vacuum, Romspen stepped in and funded the case and allowed Mr. Milligan and his team to do what was necessary to bring this case to a successful conclusion without significant interference.

A theme of the Court's holding on confirmation as well as on the adversary proceeding is that, frankly, Romspen has not behaved nearly as aggressively as it probably could have. In my view, from the time of the Zen Garden bankruptcy through its behavior in this bankruptcy, it has erred on the side of caution. Not with every one of its internal emails—but with respect to its actual actions. *It inarguably funded a large amount of money into this project*, and furthermore, trusted a great deal in Mr. Zarafshani's discretion as contractor. It finally took steps to rein in the pace of funding and to put him in a different role, but he is the one who stepped away from the project entirely and ultimately placed the Debtor into an involuntary bankruptcy case. It was then Romspen who stepped up to fund that bankruptcy case, but even there, it did not insist on having a stranglehold on the outcome of the case—

5

which is common with debtor-in-possession financing when no one else steps up. It permitted an auction and didn't even demand that its DIP loan be repaid up front in the auction.

The Court believes that Romspen ultimately behaved fairly to Mr. Zarafshani and his entities under the actual facts and circumstances, in fact going out of their way to give more chances for participation, and for success, at every stage of this relationship, than the Court would expect. In fact, it would be grossly inequitable for Mr. Zarafshani to win this lawsuit or prevent confirmation of the proposed plan given his profoundly subordinate position, the amount of funding that Romspen has put into this project, and the agreements that Mr. Zarafshani made, which include his undertaking significant financial risks that have unfortunately now been realized. Accordingly, the Court will confirm the plan, deny the Panache Party's claims, and grant most of Romspen's claims.

The Court found all of the Romspen witnesses to be credible. Take Mr. Weldon, for instance. Within Romspen, he was apparently the pro-Zarafshani voice, and the Panache Parties have picked numerous parts of his emails and made great use of them. And yet even his contemporaneous emails reflect an acknowledgement that the project had not progressed as anticipated. In addition, the Court found his testimony credible that he got carried away at times in those days (when he also had gone/was going through significant personal difficulties) and that some of his correspondence reflects heated rhetoric and loss of perspective, not considered judgment.[6]

There are other intemperate statements by Romspen executives that have been pointed out and used very actively by the Panache Parties. But—looking beyond the parts cherry-picked by the highly skilled litigators for the Panache Parties—what the Court sees from its review of these emails as a whole, together with the extensive testimony received at trial, was a team that was very actively and seriously discussing what to do with a project that had been problematic for a long time. The intemperate remarks were in the context of lengthy exchanges about the project, about who should be believed and where the project really stood. Ultimately, the Court believes these exchanges reflect good faith decision-making. If there really had been some plot—any pre-arranged inequitable design of any sort—then complex and passionate emails like these would be unlikely to exist: The emails show that the course of action was anything but a fait accompli. To the contrary, it was an active topic of discussion being weighed within this organization. The fact that there may

---

[6]     Adversary Proceeding, ECF No. 187, Trial Tr. (Day 2, April 23, 2026) at pages 167:3-169:17.

6

have been frustration or even disdain for Mr. Zarafshani does not alter this fact. In fact, certain of his skills were recognized and he was offered an important ongoing role (which he refused) even after Romspen didn't want to entrust construction to him anymore.

Finally, as for the fact that Romspen's liquidity and the macroeconomic climate of the time was a factor in its decision-making: A lender cannot and does not have to ignore its own financial constraints in making decisions, even it also holds and controls an equity interest through which it has fiduciary duties to another party. The evidence was that Romspen had sufficient liquidity and in fact did continue paying a significant amount into this project even once it began trying to impose more controls on Mr. Zarafshani's spending.[7] These constraints were not the reason the Project failed.

This goes to the broader apparent view of the Panache Parties, which was that Romspen, to discharge its duties, had to pour much more money into this property,[8] after already pouring more than $37 million dollars into the property with what it very reasonably considered to be far-below-expectation results. As already mentioned, my view is that Romspen, probably because of its litigious history with Panache/Zarafshani and perhaps also Mr. Zarafshani's perceived centrality to the success of this project, went above and beyond, funding this project freely for a lengthy period and, in bankruptcy, giving the Debtor a freer hand, than it probably would have in a truly arm's length deal (in other words, even if it hadn't owed fiduciary duties).

A final preliminary thought comes in the form of a couple of inter-related questions: What progress *did* Panache/Zarafshani make with the $37 million that Romspen poured into the Debtor in the construction loan? *Was* there a workable plan for this property? It seems like an obvious point to raise. Romspen's witnesses consistently and convincingly pointed to the perceived lack of a plan or demonstrable progress in explaining their actions. Yet the Panache Parties put up

---

[7]    *See, e.g.*, Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 65:20-24; Trial Tr. (Day 5, April 28, 2026) at 49:24-25.

[8]    Adversary Proceeding, ECF No. 192, Trial Tr. (Day 5, April 28, 2026) at 182:6-17 ("THE COURT: How much -- I mean, so they put $37 million into this project from that time period, which seems to me like a lot of money, and they -- how much more – what's the evidence for how much more they had to spend to have discharged their fiduciary duties? MS. CURTIS: So I believe there were emails from Mr. Weldon among the partners. And I don't have it in front of me. But there was an email saying, essentially, you know, there's -- we need, essentially, $37 million more, to $40 million more, to complete the project").

surprisingly little convincing evidence on this point. As discussed below, Mr. Zarafshani's testimony was not generally credible, but in any event he didn't really have much to say on this point aside from generalities. The absence is perhaps telling.

## Jurisdiction and Authority

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408(1), 1409(a) and the Order of Reference of Bankruptcy Cases and Proceedings entered by the District Court for the Western District of Texas on October 4, 2013. The Court has final adjudicatory authority because all parties consented to the Court's resolution of the Adversary Proceeding, and confirmation of plans of reorganization is purely a matter of bankruptcy law and does not require the resolution of any matter similar to "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789."[9]

## Background and Procedural History

This case began as an involuntary chapter 7 case filed by the petitioning creditor, Panache Development & Construction, Inc. ("Panache"), an entity controlled by Adam Zarafshani.[10] It is the second bankruptcy proceeding filed related to a large commercial redevelopment project at the old Motorola site in Austin, Texas (the "Project").[11] The first case, *In re 3443 Zen Garden, LP*, was filed as an involuntary petition in March of 2020 and was later converted to a voluntary case under chapter 11 (the "Zen Garden Case").[12] In that case, Romspen Mortgage Limited Partnership ("Romspen" or "RMLP"), the senior lender, filed a secured claim for over $96 million.[13] Panache, the general contractor for the project, filed a claim for over $11.8 million, which included a secured claim of over $5 million.[14]

---

[9]     *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)).

[10]    Main Case, ECF No. 1 (Involuntary Petition); Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 19:23-20:1 ("Q All right.  And who owns Panache? A I do. Q Okay.  And you control Panache, correct? A Correct.").

[11]    *In re 3443 Zen Garden, LP*, Case No. 20-10410 (plan confirmed on January 2, 2021 and closed on August 23, 2022).

[12]    *In re 3443 Zen Garden, LP*, Case No. 20-10410 (plan confirmed on January 2, 2021 and closed on August 23, 2022).

[13]    *In re 3443 Zen Garden, LP*, Case No. 20-10410, Claim No. 14-1.

[14]    *In re 3443 Zen Garden, LP*, Case No. 20-10410, Claim No. 22-1.

During the Zen Garden Case, Panache and several other creditors filed an adversary proceeding seeking equitable subordination of Romspen's claim and the limitation of Romspen's credit bid rights in an upcoming sale of the Project.[15] Ultimately, Romspen and Panache settled their dispute and Romspen credit bid $45 million of its claim to purchase the Project.[16]

The settlement between Romspen and Panache led to the creation of RIC (Austin).[17] In the term sheet documenting the settlement (the "Binding Term Sheet"), Romspen and Mr. Zarafshani split ownership of the Debtor but agreed that Romspen would have ultimate control and decision-making authority.[18] In keeping with this structure, the Debtor was formed and took ownership of the Project.[19] Around the same time, Romspen formed Romspen (Reomaster) Holdings, Inc. ("Reomaster") to hold its 75% equity interest and Mr. Zarafshani formed Vesta Texas, LLC ("Vesta Texas"), which is controlled by Mr. Zarafshani and his wife, to hold his 25% equity interest in the Debtor.[20] The Binding Term Sheet included various other provisions, including Romspen's agreement to forebear on seeking to collect on its guarantee from Mr. Zarafshani[21] and both parties' agreement that they would have fiduciary duties to one another,[22] a fact that the Panache Parties have averted to many times in this litigation.[23]

---

[15] *Austin Glass & Mirror, Inc. v. Romspen Mortgage Ltd. P'ship (In re 3443 Zen Garden, LP)*, Adv. No. 20-01048, ECF No. 1.

[16] *In re 3443 Zen Garden, LP*, Case No. 20-10410, ECF No. 278 (Order authorizing sale of the Project to Romspen through $45,000,000 credit bid).

[17] Debtor Ex. 1, ¶ 1.1.

[18] Panache Ex. 324 ¶ 4 ("The equity interests of the New Owner will be: (a) 74% owned (whether directly or indirectly) by an entity exclusively owned and controlled by the Lender; (b) 24% owned (whether directly or indirectly) by an entity exclusively owned and controlled by Zarafshani or an estate-planning trust exclusively controlled by Zarafshani ("Zarafshani Owner Entity") and (c) 2% owned by an entity as the managing member, general partner and/or other control equity holder of the New Owner ("Managing Entity).") (Binding Term Sheet). Ultimately, it appears the parties split ownership 75%/25%; Ex. 54 (RIC (Austin) LLC agreement signed by Reomaster as managing member and Mr. Zarafshani on behalf of Vesta Texas as the "Zarafshani Member").

[19] Panache Ex. 501, ¶¶ 2.1, 2.4 (RIC (Austin) LLC Agreement).

[20] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 20:2-3 ("Q And you control Vesta Texas, correct? MR. ZARAFSHANI: My wife and I do, yes."); Main Case, ECF No. 288 ¶ 1.1 (Plan).

[21] Panache Ex. 324 ¶ 17.

[22] Panache Ex. 324 ¶ 6.

[23] The Binding Term Sheet also states that "Romspen, Zarafshani and Panache shall globally, generally and specifically work together in good faith and with the utmost commercially

9

In reviewing this agreement, it is clear that all parties were aware of the potential conflicts in their relationships—Romspen with a hand as both lender and owner (in fact, controller of the owning entity); Mr. Zarafshani with roles as part owner, as creditor, and as contractor. The Panache Parties essentially predicate their whole case on the notion that Romspen abused its dual position and emphasizes the scrupulousness required when conflicts are involved. Indeed, the Court agrees that heightened scrutiny is required and accordingly considers their claims carefully below. But the Court also notes that the conflicts must be viewed within the context of an agreement freely entered into between sophisticated actors experienced not just in construction generally but with knowledge of these particular parties. Further, the Court notes that Mr. Zarafshani's own conflicted position appears to have caused problems of its own, as his motives as general contractor and closeness with certain major subcontractors may have colored his actions and prevented him from exercising the sort of scrutiny of expenditures and results that a shrewd owner and contractor might have applied to a project like this.[24] This is not to suggest that it's a tit-for-tat relationship or that breaches of duty should be excused; rather it is to emphasize the context in which these sophisticated parties' agreements were reached and the respective discharge of their agreed-upon duties has to be viewed. Both parties knew there were potential conflicts, and they were still willing to deal with one another; though, of course, as the Court agrees, they each trusted the other to handle the competing interests and potential conflicts fairly and in good faith.

The Binding Term Sheet subordinated all of Panache's debt to all of Romspen's.[25] A few months after the Debtor's formation, Romspen agreed to

---

reasonable best efforts to consider, decide and implement any specific issues and/or requests that arise in connection with the construction and development of the Construction Project with such decisions made in the best interests of the Construction Project, Romspen, Panache and Zarafshani, collectively and without exclusion to the respective interests of any individual party. . . ." Panache Ex. 324 ¶ 11. This language, although less that totally clear, perhaps indicates that the collective decision-making in the interest of the Project as a whole could not and need not require complete disregard of the "the respective interests of an individual party." The Court's point is merely intended to point out that the conflicted roles of the parties have to be viewed in light of the agreements they all entered into voluntarily and with significant awareness, and even (as the language above has it) "without exclusion to the respective interests of any individual party," which includes Romspen's.

[24] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 42:20-21, 43:2-3 (Mr. Oelbaum's testimony that in light of the close relationship between Mr. Zarafshani and certain subcontractors, he began "to believe that Mr. Zarafshani was likely not acting in the best interests of RIC (Austin) or Romspen").

[25] *See* Panache Ex. 324 ¶ 14, Ex. A.

10

provide up to $125 million in senior financing (the "Senior Loan"), which includes the $45 million it credit bid to acquire the Project.[26] AFMN Investments, LLC ("AFMN"), another entity controlled by Mr. Zarafshani,[27] also entered into a promissory note with the Debtor for about $11.05 million, which memorialized the Debtor's assumption of the Panache deficiency claim from the Zen Garden Case (the "Junior Loan").[28] Several years later, AFMN signed a subordination agreement (the "Subordination Agreement" or "SIA"), which further elaborated on the general capital structure it had agreed to in the Binding Term Sheet. In the Subordination Agreement, AFMN agreed to subordinate its claim to Romspen's claims, as agreed by Romspen and Panache in the Binding Term Sheet, and to vote as directed by Romspen on any plan filed if the Debtor ended up in bankruptcy, among other things.[29]

Unfortunately, disputes between the parties re-emerged after the truce reached in the prior bankruptcy case, culminating in Panache filing this involuntary petition against RIC (Austin).[30] After the RIC (Austin) involuntary petition was converted to a voluntary petition under chapter 11,[31] Peter Oelbaum, acting as Manager for Reomaster, engaged Gregory S. Milligan with Harney Partners to serve as Chief Restructuring Officer for the Debtor.[32] To fund the case, Romspen provided the Debtor with a post-petition debtor-in-possession loan (the "DIP Loan"), which has administrative priority over secured claims.[33]

During the case, Romspen filed a $110,320,744 secured claim based on the Senior Loan ("Romspen Loan Claim") and a $99,665,917 secured claim based on its deficiency claim from the Zen Garden Case ("Romspen Deficiency Claim").[34]

---

[26]    Main Case, ECF No. 331 ¶ 10 (Brief in Support of Confirmation); Claim No. 6-3, Ex. A (Romspen First Loan Agreement).

[27]    Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 14:11-12 ("Q And you control AFMN, right? MR. ZARAFSHANI: I'm a manager for it, yes.").

[28]    Main Case, ECF No. 331 ¶ 12 (Brief in Support of Confirmation); Panache Ex. 15 (AFMN Promissory Note).

[29]    Panache Ex. 3 (Subordination and Intercreditor Agreement).

[30]    Main Case, ECF No. 1 (Involuntary Petition).

[31]    This case was originally converted to a small business case under subchapter V, but the Debtor ultimately removed the subchapter V designation so this case is now a case under chapter 11. Main Case, ECF No. 286 (Notice of Deselection of Subchapter V Designation).

[32]    Panache Exs. 502 (engagement letter), 503 (retention order).

[33]    Main Case, ECF Nos. 132, 143, 181, 200, 259 (Interim DIP Loan Orders). The final hearing to consider the DIP Loan was heard along with confirmation and trial of the Adversary Proceeding.

[34]    Claim Nos. 6-3, 7-3.

11

AMFN filed a $13,076,004 secured claim based on the Junior Loan ("AFMN Lien Claim") and Panache filed a $12,486,565 secured claim for its work on the Project along with its attorney's fees ("Panache Lien Claim").[35] Travis County also filed a $901,780 secured claim against the property for 2025 property taxes.[36] In addition, as discussed in detail below, the four primary subcontractors for the Project, hired by Panache and connected to Mr. Zarafshani in various ways, filed secured claims for work they performed for the Project ("Primary Subcontractor Claims").[37] Other smaller contractors also filed claims discussed below.

In November of 2024, Panache, AFMN, and Vesta Texas (the "Panache Parties") filed the Adversary Proceeding against Romspen and Reomaster (the "Romspen Parties").[38] In the Adversary Proceeding, in an echo of its claims from the Zen Garden Case, the Panache Parties ask the Court to equitably subordinate Romspen's claims or recharacterize the claims from debt to equity, and also generally object to the claims.[39] The Romspen Parties filed counterclaims against AFMN, Panache, and Vesta Texas and also asserted third-party claims against Mr. Zarafshani.[40] Specifically, Romspen asserts a breach of contract claim against AFMN and seeks specific performance of the Subordination Agreement and damages.[41] It also alleges that Panache, Vesta Texas, and Zarafshani tortiously interfered with the Subordination Agreement and also seeks damages against all of the Panache Parties for civil conspiracy.[42]

After a lengthy period of negotiation and litigation with the Panache Parties in both the main case and Adversary Proceeding, the Debtor filed the current Plan in February of 2026 and the Court set a hearing on confirmation, final approval of the disclosure statement, and DIP Loan, and trial of the Adversary Proceeding.[43] In the Plan, the Debtor proposes to sell new membership interests in the Debtor to the winner of an equity action and to use the proceeds to fund the Plan, provide one year

---

[35] Claim Nos. 4-1, 5-1.

[36] Claim No. 20-2.

[37] Claim Nos. 8-2 (ACM), 11-1 (Austin CG), 14-1 (Summer Legacy), 9-2 (Texas Air). Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 323:17-20 ("Let me ask this a different way. Austin CG, Summer Legacy, Texas Air, and ACM were four of the prime subcontractors on the project? MR. ZARAFSHANI: Yes.").

[38] Adversary Proceeding, ECF No. 1 (Original Complaint).

[39] Adversary Proceeding, ECF No. 54-1 (Second Amended Complaint).

[40] Adversary Proceeding, ECF No. 30 (Romspen Counterclaims and Third-Party Claims)

[41] Adversary Proceeding, ECF No. 30.

[42] Adversary Proceeding, ECF No. 30.

[43] Main Case, ECF No. 288 (Plan); ECF No. 301 (Mar. 10, 2026 Scheduling Order).

of operating expenses for the reorganized debtor, as well as to settle the Primary Subcontractor Claims upon certain conditions.[44] Reomaster, the only bidder, subsequently won the equity auction with a $5.4 million stalking horse bid.[45] Panache neither bid nor even accessed the virtual "data room" where the due diligence documents were kept.[46]

Under the Plan, Class 1 consists of Romspen's Loan Claim and provides that it will be allowed in the total amount of approximately $114 million.[47] Of that

---

[44] Main Case, ECF No. 288, p. 1 (Plan) ("Under the Plan, new membership interests in the Debtor shall be offered for sale pursuant to the Equity Auction. Reomaster or its affiliate shall be the Stalking Horse Purchaser (with no bid protections) with an initial bid in the amount of $5,400,000.00. The Equity Auction Proceeds shall provide for the payment of (i) Administrative Expenses, (ii) the escrow necessary to fund the repayment of the Allowed Travis County Secured Claim, (iii) one year of operating expenses of the Reorganized Debtor, (iv) funding of any proposed Plan settlements, (v) a ninety percent (90%) dividend to Class 10, and (vi) at least $100,000.00 in residual Equity Auction Proceeds which shall be distributed pro-rata to Allowed Unsecured Claims in Class 11. The Plan also provides for unencumbered proceeds from the Causes of Action to be paid to Class 11 pro-rata upon recovery.").

[45] Main Case, ECF No. 331 ¶ 25 (Brief in Support of Confirmation) ("No competing bidders submitted Qualified Bids by the applicable deadline, and, accordingly, the Equity Auction did not occur. As a result, the CRO identified Reomaster, the Stalking Horse Purchaser, as the Successful Bidder pursuant to the terms of the Plan. The Stalking Horse Bid consists of $5,400,000 in cash, which, together with remaining DIP availability and remaining cash on hand of $600,000, will provide the Reorganized Debtor with total Plan funding of approximately $6,000,000.").

[46] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 51:11–25 ("None of the Panache parties have accessed the debtor -- the debtor's sale data room in connection with the equity sale, have they? MR. ZARAFSHANI: No. We've seen the components of it, yes. Q: How did you see the components of it? A: I went and downloaded the file from City of Austin on your redevelopment plan, and we produced those files. Q: How do you know that that's all that's in the develop -- in the data room? A: I reviewed your bank -- your appraisal. Q: Do you know what the contents of the data room are, all of them? A: No. Q: Because you didn't access it? A: No.").

[47] Main Case, ECF No. 288, p. 8 (Plan) ("Allowance. Subject to the Adversary Proceeding, as and if appropriate, the RMLP First Lien Claim is Allowed in the amount of $114,185,038.21, consisting of a Secured Claim in the amount of $34,500,000.00 less the DIP Claim and the Allowed Travis County Secured Claim, or as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, and a deficiency Unsecured Claim in the amount of the RMLP First Lien Claim less the Allowed Secured portion of the Claim. . . . Treatment. Subject to the Adversary Proceeding, the RMLP First Lien Secured Claim shall be paid in full by the Reorganized Debtor under the same terms and conditions as the promissory note forming the basis of the RMLP First Lien Secured Claim, other than the maturity date thereunder, which

amount, $34.5 million (the current value of the Property) would be allowed as secured, junior only to Romspen's approximately $4.9 million administrative expense claim for the DIP Loan and a partially allowed secured claim for Travis County, which is treated in Class 5.[48] Romspen also elected to apply 11 U.S.C. § 1111(b) to this claim, meaning that, notwithstanding the property's value, its full claim will retain its secured status to the extent the claim is allowed.[49] Class 2 consists of the Romspen Deficiency Claim, which totals $99.7 million and will be allowed as unsecured.[50] Treatment of both of Romspen's claims remains subject to the Adversary Proceeding.[51] These classes voted to accept the Plan.[52]

Classes 3 and 4 consist of the AFMN and Panache claims, which are treated as unsecured because the current value of the property is insufficient to pay the more senior secured claims in full.[53] Thus, the AFMN and Panache's claims, which they filed as secured claims, would be treated (so far as they are ultimately allowed) as unsecured claims.[54] These impaired classes voted to reject the Plan, although

---

shall be modified and amended to December 31, 2028. Any deficiency shall be treated as an Unsecured Claim.").

[48] Main Case, ECF No. 288, p. 8 (Plan). Notably, because Romspen made the election as was its right under section 1111(b) of the Bankruptcy Code, ECF No. 122, the entirety of this claim will be treated as secured and Romspen retains its lien until this claim is paid in full.

[49] Main Case, ECF No. 122 (Notice of Election); 11 U.S.C. § 1111(b).

[50] Main Case, ECF 288, p. 8 (Plan) ("Allowance. Subject to the Adversary Proceeding, the RMLP Second Lien Claim is Allowed in the amount of $99,665,917.44. . . . Treatment. Subject to the Adversary Proceeding, the RMLP Second Lien Claim shall be treated as an Unsecured Claim.").

[51] Main Case, ECF 288, p. 8 (Plan).

[52] Main Case, ECF No. 329 (Ballot Summary).

[53] Main Case, ECF No. 288, p. 9 (Plan) ("Identification of Class. Class 3 consists of the AFMN Third Lien Claim. b. No Allowance. Nothing in this Plan Allows the AFMN Third Lien Claim. The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan. c. Treatment. To the extent later Allowed, the AFMN Third Lien Claim shall be treated as an Unsecured Claim. . . . Identification of Class. Class 4 consists of the Panache Fourth Lien Claim. b. No Allowance. Nothing in this Plan allows the Panache Fourth Lien Claim. The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan. c. Treatment. To the extent later Allowed, the Panache Fourth Lien Claim shall be treated as an Unsecured Claim.")

[54] Main Case, ECF 288, p. 9 (Plan); Claim Nos. 4-1, 5-1.

14

Romspen also filed a ballot on behalf of AFMN accepting the Plan based on AFMN's agreement to do so in the Subordination Agreement.[55]

For Class 5, the Plan proposes to pay Travis County $64,934 of its secured claim in quarterly installments from the effective date through September 30, 2029 and makes provision for payment of the remaining disputed portion of the claim, to the extent it is allowed, also by September 30, 2029.[56] This impaired class voted to accept the Plan.[57]

Classes 6–9 consist of the Primary Subcontractor Claims.[58] Class 6 treats a $267,720 claim filed by ACM Services, LLC ("ACM").[59] When it was initially filed,

---

[55] Main Case, ECF No. 329, p. 2 n. 4 (Ballot Summary) ("Dueling ballots: AFMN Investments, LLC rejects. Romspen Mortgage Limited Partnership, as alleged attorney-in fact for AFMN Investments, LLC pursuant to the Subordination and Intercreditor Agreement, accepts.").

[56] Main Case, ECF 288, p. 9-10 (Plan) ("b. Partial Allowance. The Travis County Secured Claim is Allowed in the amount of $64,934.04, plus any additional amount finally determined to be valid pursuant to or in connection with the dispute between the Debtor and Travis County, whether consensual or otherwise. . . . d. Treatment. The Allowed Travis County Secured Claim shall be paid by the Reorganized Debtor's funding into escrow of quarterly, equal installments of the entire asserted amount, with statutory interest, beginning on the Effective Date and calculated through September 30, 2029, until the end of the calendar quarter following the final and unappealable resolution of the disputed portion ("Segregated Funds"). …The Debtor shall complete payment of the Allowed Travis County Secured Claim, in full, with statutory interest, by no later than September 30, 2029 …").

[57] Main Case, ECF No. 329 (Ballot Summary).

[58] Claim Nos. 8-2 (ACM), 11-1 (Austin CG), 14-1 (Summer Legacy), 9-2 (Texas Air). Trial Tr. (Day 2, April 23, 2026) at 323:17-20 ("Q So I appreciate that. Let me ask this a different way. Austin CG, Summer Legacy, Texas Air, and ACM were four of the prime subcontractors on the project? MR. ZARAFSHANI: Yes.").

[59] Main Case, ECF No. 288, p. 10-11 (Plan) ("No Allowance. Nothing in this Plan Allows the ACM Secured Claim, save-and except for the election of subsection (d). The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan. ... d. Optional Allowance and Treatment. If Class 6 affirmatively elects this optional treatment on its Ballot and accepts the Plan, then, in full and final satisfaction of the ACM Secured Claim against the Estate, as well as in mutual release of any other Claims, Causes of Action, or Avoidance Actions ACM and the Debtor may have against one another, on the Effective Date: (i) the ACM Undisputed Secured Claim shall be Allowed in full, and ACM shall receive, on account of such Allowed Claim, a distribution in the amount of ninety percent (90%) of the ACM Undisputed Secured Claim, and (ii) the ACM Disputed Secured Claim shall be Allowed in full, and ACM shall receive a distribution, on account of such Allowed Claim, in the amount of seventy-five percent (75%) of such Allowed Claim, in full and final satisfaction of such Allowed Claim. ..."); Claim No. 8-2.

15

the claim was asserted to be entirely secured and was signed by Mr. Zarafshani in his capacity as president of Panache.[60] It was later amended to claim $3,897 as secured and the remaining amount unsecured and is signed by James Morris, president of ACM.[61] Class 7 consists of a $1,027,095 secured claim filed by Austin CG Construction Services, Inc. ("Austin CG") and is signed by Mr. Zarafshani in his capacity as president of Panache.[62] Class 8 treats a $538,565 secured claim filed by Summer Legacy, LLC ("Summer Legacy") and is signed by Mr. Zarafshani in his capacity as president of Panache.[63] Class 9 consists of a $446,301 claim filed by Texas Air Industries, Inc. ("Texas Air") and is also signed by Mr. Zarafshani in his capacity as president of Panache.[64]

Overall, the testimony and evidence suggest an *extremely* close relationship between these four subcontractors and Mr. Zarafshani.[65] In fact, Mr. Zarafshani set up Austin CG and Summer Legacy in Texas when they began work on the Project, and he formerly owned Summer Legacy.[66] Mr. Zarafshani is also the authorized signature on Summary Legacy's bank account.[67] Mr. Zarafshani testified that he uses Summer Legacy for 100% of the framing, drywall, and roofing needs for all of

---

[60] Claim No. 8-1.

[61] Claim No. 8-2.

[62] Main Case, ECF No. 288, p. 11 (Plan - similar treatment to ACM Secured Claim); Claim No. 11-1.

[63] Main Case, ECF No. 288, p. 12 (Plan - similar treatment to ACM Secured Claim).

[64] Main Case, ECF No. 288, p. 13 (Plan - similar treatment to ACM Secured Claim); Claim No. 16-1.

[65] *See e.g.* Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 264:1-265:20 (Mr. Milligan testifying about the closeness between Mr. Zarafshani and the Primary Subcontractors).

[66] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 324:24-325:9 ("But you brought [Austin AG and Summer Legacy] down here to help you do that 24 project? MR. ZARAFSHANI: I invited them to come, yes. Q: And, in fact, you set their companies up, correct? A: Yes. Q: Right. And you are the owner of Summer Legacy, right? A: When -- yes, I was in 2015 or '16, I'm -- I think. Q: Right. You were the owner in name, and then I believe I saw there was a document that transitioned the ownership in name from you to Rafael Gutierrez, correct? A: Yes, that's correct."); Debtor Ex. 54 (Summer Legacy Articles of Incorporation listed Mr. Zarafshani as sole manager).

[67] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 330:20-24 ("You're not an authorized -- you don't have access to their bank accounts? MR. ZARAFSHANI: No, I'm the authorized signature on their bank accounts. Q You're the authorized signature on their bank accounts? A: Yes.").

16

his projects.[68] He also incorporated and served as the sole original director of Texas Air; he testified that this was a mistake that was later corrected, but the Court did not find this credible.[69] Mr. Zarafshani testified that he has no control over these four subcontractors, but the Court finds that this testimony was also not credible.[70]

In fact, the Court makes the general finding that Mr. Zarafshani's testimony was simply not credible. The Court does not at all doubt his good intentions, his efforts, or his belief that this property has a lot of potential. But throughout his examination, Mr. Zarafshani's testimony was unconvincing, and it often contradicted or stood in tension with credible evidence and testimony from other witnesses. For example, his extreme closeness with a number of the contractors on the property is unusual and raises concerns that they were not being supervised or paid on commercially responsible terms. His testimony did not dispel these suspicions. In his deposition, Mr. Zarafshani testified that he had no written logs of the subcontractor's work.[71] At trial, he testified that he kept notebooks recording work performed by the subcontractors but that he destroyed the notebooks so there is no record of the work performed.[72] And the only other employee of Panache and its chief financial officer, Ms. Woodham, was apparently not aware of any time logs

---

[68] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 32:15-22 ("Q How do you decide whether Summer Legacy is the best provider to do that work on any particular Panache project? A Depending on the project and the scope of work. They are commercial contractors. They're union trained. So for -- I use them 100 percent of the time for framing, 100 percent of the time for drywall, 100 percent of the time for roofing. And if there are other things the job requires, we evaluate it based on the need of the job.")

[69] Debtor Exs. 61, 63 (Texas Air Certificate of Formation); Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 33:18-20; 34:1-34:2 ("Q So they put you on as the owner, and that was a mistake? That's what you just said? MR. ZARAFSHANI: Yes, that's exactly what I said.").

[70] *See e.g.* Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 330:18-19 ("And so you have no control over Summer Legacy? MR. ZARAFSHANI: Oh, god, no. I -- I wish I could, but no.").

[71] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 23, 2026) at 82:15-25.

[72] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 329:9-22 ("So let me -- so if -- so now you're telling me that there were logs that you kept and signed off on every day? MR. ZARAFSHANI: No, I kept them weekly. Q: There were weekly logs? A: Yes, I wrote them on my -- Q: Sorry, go ahead. A: I kept track of who did what on my notebook, and once the -- the invoices were turned in and it matched, that was the end of it. Q: So you verified how many men and how many hours were -- of work were performed by the subcontractors Austin CG and Summer Legacy every week? Is that what your testimony is? A: Every day, every week. Q: And you got the -- and you have those logs? A: No. Q: All right. Did you throw them away? A: I had them on weekly basis. When I got the invoices, I didn't keep the paper.").

of the subcontractors.[73] To take another example, it seems that Mr. Zarafshani had video recordings from meetings at the Project dating back to the Zen Garden Case, but he claimed to be unable to produce any such video files for the Project during the RIC (Austin) era, claiming without reasonable explanation that the video recorded over itself only during this time period, such that he was not able to produce them to Romspen in discovery.[74] In addition, his testimony concerning the land he cleared of trees, which drew criminal action from the City of Austin, was not credible.[75] These are merely a few examples. But they relate to the broader question of who is to blame for the fact that the Project was such a failure: Was it Romspen for not funding even more than it did, or was it Mr. Zarafshani's team for not being capable? Ultimately, the Court believes that the evidence strongly favored the notion that Mr. Zarafshani's organization was simply not up to the task of completing this serious, massive project, and that is the reason that it failed despite the dramatic amounts of money spent on it. The Court did not find Mr. Zarafshani's efforts to shift the blame to be credible.

---

[73] Adversary Proceeding, ECF No. 187, Trial Tr. (Day 1, April 22, 2026) at 141:8-25 ("And you aren't aware of any written logs that documented the time that labors for -- laborers for a particular sub actually spent onsite on any given day, right? MS. WOODHAM: I'm not aware of those records. Q: Right. Panache didn't keep any time logs, right? A: Panache did not. Q: And the subs weren't required to keep time logs either, were they? A: I do not -- I cannot speak to that. Q: Well, you never asked them to submit it, did you? A: I personally did not. Q: That was not something you considered in your quality control role when you were submitting draw requests to RMLP, right? A: No. Q: So the only confirmation that the work was performed was based on photographs and Mr. Zarafshani's observations, right? A: That's correct.").

[74] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 85:8-24 ("Do you recall searching through your video files of recorded meetings when you were talking with Mr. Milligan in an effort to show him one of the videos when you were talking with him back during the Zen Garden phase? MR. ZARAFSHANI: Mr. Milligan came to our office. I displayed the meeting with -- Q: Mm-hmm. A: -- for him, and he watched it. Q: And do you recall searching through your video files to find that meeting? A: We went through the DVD recorder and fast-forward and backwards, yes. Q: You do have video files of recorded meetings in connection with the project? A: It's an ongoing recording, and it replaces itself, yes. Q: Has it been produced to us, sir? A: I -- I don't have it anymore, no.").

[75] Mr. Zarafshani maintained that damaged trees were removed "throughout the campus" due to damage from Winter Storm Uri but then conceded that the tree removal was actually to make an industrial park for Austin Energy; his testimony as to this tree-clearing was just unconvincing and was very effectively undermined by cross-examination. *See, e.g.*, Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 76:22–77:4; 80:18–81:3; 126:12-127:4.

18

According to Mr. Zarafshani, the contractors behind the Primary Subcontractor Claims could not carry large account receivable balances and so had to be paid weekly during this constructions.[76] These financially strapped contractors were given the option of voting in favor of the Plan and receiving payment of 90% of their undisputed claims and 75% of their disputed claims or voting against the plan and litigating allowance of their claims.[77] Notwithstanding what is essentially a favorable settlement offer for speedy and guaranteed payment of the supermajority of their claims, these four impaired creditors, like AFMN and Panache, voted to reject the Plan and continue litigating their claims, and likely incurring even more legal fees, which strongly suggests some influence from Mr. Zarafshani despite his denial of having spoken with them.[78]

Class 10 is an administrative convenience class that consists of nine unsecured claims that total less than $25,000.[79] The Plan allows the claims and provides that they will be paid 90% of their claims within five days of the effective date.[80] This impaired class voted in favor of the Plan.[81]

The final class of claims, Class 11, which consists of unsecured claims that total more than $25,000, would share pro-rata from the remaining equity auction proceeds of at least $100,000, as well as any net proceeds from unencumbered estate causes of action, if any.[82] This class includes the allowed $99.6 million Romspen Deficiency Claim (subject to the Adversary Proceeding) and the AFMN and Panache

---

[76] Adversary Proceeding, ECF No. 188, Trial Tr. (Day 2, April 23, 2026) at 327:2-18 ("Q All right. The weekly payments are in the binding term sheet? MR. ZARAFSHANI: No, their rate. They would come back at the same rate they were getting – Q: Okay. -- paid before. But that was all predicated on the agreement back in the Zen Garden days that you would bring them -- that you were going to pay them weekly and you would get a lower rate. And I believe Ms. Woodham said yesterday that was a win-win for everybody, right? A: I think what I heard Ms. Woodham say, and I agree with what she said, was that they were smaller companies and they couldn't carry large amounts of receivables, so we paid them weekly or bi-weekly to -- but you get cheaper rates that way because you end up -- they don't have to finance their own work."); Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 41:23-42:1 ("You don't know why the subcontractors who you've testified can't carry large accounts receivable balances would turn down a 90 percent payout under the plan? MR. ZARAFSHANI: I have not spoken to them about the plan.").

[77] Main Case, ECF No. 288, p. 10-13 (Plan).

[78] Main Case, ECF No. 329 (Ballot Summary).

[79] Claim Nos. 1-1, 9-1, 10-1, 12-1, 13-1, 15-1, 17-1, 18-1, 19-1.

[80] Main Case, ECF No. 288, p. 14 (Plan).

[81] Main Case, ECF No. 329 (Ballot Summary).

[82] Main Case, ECF No. 288, p. 14 (Plan).

claims, to the extent they are allowed.[83] The only Class 11 creditors to vote were ACM, AFMN, and Panache who all voted to reject the Plan.[84]

## Analysis

To obtain confirmation of a plan of reorganization, a debtor must prove that the plan complies with the requirements of 11 U.S.C. § 1129 by a preponderance of the evidence.[85] These requirements include that the plan is "proposed in good faith and not by any means forbidden by law,"[86] that at least one class of non-insider impaired claims accepts the plan,[87] and that the plan does not "discriminate unfairly" and is "fair and equitable" as to any objecting class of creditors.[88] The Panache Parties contend that the Plan does not meet these requirements and so confirmation should be denied.[89] The Court will discuss only some of the arguments that have been raised, although its finding is that all elements have been met.

### I. The Plan meets the statutory requirements and should be confirmed.

#### A. Good faith

The Panache Parties argue that the Plan was not filed in good faith because the Debtor has been unduly influenced by the Romspen Parties, who are insiders,

---

[83] Main Case, ECF No. 288, p. 14 (Plan) ("a. Identification of Class. Class 11 consists of Unsecured Claims which are equal to or exceed $25,000.00 in amount. . . . c. Treatment. Class 11 Claims shall be paid pro-rata from the residual Equity Auction Proceeds which shall be at least $100,000.00, as well as any net proceeds of unencumbered Causes of Action, if any. The Debtor reserves all rights to object to or otherwise contest any Unsecured Claim, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan."), p. 8-9 ("b. Allowance. Subject to the Adversary Proceeding, the RMLP Second Lien Claim is Allowed in the amount of $99,665,917.44. c. Treatment. Subject to the Adversary Proceeding, the RMLP Second Lien Claim shall be treated as an Unsecured Claim."), p. 9 ("c. Treatment. To the extent later Allowed, the AFMN Third Lien Claim shall be treated as an Unsecured Claim."), p. 9 ("c. Treatment. To the extent later Allowed, the Panache Fourth Lien Claim shall be treated as an Unsecured Claim.").

[84] Main Case, ECF No. 329 (Ballot Summary).

[85] 11 U.S.C. § 1129; *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[86] 11 U.S.C. § 1129(a)(3).

[87] 11 U.S.C. § 1129(a)(10).

[88] 11 U.S.C. § 1129(b).

[89] Main Case, ECF No. 383 ¶ 2 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

20

and the Plan is designed to shield them from estate causes of action, rather than maximize estate assets.[90] Specifically, they contend that because Reomaster, an affiliate of Romspen, won the equity auction—after a self-serving and ineffective marketing effort—the estate causes of action against the Romspen Parties will not be pursued, effectively releasing the Romspen Parties from liability.[91]

Courts evaluate whether a plan is proposed in good faith based on the totality of the circumstances related to creation of the plan.[92] "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied."[93] Some factors courts consider when evaluating good faith are "(1) whether the proposed plan promotes a result consistent with the Bankruptcy Code's objectives; (2) whether the proposed plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) whether the debtor exhibited fundamental fairness when dealing with its creditors."[94]

As to the first factor, the Plan appears to be an effort to reorganize the Debtor's debt and provide a path for moving forward with the Project. The Plan provided for an equity auction designed infuse new money into the estate so the Debtor could pay creditors and continue developing the property. According to the evidence and testimony presented at trial, the Project was actively marketed to thousands of parties for two months and had been toured by hundreds of sophisticated parties over a period of years.[95] Specifically, Mr. Milligan credibly testified that during their marketing efforts, the Debtor contacted the top 20 commercial real estate brokers and top 20 commercial real estate developers with calls, emails, and a marketing teaser.[96] Separately, the Debtor also listed the equity auction on two national

---

[90] Main Case, ECF No. 383 ¶¶ 3-7 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

[91] Main Case, ECF No. 383 ¶ 5 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

[92] *B.M. Brite v. Sun County Development, Inc. (In re Sun County Development, Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).

[93] *Id.*; *Double H Transportation LLC v. Odell (In re Double H Transportation LLC)*, 603 F.Supp. 3d 468, 477 (W.D. Tex. 2022).

[94] *In re Trinity Family Practice & Urgent Care PLLC*, 661 B.R. 793, 813 (Bankr. W.D. Tex. 2024) (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 87-88 (D. Del. 2012)).

[95] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 250:17-25-255:19.

[96] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 250:17-25 ("[W]e used the 2025 Austin Business Journal list of the top 20 commercial real estate brokers and top 20 commercial real estate developers in Austin. They each, all 40, got a phone call, an

bankruptcy sale platforms that each have thousands of subscribers.[97] In general, Mr. Milligan's testimony concerning both marketing, good faith, and other points was highly credible.

The Panache Parties point to one marketing email and attached teaser as evidence that the property was not properly marketed because it stated that the Project was subject to $200 million in liens and claims, which would not be true post-confirmation, and included a paragraph in some versions that stated "We understand this is an unusual value proposition, but we must satisfy the court that we've conducted a robust marketing process, so I have attached the Teaser that contains further info in case you or someone you know might be interested."[98] While this email and teaser could have been better articulated, it is generally reflected the Project's current lien and claim status.[99] It is also unclear whether this version of the email was widely circulated.[100]

The Court notes that the Panache Parties' argument on this issue was overstated at best and disingenuous at worst, since given the § 1111(b) election that has been exercised by Romspen,[101] the ongoing lien on the property is more than

---

email, and a copy of the teaser. We also used a couple of widely used national bankruptcy sale platforms, one being the DailyDAC based out of Chicago that I think has a subscriber base north of 10,000. And Inforuptcy, they don't publish their subscriber base, but I think there's public information that they had listed more than 8,000 assets for sale last year."); Debtor Ex. 17 (marketing outreach list).

[97] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 250:17-251-5 ("We also used a couple of widely used national bankruptcy sale platforms, one being the DailyDAC based out of Chicago that I think has a subscriber base north of 10,000. And Inforuptcy, they don't publish their subscriber base, but I think there's public information that they had listed more than 8,000 assets for sale last year.").

[98] Panache Ex. 514.

[99] *See generally* Claim Register; Main Case, ECF No. 288 (Plan).

[100] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 253:11-24 ("So focusing on this email, in looking at this last few days, particularly this last paragraph, is it also the case that there were versions of this email that went out to a group out of that 40 that actually has different language at the bottom? MR. MILLIGAN: Correct. We figured this out, I think, yesterday, that there were versions of this solicitation that did not include the last paragraph. Q: Okay. And that's kind of important just -- I mean, I think the Court was even maybe poking fun that it wasn't the best language in that last paragraph, but it's the case that there are emails that went out without that, correct? A: That – that's why it stuck out when we saw one that didn't have that last paragraph.").

[101] Main Case ECF No. 122 (Notice of Election); ECF No. 386 ¶ 10 (Debtor's Post-Trial Reply Brief).

22

$100 million, much more than the currently estimated value of the property.[102] In any case, based on the evidence presented, the Court finds that the equity auction was appropriately marketed. It is too bad that no other bidders materialized; but Mr. Milligan is experienced, trustworthy, and energetic. It is not his fault that he could not spin gold from straw.

Additionally, if they thought the auction undervalued the Property, the Panache Parties were free to participate in the auction, or to find buyers to do so, and were well-positioned to do so; given Mr. Zarafshani's deep knowledge of the Property and well-attested gift for marketing, he could no doubt have marketed the Property as effectively as anyone else and obviously had motivation to do so. He claimed at trial to have "shown the property 539 times" over the years.[103] In fact, although he seemed to deny it (not credibly), there are some indications in the record that he did undertake marketing efforts during the bankruptcy.[104] Had the Panache Parties won the auction or helped another party do so, they could have potentially gained control of the Debtor and pursued claims against the Romspen Parties. They did not.

Because the Debtor is insolvent and is currently without a revenue source, the only hope for getting payments to existing creditors and moving forward with the Project was from an influx of new money, which the Reomaster bid provides. The Court asked the Panache Parties multiple times during this bankruptcy case whether they would fund the case, and they declined. In the absence of funds from another source, the Debtor reasonably accepted Reomaster's bid so that it could move forward with reorganizing before its DIP facility ran out. The likely outcome of the auction is that claims against the Romspen Parties will not be pursued, but that outcome does not mean the Plan was filed in bad faith nor that this outcome was fore-ordained; it was a product of events, including an auction. The Plan provides a path for the Debtor to pay its creditors and move this troubled Project forward so that it can finish construction and begin leasing space and earning income. This result is obviously consistent with the Bankruptcy Code's objectives and so the Court finds that the first factor is easily met.

---

[102]   Main Case, ECF No. 383 ¶ 19 (Panache Parties' Post-Trial Brief in Opposition to Confirmation - "Contrary to those assertions, the Reorganized Debtor will not be subject to existing claims and liens beyond $32.8 million valuation of the property because all junior debt will be discharged.").

[103]   Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 287:9.

[104]   Adversary Proceeding, ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at pages 53-54, 60.

23

For the second factor, the evidence suggests that the Debtor's Chief Restructuring Officer, Mr. Milligan, attempted to negotiate with the Panache Parties on a consensual plan structure and only proposed this Plan after those negotiations failed.[105] Even so, the structure of the Plan as an equity auction gave the Panache Parties a way to take control of the Project if they desired, but the Panache Parties chose not to participate in the auction. As discussed, this Debtor needed an influx of cash to reorganize and move forward. The Panache Parties decided not to participate in that process. Even at the very end of trial, after evidence had closed and the Court was hearing argument, the Panache Parties' bankruptcy counsel vaguely claimed his clients had an offer on the table to take this case in an alternative direction.[106] The Court fails to see how this "too little too late" quasi-offer could have mattered in any case, but it seems to have been nothing more than vapor; there was never any filing on record about it and it has not been mentioned in their briefing. The point is that the Panache Parties had ample chances to take this case in a different direction.

The Plan also appropriately made the treatment of Romspen's claims contingent on the outcome of the Adversary Proceeding.[107] Given the circumstances

---

[105]  Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 242:3-9 ("And what was the response to that? The Panache parties would not mediate on plan terms. And is that sort of the only reason why you pivoted to a nonconsensual plan? MR. MILLIGAN: Yeah, at that point, I mean, it was clear. We had tried a couple of different ways and offered mediation, and it wasn't going to happen, and you could see the -- the runway ending with the available cash. And so we had to pivot.").

[106]  Adversary Proceeding, ECF No. 192, Trial Tr. (Day 5, April 28, 2026) 164:5-20 ("MR. GAITHER: It's a nice segue, Your Honor, because I stood at this podium in opening and said it's my hope to be able to make an alternative proposal, and as of 12:28 this afternoon, I was very concerned that I was not going to be able to tell the Court that I had an alternative proposal. I will tell the Court now that as of our lunch break, we received an alternate take out DIP proposal, which we've shared with Mr. Berghman and Mr. Milligan. Obviously, we're here on confirmation today. The point of that take out DIP would be to position this estate to fund the operations, take out the existing DIP, fund the maintenance of the property, pending the Court's ruling in the adversary, of course, and then with respect -- with the benefit of that ruling, perhaps propose an alternative plan. I don't have an alternative plan that I can give Your Honor today, but that's -- that is our alternative proposal.").

[107]  Main Case, ECF No. 288, p. 8 (Plan - "Allowance. Subject to the Adversary Proceeding, as and if appropriate, the RMLP First Lien Claim is Allowed in the amount of $114,185,038.21, consisting of a Secured Claim in the amount of $34,500,000.00 less the DIP Claim and the Allowed Travis County Secured Claim, or as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, and a deficiency Unsecured Claim in the amount of the RMLP First Lien Claim less the Allowed Secured portion of the Claim. . . ."); (Plan - "Allowance. Subject to the Adversary Proceeding, the RMLP Second Lien Claim is Allowed in the

24

of this case, where the parties blame each other for the Project's failure, the Court finds that the Plan was proposed with honesty and good intentions so that a reorganization could proceed while the results of the Adversary Proceeding were unknown. Delay was not a possibility; there was no funding—including from the Panache Parties, who wanted delay but did not want to pay for it.

Relatedly, as to the third factor, again, the testimony indicated that Mr. Milligan attempted to negotiate with the Panache Parties, the Plan gave the Panache Parties an opportunity to gain control of the Debtor, and the Plan pays administrative class claimants 90% of their claims and gave the secured creditors who are connected to Mr. Zarafshani an opportunity to vote in favor of the Plan and also receive 75-90% payment of their claims (even the contested portions of them). The Court finds that this treatment is fundamentally fair under the facts of this case.

Thus, the Court finds that the Plan was proposed in good faith as required by 11 U.S.C. 1129(a)(3).

## B. Impaired Accepting Classes

Subsection (a)(10) mandates that at least one impaired class of creditors accept a plan of reorganization, which must be determined without counting insider creditor votes.[108] A claim is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interests."[109]

The Panache Parties also contend that the Plan cannot be confirmed because it lacks an impaired accepting class.[110] Even though classes 5 and 10 voted in favor of the plan, they argue that those classes are improperly classified and artificially impaired and therefore cannot fulfill this statutory requirement.[111]

---

amount of $99,665,917.44. . . . Treatment. Subject to the Adversary Proceeding, the RMLP Second Lien Claim shall be treated as an Unsecured Claim.").

[108] 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the following requirements are met . . . (10) [i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.").

[109] 11 U.S.C. § 1124(a)(1).

[110] Main Case, ECF No. 383 ¶¶ 8-15 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

[111] Main Case, ECF No. 383 ¶ 8 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

### 1. Class 5 – Travis County Secured Claim

Governing law is not clear on whether secured tax claims can constitute an impaired accepting class. The analysis requires some background.

*Unsecured* tax claims are entitled to special treatment in plans of reorganization. Under § 1129(a)(9)(C) of the Bankruptcy Code, unless the claimant agrees to different treatment, a claimant whose claim arises under § 507(a)(8) must receive regular installment payments that equal the amount of the claim, over a period of five years or less, and in a manner that is "not less favorable than the most favored nonpriority unsecured claim provided for by the plan."[112] Unsecured tax claimants—holders of "allowed unsecured claims of governmental units"—receive this § 507(a)(8) status (with certain exceptions) and thus are entitled to the treatment specified in § 1129(a)(9)(C).

But the widely accepted rule is that unsecured tax claims, even if *impaired* (i.e., receiving worse treatment than it would be entitled to under the Code), are not *classified* under the Code because they are specifically excluded from the classes of claims that plans are required to designate: § 1123(a) states that a plan shall "designate ... classes of claims, *other than* claims of a kind specified in ... § 507(a)(8) of this title."[113] Because of this lack of being in a "class," holders of such claims cannot, of course, fulfill the statutory requirement of an impaired accepting class.[114] This chain of logic follows directly from, and adheres closely to, the text of the Code, and to this Court it seems plainly correct.

The Code contains no such prohibition on the classification of *secured* tax claims. Nonetheless, some courts have been persuaded that they should not be able to serve as impaired accepting classes.[115] This approach has some appeal, because the Code does say that a secured tax claim must be paid in the same manner as unsecured tax claim if, but for the security interest, the claim is entitled to receive the same treatment as a priority *unsecured* tax claim. In specific, § 1129(a)(9)(D) provides that "with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8),

---

[112]    11 U.S.C. § 1129(a)(9)(C). Unsecured tax claims are among those claims entitled to payment under § 507(a)(8) and therefore within the scope of this section.

[113]    11 U.S.C. § 1123(a)(1) (emphasis added).

[114]    11 U.S.C. § 1129(a)(10) ("If a **class of claims** is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan . . . .") (emphasis added).

[115]    *See, e.g.*, *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 677-79 (Bankr. W.D. Tex. 2012).

26

but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).[116]

But note that neither § 1123(a) nor any other section states that *both* "claims of a kind specified in ... § 507(a)(8) of this title" *and other claims entitled to the same treatment as those claims* are excluded from classification. In other words, the text of the Code itself provides no reason to exclude *secured* tax claims from classification. Indeed, the clear statement about the (non-)classification of *unsecured* tax claims might suggest that the omission of *secured* tax claims from § 1123(a)'s classification rules is meaningful.

But courts have not all agreed with this analysis. In *Mangia Pizza Investments, LP*, a bankruptcy court in this district found that tax claims given the treatment available under 1129(a)(9)(C) are not entitled to vote even if impaired (i.e., given worse treatment under the plan than what they would be entitled to under the statute) because they cannot be "classified for purposes of voting and cram down."[117] The justification for this holding is not based on the text so much as a sense of (a) the analogy to unsecured tax creditors, mentioned above[118]; and (b) a sense of inequity toward other creditors if secured tax creditors were able to "bind" them by being the impaired accepting class in a plan. The second point is best articulated thus: "[G]iven the express statutory treatment afforded tax claims, tax claims should not be given the ability to vote if the taxing authority accepts treatment less than that allowed under section 1129(a)(9)(C) and (D). In doing so, creditors who are not given statutory rights will not have their votes diluted."[119] But various other creditors's claims are also "given statutory rights" in the Bankruptcy Code. With the greatest respect for this thoughtful opinion, the Court does not ultimately find this reasoning persuasive. The Court is not convinced it is empowered to decide when prescribed statutory treatment is sufficiently special that creditors should not be able to serve as an impaired accepting class.

---

[116] 11 U.S.C. § 1129(a)(9)(D).

[117] 480 B.R. 669, 677-79 (Bankr. W.D. Tex. 2012). The only circuit point opinion that comes close to addressing this issue is the Fourth Circuit in a short footnote, but despite the general language used ("tax claimants"), it appears that the claimant in question held an unsecured claim and is thus likely distinguishable from the ruling here. *See In re Bryson Properties, XVIII*, 961 F.2d 496, 501 n. 8 (4th Cir. 1992).

[118] *Mangia*, 480 B.R. at 678 ("Because § 1129(a)(9)(D) requires that secured tax claims be given the same treatment as all other priority tax claims, there is a strong argument to be made that such claims should be treated equally when it comes to purposes of voting and cram down.").

[119] *Mangia*, 480 B.R. at 678-79.

In sum, this Court believes that the text is clear and should be followed: A class consisting of a holder of a secured tax claim who accepts a plan in which it is given worse treatment than that to which it is statutorily entitled qualifies as an impaired accepting class. While it seems clear that unsecured tax creditors, even if impaired, cannot serve as the statutorily required accepting class, the Court believes that secured tax creditors can.

Here, the Plan provides for treatment of the Travis County claim over a period longer than the statutory five-year period in subsection (a)(9)(C). It also incorporates a process for reserving funds on disputed amounts while the parties continue litigation over the disputed amounts and gives the reorganized debtor discretion in the timing of installment payments. This treatment certainly impairs Travis County's rights, and it nonetheless decided to accept the Plan. Travis County qualifies as an impaired accepting class.

### 2. Class 10 – Administrative Convenience Class

Even if the Travis County vote cannot be considered, Class 10, another impaired class, voted to accept the Plan.[120] However, the Panache Parties argue that this class was both gerrymandered and artificially impaired.[121]

When classifying claims, debtors may propose a plan that places "a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests in such class."[122] A plan may also "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."[123]

From the testimony at trial, it seems clear that the Debtor chose to classify these claims separately for two independently sufficient and compelling reasons: (1) because of their small amounts compared to the other unsecured claims *and* (2)

---

[120]  Main Case, ECF No. 329, p. 3 (Ballot Summary - summary chart), Ex. A, p. 16-17 (Class 10 ballots).

[121]  Main Case, ECF No. 383 ¶¶ 12-15 (Panache Parties' Post-Trial Brief in Opposition to Confirmation). As all parties recognize, in the Fifth Circuit, "artificial impairment" is not an independent issue, it sounds in good faith (and does not suffice in itself to support a finding of bad faith). *See generally In re Village at Camp Bowie, L.P.*, 710 F.3d 289 (5th Cir. 2013).

[122]  11 U.S.C. § 1122(a).

[123]  11 U.S.C. § 1122(b).

because these claimants are true arms-length creditors, unlike the creditors in Classes 6–9 who appear to be deeply connected to Mr. Zarafshani. In other words, as Mr. Milligan put it, the Class 10 creditors are creditors who "don't have a dog in this fight."[124] During the trial, Mr. Milligan testified that the Debtor classified the Class 10 claims separately to pay them right away—rather than over time like the other unsecured claims—so that it could focus on the more complicated litigation involving the Panache Parties and the subcontractors who have much larger unsecured claims and whose extremely deep connections with Mr. Zarafshani raise certain suspicions about both their behavior in this case and potentially about the underlying validity of their claims.[125]

Under the facts of this case, the Court finds that this classification is both reasonable and necessary. The decision is an easy one. Either of the two credibly offered reasons above would suffice to support the separate classification of these claims. If the claimants in Classes 6–9 had voted in Class 10, their claims would have swamped the votes of the actual Class 10 creditors and some of the only truly arms-length creditors in this case would have been silenced.

In its post-trial brief, Panache also argues that the Debtor has sufficient liquidity to pay the claims in Class 10 in full and that it artificially impaired their claims by only paying 90%.[126] Mr. Milligan contends that it reduced payment to this class to 90% of their claims to recognize that these claimants would be paid right

---

[124]  Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 260:24-25 ("I mean, those are the kids who don't have a dog in this fight.").

[125]  Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 261:11-262:11 ("Q Okay.  And why pay the convenience class 90 cents on the dollar? MR. MILLIGAN: I mean, A, because they're getting payment sooner.  Because if they had to ride along until, you know, this -- the retained claims are litigated, et cetera, it would be, you know, years. And it's common, very common for folks to take a discount for early payment.  And it also lined up and was consistent with the offer that we made to the subcontractors to pay 90 percent of their scheduled claims. Q And you heard in opening that the Panache parties believe the debtor has got enough money to pay all these people in full.  What's your response to that? A Well, I mean, they do.  It's spending somebody else's money.  We have unknowns about what the future liabilities are going to be. We have more than $26,000 of cash now since the subs didn't take those offers. But we've got the unknown with respect to the City of Austin litigation on the industrial site, what that's going to turn into.  You know, there are other contingencies.  We still don't know what the fix and resolution is on the -- on the, this deal. So there's still, you know, lots of open variables.").

[126]  Main Case, ECF No. 383 ¶ 14 (Panache Parties' Post-Trial Brief in Opposition to Confirmation).

29

away, rather than over time, to reflect the time-value of money.[127] He recognized that the Debtor has more than $26,000 in cash, but also said that paying the claims in full would be "spending somebody else's money" because of unknown future liabilities, like litigation with the City of Austin, and because whatever cash is available on the other side of confirmation would be impaired by a $100 million secured claim.[128]

Under the facts of this case, where the largest creditors are either affiliated with each other or appear to have loyalty to one side or the other, the Debtor's separate classification of true third-party creditors is reasonable and necessary to prevent those creditors from being swamped by the other parties. As an independently sufficient reason to approve the classification, these claims are also significantly different in size and type from the other claims and the administrative convenience test is met.

For these reasons, the Court finds that the Plan meets the requirements of 11 U.S.C. § 1129(a)(10).

## C. Cramdown

When a class objects to a plan, courts will still confirm the plan notwithstanding the objection, if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[129]

---

[127] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 261:11-262:11 ("And why pay the convenience class 90 cents on the dollar? MR. MILLIGAN: I mean, A, because they're getting payment sooner. Because if they had to ride along until, you know, this -- the retained claims are litigated, et cetera, it would be, you know, years. And it's common, very common for folks to take a discount for early payment. And it also lined up and was consistent with the offer that we made to the subcontractors to pay 90 percent of their scheduled claims. Q: And you heard in opening that the Panache parties believe the debtor has got enough money to pay all these people in full. What's your response to that? A: Well, I mean, they do. It's spending somebody else's money. We have unknowns about what the future liabilities are going to be. We have more than $26,000 of cash now since the subs didn't take those offers. But we've got the unknown with respect to the City of Austin litigation on the industrial site, what that's going to turn into. You know, there are other contingencies. We still don't know what the fix and resolution is on the -- on the, this deal. So there's still, you know, lots of open variables.").

[128] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 261:20-262:8.

[129] 11 U.S.C. § 1129(b)(1).

### 1. Unfair Discrimination

The Panache Parties argue that the Plan unfairly discriminates against AFMN in Class 3 and Panache in Class 4 by allowing Romspen's first and second lien claims and providing better treatment to creditors of equal propriety who have similar claims.[130] They contend that by forcing AFMN and Panache to receive distribution in Class 11, but giving Classes 6–9 the option of receiving 90% of their undisputed claims and 75% of their disputed claims, and by simply paying Class 10 90% of their claims, the Plan cannot be confirmed due to unfair discrimination.

Courts look at the facts and circumstances of a case to determine whether unfair discrimination exists.[131] As discussed above, given the facts of this case and the serious distrust and animosity between the parties, along with the very close relationship between Mr. Zarafshani and the non-accepting subcontractors, the Court finds that the disparate treatment of these claims is not unfair.

### 2. Fair & Equitable/Absolute Priority Rule

The Panache Parties argue that the Plan is not fair and equitable because it allows Reomaster to retain its equity interests in violation of the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B).[132] The absolute priority rule requires the plan to provide that creditors in senior classes get paid before creditors in junior classes.[133] The Panache Parties contend that because Reomaster, a pre-petition equity interest holder, will retain control over the Reorganized Debtor and obtain 100% of the equity, the Plan violates the absolute priority rule. But the Panache Parties' argument ignores or dismisses that Reomaster's original equity interests are extinguished by the Plan.[134] The rights Reomaster will obtain to equity in the Reorganized Debtor are by virtue of its $5.4 million winning bid from the equity auction. As discussed above, the Court finds that these equity interests were appropriately marketed and that the equity auction was conducted in good faith. Thus, the Court finds that the Plan is does not violate the absolute priority rule and is fair and equitable as to the dissenting creditors.

---

[130] Main Case, ECF No. 323, ¶ 36-38 (Panache Parties' Obj. to Confirmation).
[131] *In re Cypresswood Land Partners*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009).
[132] 11 U.S.C. § 1129(b)(2)(B).
[133] *Cypresswood*, 409 B.R. at 419.
[134] Main Case, ECF No. 288, p. 14 (Plan - Class 12 treatment).

## II. The Court will explain why the Panache Parties have standing to bring their Equitable Subordination and Recharacterization claims in a separate opinion.

The Court acknowledges the Romspen Parties' continued objection to the Panache Parties' standing to bring the claims of equitable subordination and recharacterization. The Court rules that the Panache Parties do have standing to bring these claims for reasons that will be enumerated in a separate written opinion on the motion for summary judgment.

## III. Equitable Subordination is not warranted.

The Panache Parties seek equitable subordination under 11 U.S.C. § 510(c), specifically, "full subordination of the [Romspen] Claims to all other creditors, with corresponding subordination of Reomaster's 75% equity behind Vesta Texas's 25%."[135] This is after Panache, acting through Mr. Zarafshani, expressly agreed to subordinate their interests to Romspen's in the Binding Term Sheet—which was extensively negotiated to settle, in part, the Panache Parties' equitable subordination claims from the Zen Garden Case.[136] Relying on the superior lien promised in the Binding Term Sheet, Romspen entered into a new lending arrangement with the Debtor and provided funds to continue the redevelopment efforts, which were necessary for the Project to begin making money and paying back its secured debt.[137] After the Debtor entered into this new agreement with Romspen, Mr. Zarafshani signed the Subordination Agreement on behalf of AFMN, wherein he, again, agreed to subordinate AFMN's claim (which is based on the Panache deficiency from the Zen Garden case) to Romspen's claims.[138] So if the Panache Parties' get their way, Romspen, an entity that has provided the vast majority of the funding for the Project over a number of years, will lose the secured position that it negotiated for and that Mr. Zarafshani repeatedly agreed to.

---

[135] Adversary Proceeding, ECF No. 202 at 17 (Panache Parties' Post-Trial Brief).
[136] Panache Ex. 324 ¶¶ 2, 14, Ex. A (Binding Term Sheet).
[137] Romspen Ex. 3 (Romspen Proof of Claim attaching loan agreement between the Debtor and Romspen).
[138] Panache Ex. 3 (Subordination Agreement).

"Equitable subordination is an unusual remedy which should be applied only in limited circumstances."[139] This provision of the Bankruptcy Code "allows the Court to look beyond the form of a dispute or transaction to its substance and to rearrange the priority of claims based upon the conduct of the creditors."[140] The Fifth Circuit has articulated guidance for when equitable subordination is appropriate: "(1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code."[141]

Generally, three categories of conduct can warrant equitable subordination: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." [142] "Undercapitalization generally refers to the insufficiency of capital contributions made to the debtor corporation."[143] However, "undercapitalization alone generally is insufficient to justify equitable subordination."[144]

Additionally, "a claim should be subordinated only to the extent necessary to offset the harm which the debtor or its creditors have suffered as a result of the inequitable conduct."[145] Crucially, "equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate."[146]

---

[139] *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991).

[140] *e2 Creditors Tr. v. Stephens, Inc. (In re e2 Communs., Inc.)*, 354 B.R. 368, 401 (Bankr. N.D. Tex. 2006) (collecting cases). *See also Fabricators*, 926 F.2d at 1464 (discussing the development of the doctrine of equitable subordination as "a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." (citing *Pepper v. Litton*, 308 U.S. 295, 311 (1939)).

[141] *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008) (first citing *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692, 700 (5th Cir. 1977), and then citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 357 (5th Cir. 1997)).

[142] *Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 712 F.2d 206, 212 (5th Cir. 1983)

[143] *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods)*, 2 F.3d 128, 131 (5th Cir. 1993).

[144] *Id.* at 132.

[145] *SI Restructuring, Inc.*, 532 F.3d at 360–61 (citing *Mobile Steel*, 563 F.2d at 701).

[146] *Id.* at 361.

33

To justify equitable subordination, the Court must make "specific findings and conclusions with respect to each of the requirements."[147] Here, the Panache Parties did not come close to meeting their burden.

The Panache Parties allege that the Romspen Parties engaged in inequitable conduct by, among other things, disregarding corporate separateness, undercapitalizing the Project, self-dealing, and failing to provide financial transparency.[148] The evidence, including Mr. Zarafshani's own testimony about the worth of the project, did not support that the project was undercapitalized and the Court does not believe that it was. Even if it were, undercapitalization alone is not enough.[149]

As to the other factors—fraud, illegality, breach of fiduciary duties, and claimant's use of the Debtor as a mere instrumentality or alter ego—there is insufficient evidence to support them. Overall, the assertion that the Romspen Parties acted inequitably is simply not supported by the substantial body of the evidence. While the Panache Parties seize on intemperate language in internal Romspen correspondence, actions speak louder than words: the Romspen Parties wrote large checks on the project for a long time, and trusted Mr. Zarafshani and Panache essentially without questioning for a long time—if anything, longer than they perhaps should have. Eventually, understandably, perhaps belatedly, they lost faith in Mr. Zarafshani. Even after Romspen began trying to exercise more control over his spending, they continued paying bills, but they also became concerned about the justification for many of them, including expenses from the contractors who were extremely close to Mr. Zarafshani,[150] and found the explanations they received unsatisfactory.[151] Their decision to stop pouring money into the Project without

---

[147] *Fabricators*, 926 F.2d at 1465 (citing *Missionary Baptist Found. of Am., Inc.*, 712 F.2d at 212).

[148] *See* Adversary Proceeding, ECF No. 54-1 at 38–39 (Second Amended Complaint).

[149] *Herby's Foods*, 2 F.3d at 132.

[150] *See, e.g.*, Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 37:22-38:3 (uncomfortable with some subcontractors constituting "the majority of the expenditures" yet "we were having trouble quantifying that work").

[151] *See, e.g.*, Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 39:6-12 (uncomfortable with payments made on deadlines without adequate information despite requests).

more measure and consideration was reasonable and was not inequitable in light of their very legitimate doubts about the Project and its progress.[152]

The Romspen Parties' witnesses' testimony was highly credible. There was not evidence that the Romspen Parties intentionally sabotaged funding or intentionally sabotaged the project or sought to induce Mr. Zarafshani or the other Panache Parties to invest time and money in the Project with no reward or hid their nefarious designs from him.

The Panache Parties have made much of the emails between the Romspen partners and the language in those emails. But in context, what was apparent to the Court was that the Romspen Parties engaged in good faith, robust debate, although it was, at times, vulgar or unprofessional.[153] The emails did not show a nefarious scheme, but rather, an all-hands-on-deck attempt to make the best of what even Mr. Zarafshani's supporter within the team (Mr. Weldon) acknowledges had been a long and unsuccessful situation. [154] Maybe the Romspen Parties should have made different judgment calls or business decisions in this difficult situation; but whether or not the better side won the debate on any particular business decision, *the decisions they made are well-supported and in good faith and by no means inequitable or unfair*.

The Court denies the Panache Parties' claim for equitable subordination.

---

[152] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 85:8-9 ("Didn't see where the funding was going into the project based on progress"); Trial Tr. (Day 5, April 28, 2026) at 113:12-15 ("We felt like we were going nowhere. It was like a black hole. … It as like we were just putting money in and it seemed like we were making no discernible progress.").

[153] Adversary Proceeding ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 70:2-15 (expressing some regret at not being "more artful in my prose" but emphasizing the importance of free exchange of views within the organization's decision-making).

[154] Regarding Panache's Ex. 4, for instance, Mr. Roitman gave a lengthy, detailed, and credible account for the context of this email and the sentiments expressed therein. *See* Adversary Proceeding, ECF No. 192, Trial Tr. (Day 5, April 28, 2026) at 75 and following. The Court also notes that this email was forwarded to Mr. Zarafshani and the Court does not find credible any suggestion that he did not read it—and this was *months before* he entered into the Binding Term Sheet.

35

## IV.    Recharacterization is not warranted.

In addition to or in the alternative from equitable subordination, the Panache Parties ask the Court to "recharacterize the [Romspen] claims as equity." [155] Recharacterization is "part of the bankruptcy courts' authority to allow and disallow claims under 11 U.S.C. § 502."[156] The Court looks to state law to determine whether a claim is enforceable against the debtor.[157] If state law classifies a claim as equity rather than debt, then the bankruptcy court is required to recharacterize the claim rather than disallow it.[158] Under Texas law, the factors for recharacterization of debt as equity are:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.[159]

---

[155]  Adversary Proceeding, ECF No. 202 at 21 (Panache Parties' Post-Trial Brief).

[156]  *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 542 (5th Cir. 2011).

[157]  *Id.* at 543 (citing 11 U.S.C. § 502(b); *Butner v. United States*, 440 U.S. 48, 54 (1979)).

[158]  *Id.*

[159]  *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 707 (Bankr. W.D. Tex. 2012) (quoting *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968)). The *Fin Hay Realty Co.* factors are incorporated into Texas law by *Arch Petrol. v. Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. App.—Austin 1997, no pet.). *See Mangia Pizza*, 480 B.R. at 706–07 (citing *Lothian Oil Inc.*, 650 F.3d 539).

36

"In applying these tests, we 'consider all the factors and weigh the evidence favoring characterization of the [interest] as debt or equity, while realizing that the various factors are not of equal significance and that no one factor is controlling.'"[160]

Here, the parties seem to agree that one *Fin Hay* factor supports recharacterization: the thinness of the Debtor's capital structure.[161] But even that is overstated by the Panache Parties. The Panache Parties argue that "No informed outside lender would advance funds to a single-asset entity with $750 of equity, no working capital, and existing debt of more than twice the asset's purchase price."[162] However, the Romspen Parties argue, and the Court agrees, that the capital structure was what these very parties bargained for and agreed to in the Binding Term Sheet. If Mr. Zarafshani made a deal he regrets, that is not grounds for recharacterization (and as the Court noted at trial, Romspen likely regrets the deal it made, too, given the size and length of its investment in this Property with essentially no return).

In terms of capitalization, the Court finds that this deal was not unusual for real estate development transactions. Of course, the forced-sale or liquidation value of the property at the time was not very high, but all agreed that the Property had a lot of upside, if the development could be managed properly. The Court lacks sufficient evidence to arrive at a valuation as of the time of these transactions, but it is confident saying that after weighing the risks, the equity had some meaningful value. True, at the time they entered into the deal, all knew that it was risky—but the payoffs could be huge. Business people, investors, and developers take those risks all the time. The Court has seen sophisticated business people think there was still equity value in many less hopeful situations than this one. Mr. Zarafshani stood to make a lot of money if things had gone well, but he knew perfectly well—and agreed in multiple documents—that his claims were subordinate to a lot of money that

---

[160] *Lothian Oil Inc.*, 650 F.3d at 544 (quoting *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)).

[161] Adversary Proceeding, ECF No. 201 at 3 (Romspen Parties' Closing Brief); ECF No. 206 at 19–20 (Panache Parties' Post-Trial Brief).

[162] Adversary Proceeding, ECF No. 206 at 21 (Panache Parties' Post-Trial Brief - citing Romspen Trial Brief, ECF 178 ¶ 19(5); *Mangia Pizza*, 480 B.R. at 707, 711; ECF No, 190, Trial Tr. (Day 3, April 24, 2026) 178:14–20, 178:24–179:6, 179:3–6, 179:11–180:3, 180:17 20).

37

Romspen had put into this and that came prior to any money being owed to him or his affiliated entities.

The Romspen Parties concede certain of the *Fin Hay* factors as neutral: identity between shareholders and creditors, source of interest payments, and the timing of advances in relation to Debtor's formation (as to the Romspen Deficiency Claim).[163]

The Panache Parties argue that the "identity-of-interest" factor is not neutral and is in favor of recharacterization. In support of its argument, Panache points the Court to the fact that the same six partners individually invested in the Romspen fund and controlled the fund and Reomaster, all of which operated under the same roof as the Debtor, RIC (Austin). The testimony at trial supported this contention: Mr. Roitman previously referred to the Romspen entities as a "spaghetti org chart"[164] and Mr. Weldon and Mr. Oelbaum each discussed the various "hats" the partners wore when representing each entity and the lack of formal restrictions on their roles.[165] It is also true that the partners each had a financial stake in the company, but the fund was a large one and the Panache Parties seem to have generally exaggerated the partners' ability to collect on their personal investments on the basis of this particular project. In addition, there was credible testimony that there is currently a cessation on granting redemptions requested by investors and that any cash recovered by Romspen could not immediately go to any investor.[166] In any case,

---

[163] Adversary Proceeding, ECF No. 201 at 6–7 (Romspen Parties' Closing Brief).

[164] Adversary Proceeding, ECF No. 192, Trial Tr. (Day 5, April 28, 2026) at 10:12–16 ("In fact, I asked you about the structure of Romspen and its various entities, and you described it as a spaghetti pork chop. A Well, I think that's a bit of a typo. I think it was a spaghetti org chart.").

[165] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 232:23–24 ("I was holding a hat in RIC, Romspen Investment Corp, and in RIC (Austin)."); ECF No. 190, Trial Tr. (Day 3, April 24, 2026) at 159:20 ("Sorry. There's a lot of hat moving there."); 160:2–4 ("It would be hard in certain circumstances to do that, but at all times, I would think that we're acting in the best interests of all of the entities that we represent.").

[166] Adversary Proceeding, ECF No. 190, Trial Tr. (Day 4, April 27, 2026) at 56:19–57:16 ("So if a dollar is recovered from an RMLP loan and they collect it into RMLP, that dollar doesn't immediately get distributed to investors, right? A: No. Q: And there's been discussion about this notion of liquidity and redemptions. A: Correct. Q: And it's the redemption process through which investors would be recovering funds, right? A: Yes. Q: And I think you -- your testimony was that at the fund level there's no new investors that are able to invest

38

the Court believes that the record reflects that the Romspen professionals were engaging in good faith efforts to try to move this Project forward, including by more than amply funding it for quite a long time with a very free hand and trying to, as one witness memorably put it, "maximize the value of the property, to spend the most efficiently as we could to get there," because "a rising ride lifts all boats."[167] The Court does not weigh this factor heavily under the circumstances.

After considering the remaining factors, the Court finds that they support denying recharacterization. The intent of the parties (factor 1), as reflected in the Binding Term Sheet and Subordination Agreement that Mr. Zarafshani and/or his entities entered, was always and obviously that the amounts owed to Romspen would be debt.[168] If fact, in the Binding Term Sheet, Panache expressly agreed to the Debtor's assumption of the Romspen Deficiency Claim.[169] These documents also formalized the agreements between the parties (factor 7); this was not a handshake deal. This was a highly negotiated resolution of a dispute between experienced and sophisticated parties that is clearly an attempt to resolve a bad situation, which would only be made worse (and more expensive) by continued fighting.

Credible testimony also convinces the Court that the Romspen Parties were supportive of third-party financing (factor 4).[170] In fact, the Binding Term Sheet originally contemplated third-party financing for the Debtor, although it also

---

money in, right? A: Correct. Q: And at the fund level, there are limitations or restrictions or maybe even cessations on granting redemptions requested by investors. Is that right? A Currently a cessation, yes. Q: So if RMLP recovers cash as a result of the RIC (Austin) project – A: Yes. Q: -- is that cash immediately going to any investor? A: It cannot.").

[167] Adversary Proceeding, ECF No. 191, Trial Tr. (Day 4, April 27, 2026) at 64: 11-12.

[168] Panache Exs. 324 (Binding Term Sheet); 3 (Subordination Agreement).

[169] Panache Ex. 324 ¶ 14 ("Panache and Romspen shall enter into new capitalization documents, including without limitation, an intercreditor agreement whereby the New Owner assumes the financial obligations for the Romspen Deficiency Claim and the Panache Deficiency Claim.").

[170] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 107:6-9 ("Was RMLP supportive of obtaining third-party financing so that -- as set forth in the binding term sheet? MR. WELDON: Yes."); 13:12-16 (third-party lender would want the information Romspen was requesting but had not received, "if not more"); Trial Tr. (Day 4, April 27, 2026) at 7-11 (third party financing unlikely without information).

addressed a contingency where Romspen acted as the lender.[171] In all, the loan documents formalizing the agreement between the parties appear to be fairly standard and in line with the Binding Term Sheet: Romspen negotiated a superior lien position to assure (to the extent possible) that it would be repaid, there is a fixed rate of interest (10%), a fixed maturity date (December 31, 2027), and a firm obligation to repay (factors 8, 10, 11, 13).[172] These factors suggest that the parties always intended and acted as though the money obtained from Romspen was debt, not equity.

While the financing was risky (factor 6) given the history of the Project and condition of the property, Romspen carefully maintained its senior position and its security interest. Even in the poor shape in which it currently lies, the property has been appraised a more than $30 million and it obviously has considerable upside. Again, the Court has seen much riskier situations without any cause for recharacterization. Further, Mr. Zarafshani's own rosy estimates of the past are in considerable tension with the Panache Parties' claim now that a senior secured position was so shaky as to support recharacterization. Contrary to Panache's contentions, the Court finds that, under these unique circumstances, this factor also does not support recharacterization.

For these reasons, the Court easily finds that the recharacterization cause of action should be denied.

## V. The tortious interference claims against Panache, Vesta Texas, and Mr. Zarafshani must be denied because they are not strangers to the contract with which they allegedly interfered.

Romspen brings a claim of tortious interference against Panache, Vesta Texas, and Adam Zarafshani, asserting that the filing of this adversary case seeking recharacterization and subordination tortiously interfered with the Subordination

---

[171] Panache Exs. 324 ¶ 2 ("The funding for the sale proceeds paid to Romspen or Romspen SPE for the New Owner for title to the Construction Project will be cash proceeds obtained from third party financing."); Ex. A (referring to a third-party loan).

[172] *See generally* Romspen Ex. 3, Ex. A (Loan agreement between RIC (Austin) LLC and Romspen).

40

Agreement.[173] The named plaintiffs on the live pleading in this case are Panache, AFMN, and Vesta Texas. Adam Zarafshani is not a plaintiff in this adversary proceeding.[174]

Under Texas law, "The elements of a claim for tortious interference with an existing contract are '(1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred.'"[175] A party cannot recover for tortious interference if it does not possess legal rights under the contract.[176]

"To be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered."[177] Panache, Vesta Texas, and Adam Zarafshani are not directly parties to the Subordination Agreement, which was between AFMN Investment, LLC and Romspen Mortgage Limited Partnership.[178]

However, the analysis does not end there. It is common sense that corporations can only act through their human agents.[179] When it is alleged that a corporate agent defendant induced a corporation to breach a contract, "the alleged act of interference must be performed in furtherance of the defendant's personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract."[180] Therefore, it is the plaintiff's burden to prove "that the defendant acted in a fashion so contrary to the corporation's best interests that his actions could

---

[173] Adversary Proceeding, ECF No. 30 at 9 (Romspen First Am. Counterclaims and Third-Party Claims - "Zarafshani caused Panache, Vesta Texas, and Junior Lender to initiate the Adversary Proceeding. Zarafshani, and thus Panache and Vesta Texas, knew and intended that the Adversary Proceeding would interfere with Senior Lender's rights under the SIA.").

[174] Adversary Proceeding, ECF No. 54-1 (Second Amended Complaint).

[175] *Inwood Nat'l Bank v. Fagin*, 706 S.W.3d 342, 347 (Tex. 2025) (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017)).

[176] *Id.* (quoting *Associated Indem. Corp. v. CAT Contracting Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)) (collecting cases).

[177] *Cmty. Health Sys. Prof. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995)).

[178] Panache Ex. 3. Obviously, AFMN is not a stranger to this contract and therefore was not sued under this theory.

[179] *E.g.*, *Holloway*, 898 S.W.2d at 795.

[180] *Id.* at 796.

only have been motivated by personal interests."[181] "A corporate officer's mixed motives—to benefit both himself and the corporation—are insufficient to establish liability."[182] When determining whether the corporate officer acted against the corporation's interests, the Court is to consider the corporation's "evaluation of the agent's actions."[183] "If the principal 'does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests.'"[184]

### a. Adam Zarafshani is not liable for tortious interference in his personal or corporate agent capacities.

Here, Mr. Zarafshani is not liable for tortious interference in his individual capacity. He is not a plaintiff in the adversary proceeding.[185] The conduct that allegedly interfered with the contract was the adversary proceeding. He, as himself, did not file the adversary proceeding.

Mr. Zarafshani is also not liable for tortious interference in his capacity as a corporate agent of Panache or of Vesta Texas. While Mr. Zarafshani did concede that he will receive some personal benefit if the adversary proceeding is successful, mixed motives are not enough.[186] Panache and Vesta Texas both stand to benefit if they succeed on their claims in this lawsuit. Therefore, it cannot be said that Mr. Zarafshani acted "*only* in his own interest and against the company's interest."[187] Further, neither Panache nor Vesta Texas have complained about Mr. Zarafshani's conduct, as they have each secured separate counsel from Mr. Zarafshani and have continued to pursue this case. For these reasons, the claim for tortious interference against Mr. Zarafshani is denied.

---

[181] *Id.*; *see also Cmty. Health Sys. Prof. Servs. Corp.*, 525 S.W.3d at 691.

[182] *Cmty Health Sys. Prof. Servs. Corp.*, 525 S.W.3d at 695 (quoting *Powell Indus., Inc. v. Allen.*, 985 S.W.2d 455, 457 (Tex. 1998)).

[183] *Id.* at 695 (citing *Allen*, 985 S.W.2d at 457).

[184] *Id.* (quoting *Allen*, 985 S.W.2d at 457).

[185] *See* Adversary Proceeding, ECF No. 54-1 (Second Amended Complaint).

[186] *See, e.g.*, *Allen*, 985 S.W.2d at 457 ("[T]he mere existence of a personal stake in the outcome is insufficient to show that the defendant committed an act of willful or intentional interference." (citing *Holloway*, 898 S.W.2d at 796)).

[187] *Id.* (citing *Holloway*, 898 S.W.2d at 796) (emphasis in original).

The Court recognizes the arguable inequity of allowing Mr. Zarafshani to embark upon, and to have his other affiliated entities embark upon, a course of action he agreed through another entity not to, all to the significant detriment of a contractual counterparty. But that is the law as this Court understands it. (And of course, the contracts *could* have bound him personally as well as his affiliates, but they did not.)

### b. Panache is not liable for tortious interference because AFMN is its subsidiary.

AFMN, a signatory to the contract, is a subsidiary of Panache.[188] There is a split of authority among the Texas Courts of Appeal[189] as to whether a parent corporation can be liable for interfering with the contracts of its subsidiaries, and the Supreme Court of Texas has not yet weighed in on the issue.[190] In *ProTradeNet, LLC v. Predictive Profiles, Inc.*, the United States District Court for the Western District of Texas surveyed the law on this issue.[191] Relying on "Texas appellate court precedent, Fifth Circuit precedent, United States Supreme Court precedent, and Western District of Texas precedent," the *ProTradeNet* court held that "a corporate parent is incapable of tortiously interfering with the contracts of its subsidiary."[192] This Court agrees with *ProTradeNet*. Because AFMN is a subsidiary of Panache, Panache's economic interests are so aligned with AFMN that Panache is incapable

---

[188] Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) 296:23–297:3 ("Q: There's AFMN, which is another single purpose entity that you formed and — to hold the Panache's removable claim, right? A: I caused it to be formed, yes. Q: All right. But it's owned by Panache. A: Its single member is Panache Development.").

[189] More generally, there is a split of authority on this issue across the country, including whether a parent company *can* interfere with its subsidiary's contracts at all, or whether it is just privileged to do so. *See generally Valores Corporativos, S.A. de C.V. v. McLane Co., Inc.*, 945 S.W.2d 160, 167 (Tex. App.—San Antonio 1997, writ denied).

[190] *E.g., Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props. L.C.*, 323 S.W.3d 322, 348 (Tex. App.—Beaumont 2010, pet.denied); *Grizzle v. Tex. Comm. Bank*, 38 S.W.3d 265, 286 (Tex. App.—Dallas 2001), *rev'd in part on other grounds*, 96 S.W.3d 240 (Tex. 2002); *H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 882–83 (Tex. App.—Corpus Christi 1996, writ denied); *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 336 (Tex. App.—Houston [14th Dist.] 1991, no writ); *Valores Corporativos, S.A. de C.V*, 945 S.W.2d 160.

[191] 369 F.Supp. 3d 788, 791–92 (W.D. Tex. 2019).

[192] *Id.* at 793 (collecting cases).

43

of tortiously interfering with AFMN's contracts.[193] The tortious interference claim against Panache is dismissed.

### c. Vesta Texas is not liable for tortious interference because its interests are too closely aligned with (and even subject to the control of) AFMN, Panache, and Mr. Zarafshani.

Vesta Texas is a single-asset entity that holds a 25% interest in the Debtor, RIC (Austin).[194] Vesta Texas is managed by Mr. Zarafshani and his wife.[195] Mr. Zarafshani is both a co-member and a co-manager of Vesta Texas.[196]

"[T]here can be no tortious interference when there is a complete identity of interests between a party to a contract and the defendant who is accused of interfering with the contract."[197] On the facts of this case, the Court finds that such a unity of interests exists between Vesta Texas and Panache, AFMN, and Mr. Zarafshani. To find that Vesta Texas could tortiously interfere with the contract while these other entities cannot would be an unsustainable result.[198] Romspen's claim of tortious interference against Vesta Texas is dismissed.

---

[193]  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.").

[194]  The evidence shows that the parties initially contemplated Vesta Texas having a 24% interest, but when the RIC (Austin) LLC Agreement was formed, Vesta Texas ended up with a 25% interest. *Compare* Panche Ex. 324, at 5 (Binding Term Sheet - "The equity interests of the New Owner will be . . . 24% owned (whether directly or indirectly) by an entity exclusively owned and controlled by Zarafshani or an estate-planning trust exclusively controlled by Zarafshani ('Zarafshani Owner Entity')"), *with* Panache Ex. 54 (RIC (Austin) LLC Agreement). The testimony at trial was mostly that Vesta Texas had a 25% interest. *See, e.g.*, Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 234:14–17 ("And that's not the way it was ultimately done. It was done 75/25, correct? MR. WELDON: It was negotiated and changed in the operating agreement, the LLC agreement.").

[195]  Adversary Proceeding, ECF No. 189, Trial Tr. (Day 2, April 23, 2026) at 296:18–22 ("Q: And then there's Vesta Texas. MR. ZARAFSHANI: Yes. Q: And that's a single-purpose entity that you formed to hold the minority ownership interest in RIC (Austin), right? A: My wife and I, yes.").

[196]  Adversary Proceeding, ECF No. 139-17 at 3 (Romspen Motion for Summary Judgment).

[197]  *ProTradeNet, LLC*, 369 F.Supp. 3d at 791 (citing *Holloway*, 898 S.W.2d at 797)

[198]  *See also Schoellkopf v. Pledger*, 778 S.W.2d 897, 903 (Tex. App.—Dallas 1989, writ denied) (citing *Baker v. Welsh*, 735 S.W.2d 548, 550 (Tex. App.—Houston [1st Dist.] 1987, writ denied)).

44

## VI.  Because the predicate tort fails, the civil conspiracy count against AFMN, Panache, Vesta Texas, and Mr. Zarafshani must fail.

Under Texas law, civil conspiracy is not an independent tort, but a theory of vicarious liability that "requires some underlying wrong."[199] Thus, to recover on a civil conspiracy claim, liability for an underlying intentional tort must be established.[200] However, as liability for tortious interference was not established against any of the Panache parties, Romspen's claim for civil conspiracy fails and is dismissed.

## VII.  AFMN has breached the Subordination Agreement contract but the Court will evaluate remedies at a later point.

Romspen alleges that AFMN breached the Subordination Agreement. The Panache parties, in return, argue that (1) the Subordination Agreement was not supported by adequate consideration; (2) the Subordination Agreement was entered into under economic duress; and (3) AFMN's performance was excused because of prior material breach by the Romspen Parties.

To prove a breach of contract, the plaintiff must show "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance and contractually required; and (4) the plaintiff sustained damages due to the breach."[201] Under Texas law, a party suing for breach of contract must elect to recover either legal damages or the equitable remedy of specific performance.[202] "Specific performance is not a separate cause of action but rather a substitute for

---

[199]  *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

[200]  *E.g.*, *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996) ("Civil conspiracy is an intentional tort. For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the agreement. Because a conspiracy requires intent, parties cannot conspire to be negligent." (citations omitted) (first citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933 (Tex. 1983), and then citing *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995))).

[201]  *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019) (citing *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018)).

[202]  *White Knight Dev., LLC v. Simmons*, 718 S.W.3d 203, 209 (Tex. 2025) (citing *Goldman v. Olmstead*, 414 S.W.3d 346, 361 (Tex. App.—Dallas 2013, pet. denied)).

45

monetary damages when such damages would be inadequate."[203] To be entitled to specific performance, a plaintiff must show that (1) money damages would be inadequate, (2) the plaintiff was ready, willing, and able to perform under the contract, and (3) the plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.[204]

First, the Court disagrees with the Panache Parties' contention that the Subordination Agreement was not supported by adequate consideration. This is a simple analysis. The Subordination Agreement constrains all parties in various ways, including Romspen.[205] The exchange of *money* is not necessary to support a contract with consideration. It is black-letter law that the voluntary foregoing of a legal right is sufficient consideration. [206] Accordingly, there was consideration for the Subordination Agreement. The Subordination Agreement was, then, a valid and enforceable contract.

AFMN breached the Subordination Agreement. Under the Subordination Agreement, AFMN agreed not to bring any "Enforcement Action" until Romspen's claim had been paid in full and after January 1, 2031, or until Romspen had commenced an Enforcement Action. Yet, before any of these conditions had been met, AFMN brought this adversary proceeding, an enforcement action as defined by the Subordination Agreement. It also failed to follow Romspen's instructions to vote in favor the plan of reorganization in this case despite its obligation to do so under the Subordination Agreement.[207]

The Court now turns to the Panache Parties' defenses. Panache Parties argue that the Subordination Agreement was entered into under economic duress. Under Texas law, "A contract may be invalid or unenforceable by reason of economic duress where undue or unjust advantage has been taken of a person's economic

---

[203]  *Id.* at 209 (citing *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Scott v. Sebree*, 986 S.W.2d 364, 368 (Tex. App.—Austin 1999, pet. denied.)).

[204]  *Id.* at 209; *DiGuiseppe v. Lawler*, 269 S.W. 588, 593–94, 599 (Tex. 2008).

[205]  *See, e.g.*, Panache Ex. 3 §§ 3(b). 8(c), (d), 10(a).

[206]  *E.g.*, *Hamer v. Sidway*, 27 N.E. 256 (1891); *Leonard v. Texaco, Inc.*, 422 S.W.2d 160, 165 (Tex. 1967).

[207]  Panache Ex. 3 § 3(d)(iv).

46

necessity or distress to coerce him into making the agreement."[208] The elements of economic duress are "(1) a threat to do something which a party threatening has no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection."[209]

Here, the evidence does not support a finding of economic duress. The Subordination Agreement was negotiated at length by counsel representing both parties as part of an intricate transactional structure that was itself a product of multiple years of litigation surrounding the prior bankruptcy case;[210] it was in fact part of the parties' joint efforts to button-up some of their paperwork that had been left somewhat incomplete since the time of the last bankruptcy. The Subordination Agreement was not signed under economic duress.

The Panache Parties also argue prior material breach, although neither they nor the other side have provided much briefing or argument on this issue. Under Texas law, "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."[211] Crucially, while a material breach by the other party excuses a party's future performance, a nonmaterial breach does not.[212] The Panache Parties' arguments on material breach form a part of their general "everything but the kitchen sink" approach to this case. They first alleged that the material breach was Romspen including certain attorneys' fees in its proof of claim contrary to the parties' agreement.[213] But Romspen was never *paid* those fees, it merely asserted them, and apparently both did so after this adversary proceeding was

---

[208] *King v. Bishop*, 879 S.W.2d 222, 224 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Brown v. Cain Chemical, Inc.*, 837 S.W.2d 239, 244 (Tex. App.—Houston [1st Dist.] 1992, writ denied)).

[209] *Id.* at 223–24 (citing *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)).

[210] *See, e.g.*, Panache Ex. 324 ¶ 14 (discussing "capitalization documents" including an "inter creditor agreement").

[211] *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)).

[212] *Id.* (citing *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)).

[213] Adversary Proceeding, ECF No. 147 at pages 7-9 (Response and Objection to Romspen Motion for Summary Judgment).

filed and subsequently withdrew the request for these fees. This argument is all but frivolous. Yet it was the only one cited in the Panache Parties' response to Romspen's Motion for Summary Judgment on this breach of contract.[214]

After that extensive briefing, the Panache Parties then put up more alleged material breaches to excuse the non-compliance with the Subordination Agreement. But these other, belated alleged material breaches are equally unconvincing. One is that because the Subordination Agreement requires both parties to comply with the Binding Term Sheet (which includes fiduciary duties) Romspen's alleged breaches of fiduciary duties excuse the signatories from compliance with the Subordination Agreement. But the Court finds here that Romspen did not behave inequitably or breach its fiduciary duties and therefore this effort must fail. Another alleged material breach was blocking third-party financing efforts. But the evidence doesn't support that allegation, as discussed above. There was ample evidence that certain aspects of the Project, budget information, and other factors all stood in the way of third-party financing and that Romspen was supportive of that financing. Yet another alleged material breach is Romspen's making the Panache Parties send personnel to Kansas City to access the Debtor's business records and refusing to make copies. But pictures of the documents were apparently taken,[215] and the Court believes access was sufficient. In addition, of course, the majority of the really important documents concerning Project progress were in the Panache Parties' possession. If this was a breach, which the Court doubts, it was not a material one.

Romspen has requested specific performance, damages, and attorney's fees. Specific performance would involve recognizing Romspen's right to control AFMN's vote on the plan and requiring it in various other ways to comply with the Subordination Agreement. Some of this relief may be moot, but some of it may be warranted.

Damages may also be warranted in addition or in the alternative, for instance in the form of additional and unnecessarily accrued interest and other costs that would not have been incurred but from AFMN's breach.

---

[214] *See* Adversary Proceeding, ECF No. 147 at pages 7-9.
[215] Adversary Proceeding, ECF No. 187, Trial Tr. (Day 1, April 22, 2026) at 120:16-18.

48

Finally, Romspen argues that it is entitled to attorney's fees under Texas Civil Practice & Remedies code ch. 38. "To recover attorney's fees under section 38.001, a claimant must meet several prerequisites. The claimant must: (1) plead and prevail on a claim for which attorney's fees are permitted under section 38.001, (2) be represented by an attorney, (3) present the claim to the opposing party or his agent, and (4) demonstrate that the opposing party did not tender payment within thirty days after the claim was presented."[216] "Reasonable attorney's fees" are recoverable for a breach of contract claim under § 38.001(b)(8). The Court believes that Romspen is likely entitled to at least some attorney's fees given this law.

The parties did not spend much time on remedies, and the Court is unclear on their arguments on this point. The Court will enter a scheduling order regarding remedies for the breach of contract and let the parties weigh in on what remedies might be appropriate as well as how to determine attorney's fees.

The Court also requests that the parties consider settling this issue if at all possible. Given the potentially duplicative nature of any damages against debts likely already owed in this case, and the potential mootness of specific performance remedies, the Court is hopeful that further litigation might be unnecessary.

## VIII. The objections to the Romspen Claims and secured status are overruled.

The Panache Parties state that they "have reviewed the Romspen Claims and find them objectionable" and ask the Court to sustain its objections and deny the Romspen claims. [217] Specifically, the Panache Parties "dispute the amount, calculation, priority, perfection, and secured status of the Romspen Claims" and assert that "Romspen failed to credit the ZG Canada Collateral to the indebtedness asserted in the Romspen Claims and asserted unearned interest and fees."[218]

As discussed above, the Romspen Parties filed two proofs of claim, the Romspen Loan Claim and the Romspen Deficiency Claim. The Romspen Loan Claim is for $110,320,744.29 at 10% interest. This claim purports to be secured by real estate and "all personal property." The Romspen Deficiency Claim is for

---

[216] *1/2 Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W.3d 378, 383 (Tex. 2011) (citing Tex. Civ. Prac. & Rem. Code §§ 38.001, 38.001).

[217] Adversary Proceeding, ECF No. 54-1 at 40 (Second Amended Complaint).

[218] Adversary Proceeding, ECF No. 54-1 at 40 (Second Amended Complaint).

49

$99,664,917.44 at 10% interest, also secured by real estate and "all personal property." Both proofs of claim attach evidence of their respective loans and documentation about the security interests.

The Court overrules the Panache Parties's objections. Under Federal Rule of Bankruptcy Procedure 3001(f), "A proof of claim signed and filed in accordance with these rules is prima facie evidence of the claim's validity and amount." "The claimant will prevail unless the objecting party produces evidence sufficient to rebut the prima facie validity of the claim."[219] Here, Panache did not provide sufficient evidence to rebut Romspen's prima facie case and the extensive testimony and documentation that support the claim including its status as secured. The Panache Parties' objection to the Romspen claims is overruled.

## Conclusion

For the reasons stated above, the Plan must be confirmed, the equitable subordination and recharacterization efforts must fail, the claim objection must fail, and while a breach of contract was established, awarding appropriate remedies for that breach will require further briefing.

The Court wishes to express, again, its appreciation for the professionalism of the lawyers and support staff who were involved with the trial of this important matter. The Court recognizes the demands that such trials put on everyone, both professionally and personally, and appreciates the frank (and occasionally fierce) but cooperative and courteous demeanor exhibited in the courtroom.

### # #

---

[219]  *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (W.D. Bankr. 2005) (citing *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir.1988)).

50