**Dated: September 30, 2026.**

Christopher G. Bradley
CHRISTOPHER G. BRADLEY
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BA**
**FOR THE WESTERN DIST**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **In re:**<br>**RIC (AUSTIN), LLC,**<br>**Debtor.** | §<br>§<br>§<br>§ | **Case No. 24-10264-cgb**<br>**Chapter 11** |
| **PANACHE DEVELOPMENT & CONSTRUCTION, INC., et al.,**<br>***Plaintiffs and Counter-Defendants*,**<br><br>**v.**<br><br>**ROMSPEN MORTGAGE, LP, ROMSPEN (REOMASTER) HOLDINGS, INC.,**<br>***Defendants and Counter-Plaintiffs*.**<br><br>**v.**<br><br>**Adam Zarafshani, an individual,**<br>***Third-Party Defendant.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. No. 24-01061-cgb** |

**OPINION ON STANDING OF A CREDITOR TO SEEK RECHARACTERIZATION AND EQUITABLE SUBORDINATION**

## Introduction

In this opinion, the Court considers the defendants' argument that individual creditors generally lack standing to bring recharacterization and equitable subordination causes of action in a bankruptcy case. The Court holds that this argument is incorrect.

Every creditor has standing to seek recharacterization of another (purported) creditor's claim. Recharacterization is the court's determination that a purported claim should not be allowed as a claim (that is, a debt) but instead must be treated as an equity interest. Bringing a recharacterization action is essentially a form of claim objection. Any party in interest, including any creditor, may object to a claim and may also seek recharacterization.

As for equitable subordination, this Court holds that any creditor may seek to equitably subordinate another creditor's claim. While courts divide on this issue, this Court concludes that both text and logic lead to this conclusion. The Court also explains why the policy concerns that have motivated some courts to hold otherwise do not stand up to scrutiny.

In addition, at least some of what is alleged in this case involves the plaintiffs' particularized injury. Courts appear unanimous in the conclusion that a creditor who has a special interest that will be served, or has suffered a particularized injury that could be remedied, has standing to seek equitable subordination. This opinion explains the Court's view that the particularized injury test in both a strict and a broader form does not ultimately provide a practicable or coherent way of determining standing. But, if either version of the test were applied here, the plaintiffs' alleged particularized injury would likely give them standing to seek at least some of the relief at issue here.

Finally, the plaintiffs here would be eligible to obtain derivative standing. The Court would grant derivative standing to the plaintiffs and accordingly hold that they had standing to pursue equitable subordination. The estate has essentially no funding that has not been provided by the defendants or their affiliates and is subject to a strict budget that does not include expensive litigation. For these and other reasons discussed below, the estate is not well-positioned to pursue this litigation.

## Procedural Background[1]

Plaintiffs and Counter-Defendants Panache Development & Construction, Inc. ("Panache"), AFMN Investments, LLC ("AFMN"), and Vesta Texas, LLC ("Vesta Texas") (collectively the "Panache Parties" or "Plaintiffs") filed this adversary proceeding on November 4, 2024, seeking various forms of relief, including recharacterization and equitable subordination of claims filed by Romspen Mortgage Limited Partnership ("Romspen") and Romspen (Reomaster) Holdings Inc. ("Reomaster") (collectively the "Romspen Parties").[2] At this time, the operative claims between the parties are contained in the *Plaintiffs' Second Amended Complaint for Declaratory Relief and Combined Claim Objection* (the "Second Amended Complaint")[3] and *Romspen Mortgage Limited Partnership's First Amended Counterclaims and Third-Party Claims* (the "Counterclaims").[4]

On February 20, 2026, the Romspen Parties filed their *Motion for Partial Summary Judgment* (the "Motion").[5] On March 13, 2026, the Panache Parties filed their *Response and Objection to Romspen Mortgage Limited Partnership and Romspen (Reomaster) Holdings Inc.'s Motion for Partial Summary Judgment* (the "Response").[6] On March 20, 2026, the Romspen Parties filed their *Romspen Mortgage Limited Partnership and Romspen (Reomaster) Holdings Inc.'s Reply in Support of Motion for Partial Summary Judgment* (the "Reply").[7]

In relevant part, the Motion seeks entry of a summary judgment dismissing Counts One and Two of the Second Amended Complaint—which seek recharacterization and equitable subordination of the Romspen Parties' claims—because the Plaintiffs lack standing to pursue those causes of action.[8] The Court held

---

[1] For the sake of brevity, the Court limits the procedural history and facts to those that are relevant to the Panache Parties' standing to seek recharacterization and equitable subordination of the Romspen Parties' claims.

[2] *Panache v. Romspen (In re RIC (Austin), LLC)*, Adv. No. 24-01061, ECF No. 1 (the "Adversary Proceeding").

[3] Adversary Proceeding, ECF No. 54-1 (the Second Amended Complaint is attached as Exhibit A to the Panache Parties' Motion for Leave to File Second Amended Complaint).

[4] Adversary Proceeding, ECF No. 30 (Romspen Counterclaims and Third-Party Claims).

[5] Adversary Proceeding, ECF No. 139 (Romspen Motion for Partial Summary Judgment).

[6] Adversary Proceeding, ECF No. 147 (Response and Objection to Romspen Motion for Partial Summary Judgment).

[7] Adversary Proceeding, ECF No. 150 (Reply in Support of Motion for Partial Summary Judgment).

[8] Adversary Proceeding, ECF No. 139 (during the briefing process and at the April 2, 2026, hearing, the Panache Parties withdrew Counts Four and Five of the Second Amended Complaint).

a hearing on the Motion on April 2, 2026.[9] At the conclusion of the hearing, the Court took the standing argument under advisement and denied all other relief requested in the Motion. Therefore, this opinion is limited to the standing question.

As the relief requested in this adversary proceeding could affect the plan proposed in the main bankruptcy case, the Court set a combined trial of this proceeding and the hearing on confirmation of the debtor's plan of reorganization.[10] The Court held that hearing and trial and has provided an opinion on the underlying merits of this adversary proceeding as well as on plan confirmation, finding in favor of the Romspen Parties and the Debtor on most relevant issues.[11]

As stated in the trial opinion, the Court decided that although they were unsuccessful on the merits, the Plaintiffs did indeed have standing to assert the claims. But the Court wished to explain that standing ruling separately (particularly because there was time pressure to issue an opinion on the issues determined at trial, and this opinion was not ready). This opinion now provides the explanation.

**Jurisdiction**

The district court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b). Under 28 U.S.C. § 157(a), the district court has referred the underlying case and this proceeding to this Court.[12] These claims are core matters under 28 U.S.C. § 157(b)(1) and (2)(B), (K), and (O) that the Court is statutorily authorized to hear and determine. Because they are part of the claims allowance process, the Court has constitutional authority to determine them.[13]

Further, to the extent that any of the matters described herein are instead "related to" proceedings or would otherwise be beyond the final adjudicatory

---

[9] At the hearing, the Court also considered a motion for partial summary judgment filed by the Panache Parties and third-party defendant Adam Zarafshani at ECF No. 147 in the Adversary Proceeding, which the Court denied in its entirety.

[10] Adversary Proceeding, ECF No. 134 (Fourth Agreed Amended Scheduling Order, setting trial of the adversary proceeding to begin on April 22, 2026); *In re RIC (Austin),* No. 24-10264 (the "Main Case"), ECF No. 301 (Scheduling Order setting the hearing on confirmation of the Debtor's plan to begin on April 22, 2026).

[11] Adversary Proceeding, ECF No. 207 (Combined Opinion on Plan Confirmation and Adversary Proceeding).

[12] Order #1301, *Order of Reference of Bankruptcy Cases and Proceedings* (W.D. Tex. Oct. 4, 2013).

[13] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

authority of this Court, the Panache Parties, Romspen Parties, and Third-Party Defendant Adam Zarafshani have all consented to entry of final orders by the Bankruptcy Court.[14]

## Factual Background

This adversary proceeding involves the tortured history of a large commercial redevelopment project (the "Project") on the east side of Austin, Texas, that spanned not one, but two chapter 11 bankruptcy cases.[15] The first case, *In re 3443 Zen Garden, LP*, was filed as an involuntary petition in March of 2020 and was later converted to a voluntary case under chapter 11 (the "Zen Garden Case").[16] In that case, Romspen, the senior lender, filed a secured claim for over $96 million.[17] Panache, the general contractor for the project, filed a claim for over $11.8 million, which included a secured claim of over $5 million.[18]

During the Zen Garden Case, Panache and several other creditors filed an adversary proceeding seeking equitable subordination of Romspen's claim and the limitation of Romspen's credit bid rights in an upcoming sale of the Project.[19] Ultimately, Romspen and Panache settled their dispute and Romspen credit bid $45 million of its claim to purchase the Project.[20]

As part of the settlement, on October 19, 2020, Panache and Romspen entered into a binding term sheet (the "Binding Term Sheet") that led to creation of RIC (Austin) (the "Debtor"), the debtor in the current bankruptcy case.[21] In the Binding Term Sheet, the parties split ownership but agreed that Romspen would have

---

[14] Adversary Proceeding, ECF No. 181, Amended Proposed Pre-Trial Order, ("[t]he Parties have agreed to the entry of final orders and judgment by the Bankruptcy Court."). *See also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015) (holding that a bankruptcy court has authority to enter orders and judgments in non-core proceedings with the consent of all parties to the proceeding).

[15] Main Case (filed on March 12, 2024, by Panache as an involuntary chapter 7 case and later converted to a voluntary chapter 11 case); *In re 3443 Zen Garden, LP*, No. 20-10410 (plan confirmed on January 27, 2021, and closed on August 23, 2022).

[16] *In re 3443 Zen Garden, LP*, No. 20-10410, Notice of Consent, ECF No. 10.

[17] *Id.*, Claim No. 14-1.

[18] *Id.*, Claim No. 22-1.

[19] *Austin Glass & Mirror, Inc. v. Romspen Mortg. Ltd. P'ship (In re 3443 Zen Garden, LP)*, No. 20-01048, ECF No. 1.

[20] *In re 3443 Zen Garden, LP*, No. 20-10410, ECF No. 278 (order authorizing sale of the Project to Romspen).

[21] Adversary Proceeding, ECF No. 139, Ex. I (Romspen Motion for Summary Judgment).

ultimate control and decision-making authority for the Debtor.[22] In keeping with this structure, the Debtor was formed and took ownership of the Project.[23] Around the same time, Romspen formed Reomaster to hold its 75% equity interest and Panache formed Vesta Texas to hold its 25% equity interest in the Debtor.[24]

A few months after execution of the Binding Term Sheet, Romspen agreed to provide the Debtor with up to $125 million in financing, and AFMN (another affiliate of Zarafshani) entered into a promissory note with the Debtor for about $11.05 million.[25] The promissory note memorialized the Debtor's assumption of the Panache deficiency claim from the Zen Garden Case.[26] Several years later, AFMN signed a subordination agreement wherein AFMN agreed to subordinate its claim to Romspen's claims, among many other things (the "Subordination Agreement").[27]

Unfortunately, after the truce reached in the prior bankruptcy case, disputes between the parties re-emerged, culminating in Panache filing an involuntary petition against RIC (Austin) and commencing this bankruptcy case[28] and adversary proceeding.[29] After the RIC (Austin) involuntary petition was converted to a voluntary petition under chapter 11, Peter Oelbaum, acting as Manager for Reomaster, engaged Gregory S. Milligan with Harney Partners to serve as Chief Restructuring Officer for the Debtor.[30]

In this adversary proceeding, the Plaintiffs contend that Romspen intentionally destabilized the Debtor in an effort to eliminate the Panache Parties' minority interests.[31] They ask the Court to recharacterize Romspen's claims from

---

[22] Adversary Proceeding, ECF No. 139, Ex. I ¶ 6 (Romspen Motion for Summary Judgment).
[23] *Id.*, pg. 7 (Romspen Motion for Summary Judgment).
[24] *Id.*, pg. 7 (Romspen Motion for Summary Judgment).
[25] *Id.*, Ex. K (Romspen proof of claim attaching Loan Agreement with RIC (Austin) dated 12/2/20); Ex. L (promissory note between AFMN and the Debtor); Main Case, ECF No. 331 ¶ 12 (Brief in Support of Confirmation).
[26] Adversary Proceeding, ECF No. 139, Ex. K; Ex. L; Main Case, ECF No. 331 ¶ 12 (Brief in Support of Confirmation).
[27] Adversary Proceeding, ECF No. 139, Ex. N (Romspen Motion for Summary Judgment). In many respects, the Subordination Agreement appears merely to memorialize agreements already made, including in the Binding Term Sheet, and the sentence in the text above is not intended to suggest otherwise.
[28] Main Case, ECF 1 (Involuntary Petition, filed March 12, 2024).
[29] Adversary Proceeding, ECF No. 1 (Complaint, filed Nov. 4, 2024).
[30] Main Case, ECF 59-3 (Engagement Letter).
[31] Adversary Proceeding, ECF No. 54-1 ¶ 1 (Second Amended Complaint).

secured claims to equity.[32] Alternatively, the Plaintiffs ask the Court to equitably subordinate the Romspen claims to those of all other holders of allowed claims (of which they are the largest).[33] In the Second Amended Complaint and in the Response to the Motion, the Plaintiffs allege, among other things, that Romspen deliberately undermined the Project to gain control and improve its repayment position, which directly injured other stakeholders, including the Panache Parties.[34]

In its plan of reorganization, the Debtor proposes to sell new membership interests in the Debtor to the winner of an equity action and to use the proceeds to fund the plan and one year of operating expenses for the reorganized debtor.[35] Reomaster subsequently won the equity auction with a $5.4 million stalking horse bid.[36] The plan also provides that, subject to this adversary proceeding, Romspen's first lien claim will be allowed in the total amount of approximately $114 million.[37] Of that amount, $34.5 million (the current value of the collateral) would be allowed as secured claim, junior only to Romspen's approximately $4.9 million administrative expense claim for debtor-in-possession financing and a partially allowed secured claim for county taxes.[38] The remaining claims against the Debtor are treated as unsecured because the current value of its property ($34.5 million) is insufficient to pay more senior secured claims in full. Thus, Romspen's $99.7 million second lien claim would be allowed as unsecured, subject to this adversary proceeding.[39] And AFMN's claim, as well as Panache's claim for its work on the

---

[32] *Id.*, ¶¶ 119-124 (Second Amended Complaint).
[33] *Id.,* ¶¶ 119-124 (Second Amended Complaint).
[34] Adversary Proceeding, ECF No. 54-1 ¶¶ 58, 77, 122, 132, 142 (Second Amended Complaint); Adversary Proceeding, ECF No. 147, p. 14 (Response and Objection to Romspen Motion for Summary Judgment) ("Plaintiffs allege that Romspen manipulated the capital structure and priority scheme to enhance its own recovery position while subordinating or eliminating the economic interests of junior creditors and equity holders. (Doc. 54-1, ¶¶ 58, 77). That alleged harm is not merely a decline in enterprise value. Counts One and Two seek recharacterization and equitable subordination of Romspen's claims relative to Plaintiffs' own recovery positions. If Romspen's claims are recharacterized or subordinated, Plaintiffs' recoveries increase. That is a direct economic injury—not a derivative injury belonging to the estate.").
[35] Main Case, ECF No. 288 (Debtor's Combined Disclosure Statement and Second Amended Plan of Reorganization).
[36] Main Case, ECF No. 288 (Debtor's Combined Disclosure Statement and Second Amended Plan of Reorganization); ECF No. 331 ¶ 25 (Brief/Memorandum of Law in Support of Confirmation).
[37] Main Case, ECF No. 288, p. 8 (Plan treatment of Class 1).
[38] *Id.*, p. 8 (Plan treatment of Class 1). Notably, because Romspen made the election as was its right under § 1111(b) of the Bankruptcy Code, ECF No. 122, the entirety of this claim will be treated as secured and Romspen retains its lien until this claim is paid in full.
[39] Main Case, ECF 288, the Combined Disclosure Statement and Second Amended Chapter 11 Plan, p. 8 (Plan treatment of Class 2).

project and for attorney's fees, both of which were filed as secured claims, would be treated (so far as they are ultimately allowed) as unsecured claims.[40]

## Summary Judgment Standard

This opinion resolves an issue of law. Summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[30] A fact is material if it "might affect the outcome of the suit under the governing law."[31] This standard of review does not merely ask the court to determine "whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court."[32] To defeat a motion for summary judgment, "the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial."[33] In determining a summary judgment motion, all facts and evidence must be taken in the light most favorable to the non-movant.[34]

## Analysis

Recharacterization and equitable subordination are powerful and extraordinary equitable remedies that adjust the status of allowed claims.

Recharacterization allows a court to recharacterize a claim as equity, instead of debt.[41] The power to recharacterize debt as equity is not expressly in the Bankruptcy Code, but the Fifth Circuit recognizes the power to recharacterize as deriving from the Bankruptcy Code's requirement that a court evaluate and allow

---

[40] Main Case, ECF 288, the Combined Disclosure Statement and Second Amended Chapter 11 Plan, p. 9 (Plan treatment of Class 3 and 4); Claim Nos. 4-1, 5-1.

[41] *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.),* 650 F.3d 539, 544 (5th Cir. 2011). Some factors courts apply to determine whether debt should be recharacterized as equity include: "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments." *Seidel v. Neugebauer (In re With Purpose, Inc.)*, No. 24-03038, 2025 WL 1698694, at *80-81 (Bankr. N.D. Tex. Jun. 16, 2025) (quoting *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001)).

claims and interests in the estate under applicable law.[42] In other words, recharacterization is almost always a consideration of whether a particular purported claim would be treated as debt or equity under state law. Under this view, while not expressly mentioned in the Bankruptcy Code itself, the power to recharacterize is inherent in the power to consider whether to deny or allow claims against the estate.[43]

The Bankruptcy Code provides for subordination of one claim to another on both contractual[44] and equitable grounds.[45] Equitable subordination is at issue in this adversary proceeding. The bankruptcy court may subordinate, "under principles of equitable subordination . . . all or part of an allowed claim to all or part of another allowed claim."[46] The "principles of equitable subordination" have been worked out in a lengthy history of case law and can be distilled as follows: "[E]quitable subordination is appropriate when (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code."[47]

The question here is whether the Panache Parties, as creditors, have standing to seek either the recharacterization of Romspen's claims or the equitable subordination of those claims.

To be clear, the question turns on what is sometimes termed "statutory" or "prudential" standing and not what is termed "constitutional" (or "Article III" or "injury-in-fact") standing.[48] Constitutional standing is not challenged here and is present. There is a live controversy between the parties, and the Panache Parties

---

[42] *In re Lothian Oil Inc.*, 650 F.3d at 543.

[43] *In re Lothian Oil Inc.,* 650 F.3d at542 ("We conclude that recharacterization extends beyond insiders and is part of the bankruptcy courts' authority to allow and disallow claims under 11 U.S.C. § 502.").

[44] 11 U.S.C. § 510(a).

[45] 11 U.S.C. § 510(c).

[46] *Id.*

[47] *Life Partners Creditor's Trust v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 122 (5th Cir. 2019) (citing *[SI Restructuring, Inc.] v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008)).

[48] *See generally Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (distinguishing between Article III standing, enforcing the constitutional requirement that courts determine cases and controversies, and prudential standing, the "judicially self-imposed limits on the exercise of federal jurisdiction." (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004))).

would benefit from the successful prosecution of their claims against Romspen.[49] Successful prosecution would give them greater rights in, and/or money payouts from, this bankruptcy estate.[50]

The issue, then, before the Court is a question of statutory standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction."[51] Prudential standing encompasses, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."[52] The prong of prudential standing most relevant here is that which "encompasses 'the general prohibition on a litigant's raising another person's legal rights.'"[53]

The Court will first analyze the Panache Parties' prudential standing to bring this recharacterization action and then turn to equitable subordination.

**A. Creditors have statutory or prudential standing to bring recharacterization actions because they are a form of claim objection.**

Recharacterization can be sought by any creditor because it is a form of claim objection. Claim objections can be brought by any party in interest. Creditors are parties in interest, therefore any creditor can seek recharacterization. Fifth Circuit law supports this straightforward syllogism.

Fifth Circuit law supports the first step in the syllogism, grounding the recharacterization power in the power to deny or allow claims.[54] In its seminal case, *Lothian Oil*, the Fifth Circuit provides a short but lucid opinion explaining that recharacterization is merely another way in which our bankruptcy law honors our federalist constitutional structure by giving power to state law entitlements.[55] The

[49] *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11.
[50] *See, e.g.*, *Elswick Co., LLC v. Comm2013 CCRE12 Crossing Mall Rd. LLC (In re Tara Retail Grp., LLC)*, 595 B.R. 215, 221 (Bankr. N.D.W. Va. 2018) (explaining why constitutional standing is present under similar circumstances).
[51] *Cibolo Waste, Inc.*, 718 F.3d at 474 (quoting *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11).
[52] *Elk Grove Unified Sch. Dist.*, 542 U.S. at 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).
[53] *Elk Grove Unified Sch. Dist.*, 542 U.S. at 12 (quoting *Allen v. Wright*, 468 at 751 (1984)).
[54] *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 543 (5th Cir. 2011).
[55] *In re Lothian Oil Inc.*, 650 F.3d at 543.

Supreme Court's *Butner* opinion recognized this principle most prominently,[56] but this structure underlies the entirety of bankruptcy law. Recharacterization is an important tool in the claims allowance process to ensure that the bankruptcy court is properly prioritizing claims and recognizing rights under state law. If a party has invested in the debtor in such a way that the investment, despite being cloaked or claimed as debt, would in fact be legally characterized as an equity interest under governing state law, it would offend the *Butner* principle for a bankruptcy court to treat it as a valid debt claim. Thus, a bankruptcy court should recharacterize it as equity—in essence, denying it as a "claim" and recognizing it as merely the "interest" that it would be outside of bankruptcy.[57]

The second and third steps of the syllogism are even more straightforward. The Code expressly permits any party in interest to object to a claim.[58] Creditors such as the Panache Parties are defined as parties in interest in Chapter 11 cases.[59] Thus, creditors such as the Panache Parties have statutory standing to assert recharacterization claims.[60]

---

[56] *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

[57] *Elswick Co., LLC v. Comm2013 CCRE12 Crossing Mall Rd. LLC (In re Tara Retail Grp., LLC)*, 595 B.R. 215, 222 (Bankr. N.D.W. Va. 2018) ("[R]echaracterization . . . is essentially an objection to a claim on the basis that it is an equity interest."); *Official Comm. of Unsecured Creditors of Russell Cave Co. v. Gen. Elec. Cap. Corp. (In re Russell Cave. Co.)*, 107 F. App'x 449, 451 (6th Cir. 2004) (recharacterization is "a request for the bankruptcy court to hold a debt, and hence any claim, is non-existent").

[58] 11 U.S.C. § 502(a). *See also* Fed. R. Bankr. P. 3007 advisory committee's note to 1983 amendment (noting that while a trustee often has a duty to do so, "any party in interest may object to a claim").

[59] 11 U.S.C. § 1109(b).

[60] It does not change the analysis whether the claim allegedly subject to recharacterization is a secured claim, as is the case here. Main Case, Claim No. 6-3. It may arguably mean that the recharacterization claim must be brought as an adversary proceeding. Fed. R. Bankr. P. 7001(h). If so, that requirement of course was met here. The better answer, though, is that it is permissible but not necessary to seek recharacterization of a claim through an adversary proceeding. The Court may order similar procedural protections in a contested matter under Fed. R. Bankr. P. 3007(b) and 9014(c), when the point of the proceeding is merely to disallow the claim and not seek any affirmative relief). *See In re McCowan*, No. 09-10347, 2018 WL 4056991 at *5 (Bankr. E.D.N.C. Aug. 24, 2018) ("An adversary proceeding is not required to contest secured status asserted in a proof of claim.").

However, even if 7001 is applicable and an adversary proceeding is required, any creditor has the right to bring the proceeding. Creditors regularly object to claims. They have standing to do that, including if the objection will de facto mean the creditor receives nothing on account of

Some courts differ from the approach explained by the Fifth Circuit and applied here. In the Fourth and Sixth Circuits, for example, courts look to the Bankruptcy Code's general § 105(a) power to authorize recharacterization.[61] Under that approach, recharacterization is held to be part of the bankruptcy court's equitable power to implement the Bankruptcy Code's priority scheme.[62] This approach to recharacterization might well lead to the same answer; but because it is not applicable here in the Fifth Circuit or in jurisdictions that adopt the same analysis,[63] this Court will not consider it further.

**B. Creditors generally have standing to bring equitable subordination actions.**

In bankruptcies, courts often struggle with whether a particular action, such as a veil-piercing action or breach of fiduciary duty claim, can be brought against a third party by an individual creditor or whether it falls within the exclusive control of the trustee in bankruptcy.[64] Largely in accord with other circuits,[65] the Fifth Circuit has provided a series of nuanced analyses of this sometimes-difficult distinction (although none directly about equitable subordination).[66] The case law has emphasized three points:

---

its alleged lien. Creditors also regularly bring actions to determine lien status or priority. The Court does not here opine on whether all creditors always have standing to do so; the Court will merely observe that where they would directly benefit from the successful prosecution of such an action, they likely have a right to challenge lien status or priority. This result is both analytically sound for the reasons set forth in section C below, as well as confirmed by this Court's observation of common practice.

[61] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 47–53 (6th Cir. 2001); *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 233–34 (4th Cir. 2006).

[62] *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 233.

[63] *See, e.g., Official Comm. of Unsecured Creditors v. Hancock Park Cap. II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1149 (9th Cir. 2013).

[64] *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 350 (5th Cir. 1999) (holding that veil-piercing causes of action belonged to the debtor and were property of the estate); *SI Restructuring, Inc. v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008) (requiring a showing of actual harm to equitably subordinate a claim for breach of fiduciary duty).

[65] *See, e.g.*, *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990).

[66] *In re SI Restructuring, Inc.*, 532 F.3d at 360; *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., LLC)*, 912 F.3d 291, 296 (5th Cir. 2019) (holding that a tortious interference "claim" that did not derive from harm to the debtor belonged to the debtor's former CEO asserting the claim); *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522

> (1) the automatic stay applies to a cause of action that under state (or federal) law belongs to the debtor, or
>
> (2) the automatic stay applies to a cause of action that seeks to recover property of the estate when the property is held or controlled by a person or entity other than the debtor, and
>
> (3) in applying the above rules, a court must keep in mind the general bankruptcy policies of securing and preserving the debtor's property and ensuring equal distribution of the debtor's assets to similarly-situated creditors.[67]

All three of these points are helpful in illustrating why, in this Court's view, and despite the division in the case law,[68] the automatic stay should not apply to bar an

---

F.3d 575, 587 (5th Cir. 2008) (holding that conspiracy and fraud claims were not derivative of harm to the debtor and so did not belong to the bankruptcy estate); *Packer v. Athol Packer (In re Athol Packer)*, 816 F.3d 87, 91-92 (5th Cir. 2016) (holding that alter ego and reverse veil-piercing claims belonged to the estate); *Segerstrom v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 224 (5th Cir. 2001) (holding that malpractice cause of action was property of the bankruptcy estate); *In re Schimmelpenninck*, 183 F.3d at 358 (holding that corporate veil-piercing causes of action belonged to the debtor); *Educators Grp. Health Trust v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1285-86 (5th Cir. 1994) (holding that claims relating to mismanagement of the debtor were property of the bankruptcy estate but that other claims for fraud, conspiracy to commit fraud, and misrepresentation, belonged to the school districts who obtained health benefits from the debtor).

[67] *In re Schimmelpenninck*, 183 F.3d at 355.

[68] In accord with this Court's view in favor of creditor standing, the best authority is *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 394 (Bankr. E.D. Ark. 2005). A major authority against creditor standing is *Miller v. Elway (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) (Shannon, J.) (holding a cause of action to equitably subordinate another creditor's claim is property of the estate and may only be brought by the trustee unless the creditor seeking to bring such claim demonstrates that they suffered a particularized injury due to the allegedly inequitable conduct). Judge Shannon, and other courts holding that a cause of action seeking equitable subordination is property of the estate, look to whether the "injury," that is the alleged inequity, was "general," in the sense that it was suffered by the estate, or whether it was "particularized" to the creditor. This opinion elsewhere challenges the particularized injury test, suggesting that it is not analytically coherent. *See* section C below. *See also In re Seven Seas Petroleum, Inc.*, 522 F.3d at 588 (5th Cir. 2008) (explaining that the labels of a general or particularized injury are not very helpful in determining who has the right to bring the cause of action, but rather serve as useful descriptors after the court has already completed the analysis to determine who may assert the claim).

equitable subordination action nor should the debtor or trustee have the exclusive right to bring such action.

First, because equitable subordination claims in bankruptcy are creatures of federal law, we look there for any indication that such claims "belong" to the bankruptcy estate. The Code provides no such indication. Instead, like various other actions such as objections to claim, lien challenges, and a wide variety of other issues that can be raised by any party in interest to a bankruptcy, equitable subordination does not appear limited to the debtor or trustee but can generally be sought by any creditor.[69]

Second, equitable subordination does not seek to "recover" anything, including any property of the estate, because at most, all it does is change the order of distribution among the different claimants to estate property. Third, relatedly, allowing a wide variety of parties to bring equitable subordination claims does not unsettle the Code's distributive priorities by allowing one creditor to arrogate more to itself. To the contrary, it is a method, blessed by the Bankruptcy Code itself, of vindicating appropriate priorities in the distributions from the estate.

The following sections elaborate why neither the text, the logic, nor the policies underlying the Bankruptcy Code support restricting individual creditors from seeking equitable subordination. Section 1 argues neither the text nor the logic of the Code support restricting individual creditors from seeking equitable subordination. Section 2 shows that the policy concerns animating cases that deny individual creditors standing to bring certain actions do not present compelling reasons with respect to equitable subordination.

1. **The text and logic of the Bankruptcy Code fail to support the argument that equitable subordination actions "belong" to the estate or that restricting standing to bring such claims is warranted.**

[69] An equity holder may also bring a cause of action for equitable subordination. Because this issue arises most commonly with creditors, for convenience and clarity, the Court will write out the analysis for creditors only. The Court notes, however, that the analysis applies equally to individual equity holders.

This Court begins with the text. Relying on the tools of statutory interpretation, we look to the text of the statute as "the alpha and the omega of the interpretive process."[70]

The text of the statute provides no indication that equitable subordination actions belong to the bankruptcy estate nor does it prescribe any limitation on who can seek equitable subordination. The Bankruptcy Code simply states that all or part of an allowed claim may be subordinated to another allowed claim under principles of equitable subordination:

> [T]he court may—
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> (2) order that any lien securing such a subordinated claim be transferred to the estate.[71]

Several points are worth highlighting about this text.

First, the text contains no express statement that the right to seek equitable subordination belongs to any particular party. This notably contrasts with various other sections that expressly give the trustee the right to bring various causes of actions:

- Section 108(a) provides that if the limitations period within which the debtor could have brought a claim had not expired at the time of the bankruptcy filing, "the trustee may commence such action" within a prescribed extended time period. Section 108(b) provides similar relief to "the trustee."[72]
- Section 544(a) states that "[t]he trustee shall have . . . the rights and powers of, and may avoid any transfer . . . that is voidable by" certain

[70] *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019) (quoting *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018). *See also United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019) ("The task of statutory interpretation begins and, if possible, ends with the language of the statute." (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013))).
[71] 11 U.S.C. § 510(c).
[72] 11 U.S.C. § 108(a).

(real or hypothetical) creditors or purchasers of real property, and § 544(b) provides that "the trustee may avoid" certain other transfers.[73]

- Section 547(b) and (d) says "[t]he trustee may . . . avoid" certain transfers.[74]
- Section 548(a) provides that "[t]he trustee may avoid" certain transfers.[75]
- Section 549(a) provides that "the trustee may avoid" certain post-petition transfers.[76]
- Section 550(a) provides that "the trustee may recover, for the benefit of the estate," the property or the value of the property from an avoided transfer.[77]

Numerous other examples could be produced.[78] Not to belabor the point, Congress knew how to say that it wanted the trustee to be the party to seek various forms of relief.[79] That it did not do so here seems telling. Judge Taylor articulated this observation in his excellent and convincing *Hoffinger Industries* opinion:

> There is no specific provision in the statute that states that an equitable subordination claim must be brought by the trustee. In fact, the statute is silent in this regard. Utilizing the contextual features recognized by the Supreme Court, it is apparent that Congress intended for § 510(c) to be broadly available. Had the trustee been the only party with authority to use this section, Congress could have so stated, as it has in many instances.[80]

[73] 11 U.S.C. § 544(a) and (b).
[74] 11 U.S.C. § 547(b) and (d).
[75] 11 U.S.C. § 548(a).
[76] 11 U.S.C. § 549(a).
[77] 11 U.S.C. § 550(a).
[78] *See, e.g.*, 11 U.S.C. § 545 (authorizing the trustee to avoid the fixing of a statutory lien on property of the debtor under certain circumstances).
[79] *Cadleway Props. v. Andrews (In re Andrews)*, No. 02-0001, 2009 WL 1076831, at *5 (Bankr. S.D. Tex. Apr. 2, 2009) (noting that the language in § 510(c) stands in contrast to other Bankruptcy Code based actions that may only be brought by the trustee). Sometimes, too, the statute expressly provides for the *debtor* to have the ability to do certain things, like avoiding certain exemption-impairing liens. *See* 11 U.S.C. § 522(f) (authorizing the debtor to avoid the fixing of a lien on an interest of the debtor in property under certain circumstances).
[80] *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 394 (Bankr. E.D. Ark. 2005).

In addition, equitable subordination claims are functionally very similar to claim objections as well as recharacterization actions, which can be brought by any party in interest.[81] A claim objection requests that the court hold a debt simply not owing; recharacterization says the claimant may have some entitlement from the debtor, but it is an equity interest and not debt; and equitable subordination argues that there may be a debt owing, but due to the malfeasance of the claimant, it should be paid after other claimants. All three have the ultimate effect of putting one claim below some or all other claims.

In practice, due to this family resemblance, claim objections are often brought alongside requests for recharacterization and/or equitable subordination—as happened in this very case—often relying on overlapping facts to support both the request for recharacterization and equitable subordination.[82] The Court is unable to imagine a rationale for why an individual creditor could bring a claim objection and request for recharacterization but be restricted from requesting equitable subordination.

Second, the relief provided for in the text of § 510(c) seems to contemplate subordination of a specific claim sought by an individual creditor. The statute permits the court to "subordinate . . . all or part of an allowed claim to all or part of another allowed claim."[83] True, the fact that "claim" is singular does not mean that the *only one* claim may be subordinated to *only one* other claim; the Bankruptcy

[81] One could object that in § 502(a), as already discussed above in section A, Congress indicated its view that any "party in interest" could bring a claim objection. The fact that it did not do so in § 510(c)(1) may suggest that it wished to exclude some parties from seeking equitable subordination. But this Court thinks not. The specific reference to "party in interest" is necessary in the context of § 502(a) because the Bankruptcy Code specifically authorizes the trustee to object to claims elsewhere. There seems to be a distinction, then, between instances where the statute is expressly empowering the estate to bring a claim, as in the sections referenced above, and where it is simply clarifying that the estate is not the only holder of the claim. This is particularly true in the context of § 502(a), because elsewhere the statute requires a trustee to investigate and if appropriate object to claims. 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a). One could easily see that provision being read too broadly, to restrict the ability of *others* to object. Thus, the clarification was necessary in § 502(a); not so in § 510(c).

[82] *E.g., Hartford Holdings, LLC v. Mladen (In re Eternal Enters., Inc.)*, 557 B.R. 277, 281 (Bankr. D. Conn. 2016) (creditor permitted to bring claim objection and seek equitable subordination and recharacterization). This is not to say that these actions are all the same. As the Fourth Circuit has noted, "although recharacterization and equitable subordination lead to a similar result, they address distinct concerns and require a bankruptcy court to conduct different inquiries." *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 232 (4th Cir. 2006) (internal quotation marks omitted).

[83] 11 U.S.C. § 510(c).

Code's rules of interpretation provide that "the singular includes the plural."[84] Still, the Code seems to contemplate *first and foremost a claim-versus-claim battle*; and thus one that would naturally be brought by *individual creditors* and not by the representative of the estate as a whole. Based on this reading of the text, it would be bizarre indeed to say a creditor seeking this remedy lacks the standing to urge it.[85]

In fact, generally speaking, *equitable subordination claims often belong more naturally to affected creditor(s) than to the bankruptcy estate*. Granted, in some instances it might make sense for the trustee to pursue equitable subordination in the interests of the majority of the body of creditors, but the bankruptcy estate usually does not suffer a direct impact merely from the priority of payments to its various creditors. It seems that a court can order relief to "all unsecured creditors" or to "all creditors except the one who behaved inequitably."[86] But certainly the statute itself does not posit that as the norm. In many common instances, it might make more sense for one or more creditors to pursue the action, rather than the estate as a whole incur expenses that might *not* accrue to sufficient numbers of holders of claims to

---

[84] 11 U.S.C. § 102(7).

[85] *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990). It bears emphasizing that the square holding of *Vitreous Steel* strongly supports this Court's holding today. That said, the Court has a few minor quibbles with *Vitreous Steel*. First, the trustee may usually be, in some sense, the representative of unsecured creditors, as the opinion states. But it is more accurate to characterize a trustee as the representative of the estate as a whole; for instance, equity holders' interests are important when an estate may be solvent. *See* 11 U.S.C. §§ 323(a) ("trustee . . . is the representative of the estate"), 11 U.S.C. § 1102 (authorizing the U.S. Trustee to appoint a committee to represent equity security interests). Second, the *Vitreous Steel* court withholds judgment on whether an unsecured creditor could bring a claim against a wholly secured creditor (noting that an unsecured creditor may have standing to seek equitable subordination under § 510(c) "at least where the creditor whose claim is objected to is at least partially unsecured"). *Id*. But the court's reasoning in *Vitreous Steel* firmly supports an unsecured creditor's standing in such an instance. After all, an unsecured creditor would only have *constitutional* (injury-in-fact) standing if it were going to see a greater distribution if equitable subordination succeeds. This implies that at least some portion of the "target" secured creditor's claim will be subordinated to unsecured claims—which requires that the secured creditor will both lose its security interest and see its *now-unsecured claim* brought even lower. This in turn means that not *all* unsecured claims will be benefitted by the action, and thus an individual unsecured creditor has standing to bring it.

[86] *See Cadleway Props. v. Andrews (In re Andrews)*, No. 02-0001 2009 WL 1076831 at *7 (Bankr. S.D. Tex. Apr. 2, 2009) (collecting cases on how courts "have routinely read a general remedy into § 510(c), subordinating a claim to all claims or an entire class of claims"). The Court agrees with the thrust of Judge Isgur's characterization of this law. However, "general" appears to be an imprecise description of the relief. The text supports broad relief applying the principles of statutory interpretation together with the requirements in § 102(7) that the singular includes the plural. That is to say, the broad remedy need not be read into the text of § 510(c) as Judge Isgur suggests. *See id.*

make such an investment (often a risky and expensive one) worthwhile. Again, as the *Hoffinger Industries* court observed: “It would be absurd to permit the estate alone to seek to reorder priorities among specific creditors on all or part of their debt.”[87]

Third, the statute, read closely, prevents a claim from being subordinated to an equity interest, thus arguably *preventing* equitable subordination under § 510(c) from providing a benefit to the *entire* estate. The text permits the court to “subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.”[88] This seems to prevent the subordination of a “claim”[89] (in common parlance, a debt) to an “interest”[90] (in common parlance, an equity or ownership stake in the enterprise).[91] This appears to cabin the relief that equitable subordination can provide: it can move a claim down to the very bottom of the entire waterfall of claims, but no further.[92] In other words, subordination of a claim *cannot truly benefit the estate as a whole*, which can include holders of equity interests as well. Also, as several courts have pointed out and as this opinion discusses further below (B.2.a), equitable subordination can *never* provide a truly “general” benefit because it will always exclude at least the subordinated creditor.[93]

The textual and logical distinction between relief to the estate and relief only to a set of claimants—even if that set might be broad—is important to maintain. There is no obvious (and certainly no textual) reason to bar any one of a set of

---

[87] *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 394 (Bankr. E.D. Ark. 2005).
[88] 11 U.S.C. § 510(c).
[89] 11 U.S.C. § 101(5).
[90] While the Bankruptcy Code does not specifically define “interest,” it does define “equity security” as a “share in a corporation, whether or not transferable or denominated “stock,” or similar security” or as an “interest of a limited partner in a limited partnership,” 11 U.S.C. § 101(16)(A) and (B), which is the type of interest apparently referred to in § 510(c). *See Shubert v. Lucent Techs. Inc. (In re Winstar Commc’ns, Inc.)*, 554 F.3d 382, 414 (3rd Cir. 2009) (distinguishing between “claims” and “equity interests” in the context of equitable subordination).
[91] *In re Winstar Commc’ns, Inc.*, 554 F.3dat 414 (3rd Cir. 2009).
[92] *In re Winstar Commc’ns, Inc.*, 554 F.3d at 414 (“[A] creditor’s claim can be subordinated only to the claims of other creditors, not equity interests.”).
[93] *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990); *In re Hoffinger Indus., Inc.*, 327 B.R. at 413; *Algonquin Powe Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06–80254, 2007 WL 2509709, at *8-9 (Bankr. N.D.N.Y. Aug. 30, 2007).

affected parties, even if that set might be broad, from defending the broader group's interest by seeking to equitably subordinate another claim to those of the group.

Fourth, the statute provides for subordination only for purposes of "distribution," which again emphasizes the fact that it is a remedy pitting *creditor versus creditor* for purposes of *distribution* of the estate's property only. The estate sees no increase in the property it will be entitled to distribute; merely a rearrangement of the folks standing in line for a piece of the distribution.

A final textual note is one that might seem to speak in favor of restricting standing. Under the Federal Rules of Bankruptcy Procedure (though not the statute itself), equitable subordination actions must be brought as a separate "adversary proceeding" rather than merely being raised as a "contested matter."

As background, in a bankruptcy case, most issues are raised as contested matters in the main case, but some must be brought as separate, more formal, adversary proceedings.[94] Technically speaking, because equitable subordination must be sought in the form of an adversary proceeding, it is a valid cause of action in a bankruptcy.[95] Thus, perhaps it should ipso facto be considered "property of the estate" (despite having no value for the estate nor promising to augment the estate as a whole).[96]

But the mere fact that equitable subordination must be brought as an adversary proceeding is by no means enough to conclude that it "belongs" to the estate. This argument would prove far too much. Two examples show why. First, some causes of action are clearly *not* "estate property." For example, an objection to a creditor's claim can be brought as an adversary proceeding and therefore becomes a "cause of action" (or more properly a "claim for relief" or "demand for . . . relief") under the federal rules.[97] But it does not also thereby become property of the estate in contravention of the statute (a good example of a tail trying to wag a dog).[98] As a second example, contested lien rights have to be adjudicated in adversary proceedings, but may still be brought by creditors.[99] In fact, they are sometimes

[94] FED. R. BANKR. P. 9014, 7001.
[95] FED. R. BANKR. P. 7001(h).
[96] *See Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 257-58 (5th Cir. 2010) (holding that property of the estate broadly includes all rights of action bestowed by either federal or state law).
[97] FED. R. BANKR. P. 3007(b); FED. R. BANKR. P. 7008(a).
[98] *See* Section A; 11 U.S.C. § 502 (allowing parties in interest, not just the debtor, to object to claims).
[99] FED. R. BANKR. P. 7001(b).

creditor-on-creditor battles in which the estate may not have, or chooses not to take, a position (even though the estate itself also has the right to bring such actions).

In sum, the distinction of whether under the bankruptcy rules a dispute can or must be brought as an adversary proceeding cannot bear much weight. Rather the Court must, as it has above, engage in a substantive determination of whether the law provides for the action to "belong" to the debtor.

2. **The policy concerns animating cases that deny standing to individual creditors do not present compelling reasons to refuse individual creditors the right to pursue equitable subordination.**

As demonstrated in the previous section, the text § 510(c) and logic of equitable subordination support individual creditors being able to seek this remedy as a matter of right. This section addresses the largely policy-motivated reasoning of the cases that have held otherwise. First, it seems very clear that the policy concerns raised by *claims for affirmative relief* are inapplicable when the relief sought by an individual creditor is equitable subordination. Second, the policy concerns expressed in cases involving standing of *creditor's committees* are inapplicable to cases involving individual creditors.

a. **The policy concerns presented when individual creditors bring claims for affirmative relief based on harm to the bankruptcy estate are not applicable when individual creditors merely seek the distributive rearrangement that is equitable subordination.**

An individual creditor seeking equitable subordination does not raise the same policy concerns as are present when an individual creditor brings a claim for affirmative relief. As noted, a recharacterization action is essentially a part of the claims allowance process that allows a party to challenge the character of a purported creditor's claim by arguing that it should be treated as equity, rather than debt. Similarly, equitable subordination does not provide grounds for affirmative recovery but is rather a fairly narrow *remedy* that adjusts the order that allowed claims are paid based on principles of equity.[100]

---

[100] 11 U.S.C. § 510(c) ("[T]he court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."); *SI Restructuring, Inc. v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008)

While the Bankruptcy Code directs courts to look to the "principles of equitable subordination" that may exist outside of bankruptcy law,[101] the cause of action pursued here does not exist before or outside of the bankruptcy proceeding, and it is very narrow. The Bankruptcy Code expressly permits a court to only change the order in which creditors are entitled to "distribution" within the bankruptcy. It does not augment the estate. It is thus unlike the sorts of causes of action that *are* property of the estate, such as breach of contract, breach of fiduciary duty, fraud, and so on.[102] As noted,[103] courts have differed over whether avoidance actions are property of the estate, but even under the analysis of the courts (including the Fifth Circuit) holding that they are, an equitable subordination action stands out as *unlike those actions* in that equitable subordination action brings nothing into the estate and merely reshuffles creditor priority in distribution.

Cases restricting creditor standing generally emphasize the need for the trustee to have a free hand in bringing property into the estate, and to "prevent individual creditors from annexing assets of the estate to gain an advantage."[104] These concerns are clearly, repeatedly, and compellingly articulated in the major Fifth Circuit cases in this area.[105] In *Schimmelpenninck*, for instance, the Fifth Circuit stated that unless standing were preserved for the debtor alone, "any creditor could seek remuneration from the debtor's affiliates, and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Bankruptcy Code, would be promoted."[106] It expressed concern that a creditor bringing what should be an estate claim would be "agglomerating to himself the other creditors' rightful pro-rata share of this asset . . . of the Debtor's estate," and

---

("The Bankruptcy Code does not otherwise set forth the circumstances under which equitable subordination is appropriate; however, the case law has formulated a number of requirements to guide courts in their application of this *remedy*.") (emphasis added).

[101] 11 U.S.C. § 510(c); *Life Partners Creditor's Trust v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 122 (5th Cir. 2019) (citing *SI Restructuring, Inc. v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008)).

[102] *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 257-58 (5th Cir. 2010) (holding that causes of action to recover fraudulent transfers under § 548 were property of the estate); *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 350 (5th Cir. 1999) (holding that veil-piercing causes of action belonged to the debtor and were property of the estate).

[103] *See Official Comm. of Unsecured Creditors v. Hancock Park Cap. II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1149 (9th Cir. 2013).

[104] *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (quoting *In re Schimmelpenninck*, 183 F.3d at 360 (5th Cir. 1999)).

[105] *In re Schimmelpenninck*, 183 F.3d at 356; *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 589.

[106] *In re Schimmelpenninck*, 183 F.3d at 356.

would thereby "obtain indirectly a very preferential status that he cannot obtain directly."[107] The Fifth Circuit also discussed this concern in *Seven Seas*.[108] There, the Fifth Circuit expressed concern that a creditor empowered to bring an action could "ultimately seek to recover assets of the estate that are not under the debtor's control," such as fraudulent transfers.[109]

*The principles and concerns that animate these cases are simply not present in equitable subordination cases*. There is no risk of individual creditors appropriating money that would otherwise flow to the estate. Equitable subordination actions rearrange the order of creditors' claims to distribution from the debtor's estate; they do not bring any money into the estate. A plaintiff creditor can at most subordinate a wrongdoing creditor's claim to one or more of the other claims in the case.[110]

A trustee usually has exclusive standing to assert the estate's right to payment—which, again, would directly affect the assets in the estate and thus all creditors. But it is the various creditors, on their own and as classes, that have the real interest in the *order* that the debtor pays their various claims, because the higher a creditor's claim falls in the priority waterfall, the more likely it is that the claim actually gets paid (and sometimes even paid in full). Fights between and among creditors within this waterfall simply are often of little to no interest to, or impact on, the estate, even if the inequitable actions of the subordinated creditor were against the debtor.

This important distinction between claims for affirmative recovery and those merely rearranging the rights of creditors amongst themselves is present in the case law (even if its crucial importance has not been uniformly recognized). For instance, the Seventh Circuit in *Vitreous Steel* denied an individual unsecured creditor standing to bring actions for recovery for preferential transfer, fraudulent conveyance, conversion of estate property, and enforcement of the trustee's "strong-arm" powers, while at the same time holding that the creditor had standing to pursue the remedy of equitable subordination.[111]

---

[107] *In re Schimmelpenninck*, 183 F.3d at 358.
[108] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 589.
[109] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 589.
[110] *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 413 (Bankr. E.D. Ark. 2005.
[111] *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 12331 (7th Cir. 1990). *See also Algonquin Powe Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06-80254,

Nevertheless, despite the lack of support for such restrictions in either the text of the Bankruptcy Code or its general policy underpinnings, some courts have concluded that equitable subordination actions cannot generally be brought by creditors. An early and prominent discussion of these policy concerns was *In re Morpheus Lights, Inc*.[112] There, a California bankruptcy court denied standing to a general unsecured creditor who sought equitable subordination, fiduciary duty, and unfair competition claims against an officer and a lender of the debtor.[113] There, the court held that not only were the fiduciary duty and unfair competition claims property of the estate (which is uncontroversial) but that the right to seek equitable subordination was as well, and that an individual creditor did not have standing to pursue such a claim without court approval.[114]

In determining that the equitable subordination action was property of the estate, the *Morpheus* court relied on two cases that analogized claims seeking equitable subordination and claims seeking affirmative relief. First, the *Morpheus* court discussed a Second Circuit case in which that court determined that a creditor could not assert alter ego claims that the debtor and creditor's committee were also asserting in a separate action,[115] as well as on a Ninth Circuit Bankruptcy Appellate Panel decision holding that only trustees and not creditors generally have standing to pursue avoidance actions.[116] For reasons exhaustively discussed directly above, this Court finds any reliance on such an analogy between claims for affirmative relief and claims seeking equitable subordination to be unconvincing. Equitable subordination claims do not risk the "non-pro-rata distribution" concerns as claims leading to affirmative relief.

---

2007 Bankr. LEXIS 3004, at *23 (Bankr. N.D.N.Y. Aug. 30, 2007) (emphasizing that both *Vitreous Steel* and the cases upon which it relies provide that court permission is required for unsecured creditors to pursue claims such as fraudulent conveyance and preference actions but not equitable subordination and noting the lack of any citations to cases in which court permission "was required to bring a claim for equitable subordination").

[112] *Variable-Parameter Fixture Dev. Corp. v. Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998).

[113] *In re Morpheus Lights, Inc.*, 228 B.R. at 454.

[114] *In re Morpheus Lights, Inc.*, 228 B.R. at 454.

[115] *In re Morpheus Lights, Inc.*, 228 B.R. at 453 (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989)).

[116] *In re Morpheus Lights, Inc.*, 228 B.R. at 453-54 (citing *Hansen v. Finn (In re Curry & Sorensen, Inc.)*, 57 B.R. 824, 828 (9th Cir. BAP 1986)). The *Morpheus* court goes on to cite other cases in support of this analysis. *Id.* These cases are equally inapplicable as they all also deal with claims for affirmative relief such as fraudulent transfers. *Id.*

Nonetheless, the *Morpheus* court urged its view that "requiring a creditor-plaintiff to seek the court's permission before bringing a claim on behalf of the estate is supported by sound policy reasons."[117] Its *entire* discussion of those "sound policy reasons" is as follows: "The requirement promotes the orderly and equitable administration of the bankruptcy estate. If individual creditors were permitted to pursue separate actions to the detriment of other creditors and of the estate, the administration of the bankruptcy estate would be chaotic."[118]

This Court respectfully observes that the "policy concerns" expressed in *Morpheus* are inapplicable in equitable subordination actions. These concerns are reasonable with respect to claims that could bring funds into the estate and that, if brought by individual creditors, risk depriving the estate of such funds in favor of the individual creditor. In these instances, permitting the individual creditor to pursue its claim without first requiring court approval conflicts with the Bankruptcy Code's core principles of pro rata distribution to similarly situated creditors.[119] As noted above, the Fifth Circuit has also acknowledged such concerns in the context of an individual creditor bringing a suit against the debtor companies on a theory of piercing the corporate veil.[120]

But the policy concerns that justify denying standing to creditors seeking to bring affirmative claims such as corporate veil piercing are not relevant here. Equitable subordination claims are simply not analogous to such claims with respect to their impact on the estate. This Court is at a loss to understand how individual creditors seeking equitable subordination bring any "detriment" to the estate or other creditors (aside from, of course, the target of the action).[121] Nor is it clear how such standing would be disorderly, inequitable, or "chaotic."

---

[117] *In re Morpheus Lights, Inc.*, 228 B.R. at 454.
[118] *In re Morpheus Lights, Inc.*, 228 B.R. at 454.
[119] *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 356 (5th Cir. 1999).
[120] *In re Schimmelpenninck*, 183 F.3d at 356 (noting that, if individual creditor had standing to bring veil-piercing action against debtor's subsidiary or affiliates, "any creditor could seek remuneration from the debtor's affiliates, and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Bankruptcy Code, would be promoted"). *See also id.* at 358 (noting that, if granted standing to pursue recovery from debtor's subsidiary, an individual creditor would be "agglomerating to himself the other creditors' rightful pro-rata share of this asset . . . of the Debtor's estate," and would thereby "obtain indirectly a very preferential status that he cannot obtain directly").
[121] *Bunch v. J.M. Cap. Fin, Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 413-14 (Bankr. E.D. Ark. 2005).

It is possible that more than one equitable subordination action based on related facts or parties could be initiated by different creditors as well as by the debtor. But this can just as easily happen with a claim objection or a recharacterization proceeding, both of which, as discussed above, can be initiated by any creditor as well as by the debtor. A court can easily exercise its tools of case management to prevent this descending into "chaos," for instance by consolidating or reordering the cases as needed.[122]

Nor would an individual creditor's standing to bring equitable subordination hinder the estate's ability to *settle* such a claim with court approval.[123] Claims objections (which are the best analogy to equitable subordination actions) are regularly settled despite creditors' standing to urge such objections themselves; if they wish to preserve their objection, they must object to the settlement and persuade the court not to approve it.[124]

In sum, the crucial distinction is that equitable subordination does not undermine the pro rata distribution of estate assets or run the risk of a certain creditor obtaining some strategic advantage. The Court feels like it must continue to emphasize this point, at the risk of repetition, because it seems to have been lost in much of the case law. Equitable subordination cases can only move wrongdoing creditors down the claims waterfall, so there is no risk of one creditor taking advantage of its status as plaintiff to arrogate funds for themselves that should belong to the estate.[125] In fact, even where the estate is the party that suffered a direct injury, it may make little sense for the trustee (or even a creditor's committee) to bring an action for equitable subordination which may only benefit a few creditors at the top of the claims waterfall, rather than increase the overall pool of assets for distribution.

---

[122] The court in *Elswick Co., LLC v. Comm2013 CCREI2 Crossing Mall Rd. LLC (In re Tara Retail Grp., LLC)*, 595 B.R 215, 224-25 (N.D.W. Va. 2018), alluded to the potential need for such case management when both a creditor and the debtor were seeking equitable subordination. While this Court does not agree with the *Tara Retail Group* requirement of permission or its application of the particularized injury test, this part of the opinion seems on point in terms of how a court should practically deal with competing cases.
[123] FED. R. BANKR. P. 9019.
[124] *See, e.g.*, *In re Heritage Org.*, 375 B.R. 230, 285 (Bankr. N.D. Tex. 2007) (citing *Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.*, 339 B.R. 91, 94-95 (D. Del. 2006)); *Roberts v. Sender (In re Roberts)*, No. 25-1103, 2026 WL 885070 at *5-6 (10th Cir. 2026) (citing *Hamon v. DVR, LLC (In re DVR, LLC)*, 606 B.R. 80, 84-86 (D. Colo. 2019)).
[125] *See Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 414 (3d Cir. 2009).

**b. The statutory and policy concerns presented by *creditors' committees* seeking to bring actions are not applicable to individual creditors bringing equitable subordination actions.**

Much of what has led—or in this Court's view, misled—other courts to hold that an individual creditor lacks standing to seek equitable subordination, seems to be the unique statutory provisions and practical dynamics at play when a creditor's committee seeks equitable subordination. Many cases stating that individual creditors lack standing are actually cases holding that *creditor's committees* lack the right to seek equitable subordination.[126] Most prominently, courts have looked to the Second Circuit's *AppliedTheory* case, in which the lower court declined to grant derivative standing to allow the official committee of unsecured creditors to seek equitable subordination. [127]

The Second Circuit's *AppliedTheory* decision articulates several serious concerns with permitting *committees* to bring claims including the court's lack of control over the reorganization process and potential loss to the estate:

> Reorganizations would routinely spin out of control if decisions that would commit the time and limited resources of the estate could be taken without the consent of the bankruptcy court, the entity charged by law with controlling and regulating such matters. Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate.[128]

Admittedly, *AppliedTheory* does mention "individual creditors" as part of its concern, but its actual facts only presented a creditors' committee bringing the

[126] *Official Comm. of Unsecured Creditors v. Halifax Fund, L.P. (In re AppliedTheory)*, 493 F.3d 82, 85 (2nd Cir. 2007).
[127] *In re AppliedTheory*, 493 F.3d at, 85. *See also Cadleway Props. v. Andrews (In re Andrews)*, No. 02-0001, 2009 WL 1076831, at *6 (Bankr. S.D. Tex. Apr. 2, 2009) (distinguishing its facts from those before the Second Circuit in *AppliedTheory* because there, a creditors' committee rather than an individual creditor sought equitable subordination as a general claim which could only be asserted by the trustee).
[128] *In re AppliedTheory*, 493 F.3d at 86.

action.[129] In any case, *AppliedTheory* and other cases primarily dealing with committees have perhaps—without much apparent consideration for whether individual creditor standing raises the same concerns as does committee standing—placed some weight on the side of the scale suggesting that *individual creditors*, too, should lack standing to seek equitable subordination. Such creditors would either be left to convince the estate to pursue such claims or convince the court that derivative standing to seek equitable subordination is warranted.[130]

Courts, including the Fifth Circuit, have permitted committees to seek equitable subordination on a derivative basis on behalf of a bankruptcy estate but not as of right.[131] These courts have held that committees can do so only when a court has either given permission or it is relatively plain that the estate itself suffers from some sort of conflict or other inability to seek this remedy.[132] Committees also have been barred from seeking other forms of relief when it is deemed that a non-conflicted trustee or debtor in possession has properly evaluated and decided not to pursue an action.[133]

---

[129] *See Algonquin Powe Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, 2007 WL 2509709, at *31-2 (Bankr. N.D.N.Y. Aug. 30, 2007) (noting that while *AppliedTheory* mentioned individual creditors, its facts "dealt exclusively with a creditors' committee commencing the adversary proceeding").

[130] *See, e.g.*, *Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.)*, No. 10-05524, 2011 WL 1042767, at *2 (Bankr. S.D.N.Y. Mar. 17, 2011) (Lifland, J.) (holding that individual creditor lacked standing to bring equitable subordination claim; stating that "[b]ecause the remedy of equitable subordination is designed to vindicate the rights of the estate as a whole, that remedy, with limited exception, can only be brought by the debtor" and that "[t]his is precisely what the Second Circuit concluded in [*AppliedTheory*]").

[131] *See, e.g. Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 135 (5th Cir. 1993) (affirming the bankruptcy court's equitable subordination of certain claims to that of equity as sought by the creditors' committee); *In re AppliedTheory*, 493 F.3d at85-86 (affirming the lower court's denial of a creditor committee's request to equitably subordinate another claim and holding that it was required to obtain court approval to seek equitable subordination); *Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Savings Bank, FSB (In re Toy King Distributors, Inc.)*, 256 B.R. 1, 29 (Bankr. M.D. Fla. 2000) (holding that a creditors' committee had standing to seek equitable subordination because it had obtained court approval); *Tenn. Valley Steel Corp. v. B.T. Com. Corp. (In re Tenn. Valley Steel Corp.),* 183 B.R. 795, 800 (Bankr. E.D. Tenn. 1995) (citing *Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987)) (applying the test from *Louisiana World* to determine whether a creditors' committee should have standing to seek equitable subordination).

[132] *In re AppliedTheory*, 493 F.3d at 85-6.

[133] *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 574 (barring creditors' committee from bringing claims where a debtor met its burden to show that bringing the claims would not be in the

These restrictions on *committees* have numerous bases that are sound as *to committees*. But the analogy to *individual creditors* does not hold.

One major distinction is that a committee's fees are generally paid by the estate.[134] Thus, when a committee pursues a claim, every creditor is made worse off by every dollar of fees expended, subject only to a court's later determination of reasonableness and benefit to the estate.[135] This is presumably what the *AppliedTheory* Second Circuit opinion means when it refers to "commit[ting] the time and limited resources of the estate" to be dissipated without court approval.[136]

However, as a bankruptcy court within the Second Circuit noted shortly after *AppliedTheory* was decided, an individual creditor's "commencing litigation in bankruptcy court seldom commits resources of the estate, and has rarely, if ever, caused 'reorganizations [to] routinely spin out of control.'"[137]

*AppliedTheory* also cites the need to prevent "committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate."[138] This statement too might refer, in part, to committee fees, although the addition of "and individual creditors" (whose fees are not paid by the estate except in very extraordinary circumstances)[139] suggests that it has some other meaning as well. This statement in dicta is not entirely clear, but may mean that, with respect to some claims for affirmative relief, an individual creditor may recover private benefits that would otherwise go to the estate and thus are in that sense a "loss" to the estate. If so, again the Court emphasizes that

best interest of the estate). *See also Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (affirming dismissal of lawsuit brought by creditors' committee for lack of standing because the suit was not necessary or beneficial to the estate).

[134] 11 U.S.C. § 330. Professionals retained by committees are "professional persons" under the statute. 11 U.S.C. §§ 327 and 328.

[135] 11 U.S.C. § 330(a)(4)(A); *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) (holding that a "hindsight" or "material benefit" standard conflicts with 11 U.S.C. § 330 and applying a "reasonable at the time" standard for attorney compensation).

[136] *In re AppliedTheory*, 493 F.3d at 86.

[137] *Algonquin Powe Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06–80254, 2007 WL 2509709, at *11 (Bankr. N.D.N.Y. Aug. 30, 2007).

[138] *In re AppliedTheory*, 493 F.3d at 86.

[139] *See* 11 U.S.C. § 503(b)(3)(D); *In re Franklin Indus. Complex, Inc.*, No. 06–80254, 2007 WL 2509709, at *8-9 (noting difficulties that an individual creditor bringing equitable subordination action would likely face in seeking to have its fees paid by the estate).

this policy concern of unequal distribution really has *no application to equitable subordination cases*.

Another major distinction is that the duties and powers of creditors' committees are defined by statute and do not expressly include the right to seek this sort of relief.[140] Instead, that right is accorded to a committee only under a judicially created "for cause" exception, carefully restricted perhaps for the very reason that, as noted above, its fees may diminish the estate's resources for no real return.[141]

In sum, there are substantial reasons to "gatekeep" committee action and deny them standing without approval. But most of these concerns do not apply to individual creditors, whose own resources underwrite their efforts to seek subordination (whether on their own behalf or that of some group of similarly situated creditors), and whose existence and powers are not as closely circumscribed by statute. Insofar as *AppliedTheory*'s concerns include both individual creditors and committees, those concerns seem to be inapplicable to equitable subordination actions.

Thus, despite the serious divisions in the case law, this Court has no trouble concluding that individual creditors have standing to bring equitable subordination actions whenever it could potentially affect their distribution and even if the inequitable conduct was targeted at the debtor and not the individual creditor. The

[140] 11 U.S.C. §§ 1102, 1103; *Azby Fund v. Wadsworth Ests., L.L.C.*, No. 22-30092, 2022 WL 17582273, at *2 (5th Cir. Dec. 12, 2022) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) in noting the distinction between the duties of the trustee as opposed to the committee, stating that "[i]mplicit in the duties of a Chapter 11 trustee or a debtor in possession as set out in §§ 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate"). In contrast, a committee's duty is to "the interest of those represented." 11 U.S.C. § 1103(c)(5). *See also* 7 COLLIER ON BANKRUPTCY ¶ 1103.05 (16th ed. 2026). ("A member of a committee owes a fiduciary duty to the class the committee represents.").

[141] *See, e.g.*, *In re AppliedTheory*, 493 F.3d at 86 (denying the committee's request that the Second Circuit adopt a bright-line rule authorizing creditors to bring equitable subordination claims and noting its reason for not doing so); *Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (articulating a similar test in the Fifth Circuit, requiring that the creditors' committee's "claim be colorable, that the debtor-in-possession have refused unjustifiably to pursue the claim, and that the committee first receive leave to sue from the bankruptcy court.").

Court notes that some of this analysis applies only in chapter 11 cases; cases in other chapters may or may not require a different outcome.[142]

**C. The particularized injury test applied by some courts is analytically problematic and difficult or impossible to apply.**

Having explained why the Court thinks standing should be freely given, this section now raises doubts about the alternative approach endorsed by other, more restrictive courts: the "particularized injury" test to determine when an individual creditor should be granted standing to pursue equitable subordination.

There appears to be a consensus that individual creditors can at least *sometimes* seek equitable subordination relief, subject to the "particularized injury" test. Courts generally say that such relief is appropriate when the creditors have suffered a "particularized injury" that equitable subordination can remedy.[143] Ultimately, under many common bankruptcy scenarios, the test must be understood either very broadly or very strictly. The Court hold that both the strict and broader version of the test are unsatisfactory. The Court addresses the issues with both tests below.

**1. The strict version of the particularized injury test may be analytically coherent but is neither textually grounded nor easily applied.**

First, there are situations in which a creditor can genuinely have suffered a particularized injury and thus have standing to seek equitable subordination under even the most exacting standard. For instance, if a senior secured creditor misleads

---

[142] *See, e.g.*, *White Family Companies, Inc. v. PNC Bank (In re Dayton Title Agency, Inc.)*, 527 B.R. 289, 299 (S.D. Ohio 2015) (explaining that case law draws distinctions between a creditor's standing to bring an equitable subordination claim in chapter 7 versus chapter 11). For clarity, this Court is *not* expressing an actual conviction that the outcome should in fact be different in the chapter 7 context. The outcome would likely be the same under either chapter 7 or 11, provided that the would-be plaintiff has an actual interest in the outcome, as an individual creditor probably would. However, an analysis of this issue under chapter 7 is outside of the scope of this opinion.

[143] *See Cadleway Properties Inc. v. Andrews (In re Andrews)*, No. 02-00001, 2009 WL 1076831 at *5-6 (Bankr. S.D. Tex. Apr. 2, 2009) (collecting cases); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 159 (Bankr. S.D.N.Y. 2014) (stating, in dicta, that a "creditor may bring an equitable subordination claim only if he can allege a particularized injury resulting from the defendant's inequitable conduct"); *Black Palm Dev. Corp. v. Barlage*, No. 1:09cv220, 2011 U.S. Dist. LEXIS 118734 at *11 (W.D.N.C. Oct. 13, 2011); *NM Enters. v. Harrington (In re Flying Star Cafes, Inc.)*, 568 B.R. 129, 135 (Bankr. N.M. 2017); *Miller v. Elway (In re Elrod Holdings Corp.)*, 392 B.R. 110, 114 (Bankr. D. Del. 2008).

or otherwise behaves inequitably in order to procure the consent of a junior secured creditor to consent to lower priority status, then that would be a direct injury suffered by the junior secured creditor, and it would make sense for the junior creditor both to have standing to bring an equitable subordination claim and, ultimately, to receive a remedy of reversing the subordination to the extent it was caused by the deception or other targeted, inequitable acts. This is the most straightforward sort of "particularized injury" that could give a creditor standing to bring an equitable subordination claim. Under this Court's characterization, an injury that meets these criteria of *direct harm to the plaintiff creditor* will be said to have passed the *strict test*.[144]

A caveat is that even this basic scenario could get complicated very quickly. A broad range of inequitable conduct can fall within the scope of equitable subordination, and the injured party is not always as clear cut as the above example. Unlike, say, a breach of contract claim or a trademark dispute, where the injured party or parties will usually be fairly clear, this is by no means always the case when inequitable conduct has been perpetrated by a creditor of a financially distressed debtor. Often *both* the debtor *and* other creditors may suffer both directly and indirectly as a result of alleged inequitable conduct. For instance, creditors may suffer indirectly by seeing the debtor's value decline which leads to a decline in the value of the creditor's collateral and a dwindling of their financial investments. Creditors may also suffer direct injury as a result of inequitable conduct if it affects their rights to participate in the debtor's business or if the inequitable conduct damages their financial ventures, which depend on the debtor. Under such circumstances, which are common, extricating "individual" versus "general" injury will often be difficult.

In fact, in this very case it is difficult to parse out what is "particularized injury" and what is not. The Panache Parties claim, for instance, that Romspen starved the debtor of funding, thereby causing a decline of the Debtor's value and (indirectly) of the Panache Parties' collateral and equity.[145] But this is tied up with an alleged scheme in which some of the Panache Parties are specifically named as

[144] The strict test appears to have been applied, for instance, in *Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.)*, No. 10-05524, 2011 Bankr. LEXIS 1025, at *4 (Bankr. S.D.N.Y. Mar. 17, 2011). There, the court denied standing to an unsecured bondholder because its injuries of recovering a lower value and being at a lower priority in the bankruptcy were not sufficiently "distinct from other creditors" so as to satisfy that particularized injury requirement. *Id*. at *6.
[145] Adversary Proceeding, ECF No. 147, Ex. A ¶ 27 (Response and Objection to Romspen Motion for Summary Judgment).

intended targets of the alleged bad acts.[146] The Panache Parties also allege breach of a fiduciary duty arguably owed directly to some of the Panache Parties under the Binding Term Sheet; but at the same time these actions arguably damaged the Debtor.[147]

If this Court were to adopt the strict test, the statute would require the exact degree of requisite harm to be ascertained because the equitable subordination doctrine requires the court to calibrate the remedy to the precise amount of *particularized harm*.[148] In other words, a plaintiff would only have standing to assert (and to receive a remedy based on) the particular injuries done to it, not injuries also done to the debtor. This would require a remarkable and probably unrealistic precision in separating out injuries, victims, and harm.

Thus, while the outcome might not be unjust in theory, applying the strict test would be very difficult in practice. Even a creditor who has suffered alongside a debtor who has suffered a mix of direct and indirect injuries might receive less relief than that creditor would otherwise be warranted. The Court will turn next to whether a somewhat broader particularized injury test might make more sense.

**2. Some courts appear to adopt a slightly broader understanding of particularized injury, but this does not appear sustainable either.**

Other courts appear to have recognized that the strict test would bar too many claims because the creditor might not have been *directly injured*, in the sense of the being the object or target of harm; but they might be the most or only direct *beneficiary of the remedy* of equitable subordination. These courts appear to have adopted what this opinion will call the "broader test," allowing creditors to bring a claim for equitable subordination if they would receive *direct or special benefits* if the equitable subordination action were successful.[149] In other words, the broader test concedes that the *injury* might have been directed at the debtor but due to the harms actually suffered as a result, the appropriate *remedy* might flow to one or more particularly harmed creditors. Courts have not always been specific as to how much

---

[146] *See, e.g.*, Adversary Proceeding, ECF No. 54-1 ¶ 2 (Second Amended Complaint).
[147] *See, e.g.*, *Id.* ¶ 112-15; 67-69 (Second Amended Complaint).
[148] 11 U.S.C. § 510(c); *In re Andrews*, No. 02-0001, 2009 WL 1076831, at *7 (collecting cases on how courts "have routinely read a general remedy into § 510(c), subordinating a claim to all claims or an entire class of claims").
[149] *Miller v. Elway (In re Elrod Holdings Corp.)*, 392 B.R. 110, 114 (Bankr. D. Del. 2008).

benefit or what type of benefit might be enough, although "junior secured creditors" appear to be the standard example of a party receiving relief under this approach.[150]

The Court notes from the outset that several courts have drawn attention to the fact that the whole dichotomy of "general" versus "particular" injury is hard to apply rigorously.[151] In fact, if "general" is understood to refer to a remedy benefitting the creditor body as a *whole*, which is what much of the case law appears to mean, then a truly "general" equitable subordination claim is actually hard to imagine, given that the statute only allows the subordination of a particular claim (or set of claims) to another claim (or set of claims).[152] Judge Taylor in *Hoffinger* thoughtfully questioned "whether there can ever be a 'general' equitable subordination claim that only belongs to the trustee or debtor-in-possession."[153] He noted that "there will always be at least one or more other creditors the alleged generalized harm has not harmed, and the cure will not benefit; specifically, the creditor(s) against whom the action is brought."[154] This was an observation also made in the most on-point circuit court case, the Seventh Circuit's opinion in *In re Vitreous Steel Products Co*.[155] In that case, the court granted an unsecured creditor standing to pursue equitable subordination of another unsecured claim. It noted that the sought-after equitable subordination was "not a benefit to all unsecured creditors equally" because it was "a detriment to the creditor whose debt is subordinated."[156]

A hypothetical, generally based on allegations that are sometimes made against aggressive lenders, illustrates the problems with the broader understanding of "particularized injury." This hypothetical explores who has standing to raise an equitable subordination claim and demonstrates that, under the existing framework

---

[150] *In re Elrod Holdings Corp.*, 392 B.R. at 115.

[151] *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 413-14 (Bankr. E.D. Ark. 2005); *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990).

[152] The Fifth Circuit has cast significant doubt on whether the characterization of an injury as "general" is helpful in any case. *See Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 588 (5th Cir. 2008) (noting that it is not illuminating exercise to label certain claims of creditors personal or general).

[153] *In re Hoffinger Indus., Inc.*, 327 B.R. at 414.

[154] *In re Hoffinger Indus., Inc.*, 327 B.R. at 413; *see also Algonquin Powe Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06–80254, 2007 WL 2509709, at *8-9 (Bankr. N.D.N.Y. Aug. 30, 2007).

[155] *In re Vitreous Steel Prods. Co.*, 911 F.2d at 1231.

[156] *In re Vitreous Steel Prods. Co*., 911 F.2d at 1231.

The Court's further minor caveats on *Vitreous Steel* are above in note 85**Error! Bookmark not defined.** and accompanying text.

adopted by many courts (and viewed by this Court as unworkable), creditor standing is evaluated based off of the potential remedy rather than the alleged injury.

Imagine a debtor with a waterfall of secured claims. Call them secured creditors ("SC") SC1, SC2, SC3, and SC4, with claims in that order of seniority and with security interests in all of the debtor's assets as their collateral. For simplicity, assume that SC1 is owed $500,000, and the three others are each owed $100,000. Also assume that all of these creditors have held their various priority positions for a significant period of time.

Now assume that SC1 is tired of being a mere creditor. It sees potential to take over the debtor, and it acts on its plan. By various inequitable machinations, it destroys a considerable part of the debtor's value. It "slow-walks" various agreed-upon loan advances. It refuses to relieve the debtor of some terms in its loan documents in order for the debtor to embark on a growth-enhancing course of action of which the lender had previous indicated likely approval. It bickers with debtor's management to force delays and increase costs, etc. Now assume that these efforts are successful, the value of the debtor's business declines, and it fails to generate the necessary cash to continue operations or make payments. Then, having stripped away all other claims on the property and put itself in control, SC1 calls a default and prepares to foreclose on the debtor's remaining assets, so that it can repurpose them in a way it sees fit.

In desperation, and on the eve of foreclosure, the debtor files for bankruptcy. At that time, the debtor's assets are worth only $500,000, although credible evidence establishes that they were worth considerably more before SC1 embarked on the actions described above. In the bankruptcy, the various secured creditors file their claims, totaling $800,000, and so do unsecured creditors whose claims total $500,000. A creditor's committee is not formed because a sufficient number of creditors decline to serve.

This is a situation where equitable subordination seems likely warranted.[157] Under the facts, SC1 appears to have engaged in inequitable conduct, it has received an advantage (control of the debtor and a first lien position in bankruptcy) as a result of that potentially inequitable conduct, and subordinating its claim does not appear inconsistent with the Bankruptcy Code. Depending on how much value was destroyed as a result of the inequitable conduct, the appropriate remedy might be

[157] Other remedies, including damages for tortious conduct against both debtor and creditor(s) might also be warranted, but the focus here is merely standing to seek equitable subordination.

subordination of SC1's claim to one or more of the other secured creditors, or to all claims.

Now assume that the debtor's analysis is that the inequitable conduct only destroyed about $300,000 in value. Thus, without the inequitable conduct, all of the other secured creditors would have been paid, but none of the unsecured creditors. Accordingly, the appropriate remedy would likely be to subordinate SC1 to the other *secured* creditors, such that they will each be paid in full, but then SC1 will receive the remaining $200,000. Under this scenario, the unsecured creditors get nothing, with or without the inequitable conduct.[158] Because all that would happen is re-allocation of value among secured creditors, the debtor decides not to bring the action on behalf of the estate.

The first question that arises from this scenario: Can SC2, SC3, and/or SC4 bring the equitable subordination action?

This Court believes that most courts would answer "yes" to that question. But even on this basic question, the analysis is a bit murky: Did these creditors each suffer a "particularized injury"? The only *direct injury* in this fact pattern appears to be inflicted on the debtor itself. It is true that SC2, SC3, and SC4's security interests were devalued, but that is only as an indirect or collateral *effect* of the injury inflicted directly on the debtor. In the fact pattern, there is no suggestion these lenders were in any way involved with or even aware of the injury. Thus, this arguably should be characterized as a "general" injury, such that perhaps the individual creditors *should not* have standing (unless perhaps they receive derivative standing from the debtor).

This conclusion, however, seems at odds with various cases, including *Elrod*.[159] Indeed, some courts have spoken in terms of such junior creditors as having a "special interest" that is affected.[160] But the meaning of this is unclear: perhaps it means simply they are *most affected*, or the *only* parties affected? Aside from potentially being entitled to be paid more if the relief is granted, what is so "special"

---

[158] Obviously, this hypothetical is stylized in various ways, including in that it ignores administrative fees, but hopefully that can be forgiven for the sake of analytical focus.

[159] *Miller v. Elway (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) (holding that "a secured creditor had standing to seek equitable subordination of another secured creditor's claim to the extent that it seeks relief for a particularized injury"). *See also In re Vitreous Steel Prods. Co.*, 911 F.2d at 1231.

[160] *Black Palm Dev. Corp. v. Barlage*, No. 1:09cv220, 2011 WL 4858420 at *6 (W.D.N.C. 2011) (citing *Bezanson v. Bayside Enter., Inc. (In re Medomak Canning)*, 922 F.2d 895, 902 (1st Cir. 1990).

or "particular" about their interest? Is simply getting paid more in the "distribution" enough? The *strict test* seems not met here; it seems clear that only the *broad understanding* of the particularized injury test would permit the creditors to bring this action: the *remedy* seems properly to benefit them, and so it seems appropriate to allow them to bring the action even though they did not *directly* suffer the injury. This is a hypothetical that *seems* to favor the broad test as an equitable and coherent outcome.

Ending the analysis here in favor of the broader test, though, is insufficient. More questions help to clarify why the existing framework for establishing standing to bring an equitable subordination claim under either test is unworkable: Can *unsecured* creditors bring the equitable subordination action? And if not, why not? To see why this is revealing, add some facts to the hypothetical: Assume that there is an unsecured creditor who has a large unsecured claim, who is commercially sophisticated, who understands the debtor's business well, and who is well-informed about the events described above. This creditor disagrees with the debtor's professionals' analysis and believes that in fact the debtor's value was much higher before the inequitable conduct, such that actually, there would have been enough to pay off all or most of the unsecured claims but for the inequitable conduct.

If this is true, then the appropriate remedy should be a *deeper subordination* of SC1, such that the unsecured creditors would receive the $200,000 remaining after SC2, SC3, and SC4 are paid in full.

A court has no way from the outset to say that this unsecured creditor is wrong about its valuation argument. Accordingly, if the junior secured creditors had standing, why shouldn't this unsecured creditor have standing to bring the equitable subordination claim too? What's so different about the "interest" or "particularized injury" of this unsecured creditor versus the junior secured creditors SC2, SC3, and SC4? There is certainly no statutory basis for a refusal to permit unsecured creditors to seek equitable subordination while granting that right to junior secured creditors, and the analytical basis seems lacking as well, on the by-no-means-farfetched hypothetical facts as presented above. But the Court thinks that most courts would deny standing to this unsecured creditor.

It is no answer to say that in such a situation, the Court should grant derivative standing so long as it finds this unsecured creditor's argument sufficiently reasonable. That is not a principled distinction for allowing SC4 to seek standing without any such requirement and imposing the additional requirement on the unsecured creditor.

In the end, the Court simply cannot understand how a particularized injury test that rests the *standing* determination on whether or not the plaintiff will receive a particularized *remedy* is unsustainable. Yet this appears to be how most courts currently apply the particularized injury test.

For this reason, if it is to avoid this analytical inconsistency, the particularized injury test must either be jettisoned entirely (as this opinion advocates); broadened even more, such that equitable subordination claims can be brought by *any* creditor with *any* sort of plausible argument that they will see a greater distribution if successful (which is functionally the same as jettisoning it entirely and following this Court's approach); or given the narrow interpretation to mean that only a creditor who was *directly* injured by the defendant can bring an equitable subordination claim (which has no basis in the statute and could present inequitable or absurd results as discussed in section C.1).[161] For these reasons, this Court believes that both the strict and broad version of the particularized injury test are unworkable, and a creditor alleging even an indirect injury based on generalized harm to the estate has standing to bring an equitable subordination claim.

**D. Some of the Panache Parties allegations constitute particularized injury and thus they would have standing to seek at least some of the relief requested.**

While there is considerable disagreement, as reflected in the lengthy preceding analysis, about whether individual creditors have standing to seek equitable subordination for injuries suffered by the bankruptcy estate and only indirectly affecting the distribution that would be paid to those creditors, courts appear to be in agreement that those who have suffered "particularized injury" have standing to seek the equitable subordination of the claims of those who have injured them.[162] While the boundaries of this test are, as the preceding section argued,

---

[161] *See, e.g.*, *Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.)*, No. 10-05524, 2011 WL 1042767, at *2-3 (Bankr. S.D.N.Y. Mar. 17, 2011) (applying a strict version of the particularized injury test).

[162] *In re of Vitreous Steel Prods. Co.*, 911 F.2d at 1231 (holding that an individual unsecured creditor had standing to seek equitable subordination because it asserted a particularized injury); *SAM REI, LLC v. Cont'l Grp., LLC (In re Strata Title, LLC)*, No. 2:14–ap–00319, 2014 WL 6685470 at *3-4 (Bankr. D. Ariz. Nov. 25, 2014) (holding that an administrative claim creditor had standing separate and apart from interests of the estate as a whole and so could pursue equitable subordination without court approval); *In re Elrod Holdings Corp.*, 392 B.R. at 115 (holding that

difficult to understand or apply, *some* "particularized injuries" are clear. Such is the case here, at least in part.

In this case, the Panache Parties assert a large number of injuries suffered by both themselves and the Debtor.[163] Although the boundaries among the various alleged harms are difficult to discern, the Court is confident that some of these can be characterized as general injuries to the Debtor and some as particularized injuries to themselves as stakeholders in the Debtor.[164] While some of the allegations refer to injuries to the Debtor and the Debtor's other creditors, in large part the Panache Parties allege that Romspen, an insider, used its position to the detriment of the non-

---

"a secured creditor had standing to seek equitable subordination of another secured creditor's claim to the extent that it seeks relief for a particularized injury"); *Hartford Holding, LLC v. Mladen (In re Eternal Enter., Inc)*, 557 B.R. 277, 281 (Bankr. D. Conn. 2016) (finding that a secured creditor had standing to seek recharacterization and equitable subordination); *Citizens Bank & Tr. Co. v. Riederer (In re Brooke Cap. Corp.)*, No. 08-6132, 2011 Bankr. LEXIS 210 at *22 (Bankr. D. Kan. Jan. 20, 2011) (finding that a secured creditor could bring a recharacterization action because the action appeared to be a priority dispute and creditors can ordinarily dispute another creditor's asserted priority); *Bunch v. J.M. Cap. Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 413-14 (Bankr. E.D. Ark. 2005) (holding that a judgment creditor had standing to bring an equitable subordination action because she had a particularized injury based on the reduced distribution she would receive if the court did not equitably subordinate the challenged claims). *See also Variable-Parameter Fixture Dev. Co. v. Comerica Bank-California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr. N.D. Ca. 1998) (holding that a general unsecured creditor did not have standing to bring an equitable subordination action because it did not assert a particularized injury to itself); *White Family Companies, Inc. v. PNC Bank (In re Dayton Title Agency, Inc.)*, 527 B.R. 289, 301 (Bankr. S.D. Ohio 2015) (holding that a general unsecured creditor did not have standing to bring an equitable subordination action because it did not assert a particularized injury to itself); *Lone Star State Bank of West Texas v. Rabo Agrifinance, LLC (In re Waggoner Cattle, LLC)*, No. 18-02007, 2019 WL 469367 at *7-8 (Bankr. N.D. Tex. Feb. 6, 2019) (holding that a creditor asserting a particularized injury may bring equitable subordination action). Ultimately, the *Waggoner* court dismissed the unsecured creditor's equitable subordination action without prejudice because at the time of the ruling the claim was not "ripe." *In re Waggoner Cattle*, 2019 WL 469367 at *8. This Court simply disagrees with *Waggoner* that an "adjudication of allegations in favor" of the plaintiff should be necessary for it to show it has standing to pursue the remedy, so long as it is prepared to demonstrate its particularized injuries before the bankruptcy court. The cases cited by the court in *Waggoner* in support of its contrary holding appear apposite; they deal with standing to seek remedies for injuries *not yet suffered*. But in *Waggoner* (as in this case), the *injuries* were claimed to already have been suffered, even if an adjudication has not yet been obtained. Respectfully, this Court believes that *Waggoner* was likely wrongly decided in this respect.

[163] *See generally* Adversary Proceeding, ECF No. 54-1 (Second Amended Complaint).

[164] *Id.* ¶¶ 122, 132 (Second Amended Complaint).

insider stakeholders, the Panache Parties.[165] Therefore, under the case law available, the Panache Parties have standing to bring recharacterization and equitable subordination actions because they have adequately alleged at least some particularized injuries.

The Court notes that the standing obtained by the particularized injury test is apparently limited. Keep in mind that the statutory remedy for equitable subordination must be carefully calibrated to the relevant inequitable behavior for which relief is sought.[166] Under the "particularized injury" test, it may be the case that the creditor can only obtain a remedy insofar as its particular injuries requires. It cannot receive relief for any injuries that are the exclusive province of the bankruptcy estate. Here, for instance, if the Panache Parties had to rely on particularized injuries alone, relief might be severely curtailed, as *most* of the conduct in this action probably impacted the Debtor more *directly* than the Panache Parties.

So, thus, while this alternative holding is that the Panache Parties do indeed have standing to seek equitable subordination, this alternative holding would limit the relief, if it were not for the broader primary holding that the particularized injury test does *not* restrict standing.

**E. The Panache Parties would have derivative standing to assert equitable subordination or recharacterization on behalf of the estate in any case.**

Finally, the Court will address derivative standing. This issue is made somewhat difficult because the Panache Parties did not actually *seek* derivative standing.[167] But ultimately the Court holds that even if the Panache Parties would not have standing to seek remedies for all of the alleged inequitable behavior on their behalf, the facts in this case support their having derivative standing to urge these remedies on behalf of the estate.

The Fifth Circuit has repeatedly permitted trustees and creditors' committees—when acting with derivative standing—to pursue relief under the

---

[165] Adversary Proceeding, ECF No. 54-1 ¶¶ 58, 77, 122, 132, 142 (Second Amended Complaint; ECF No. 147, p. 14 (Response and Objection to Romspen).

[166] *SI Restructuring, Inc. v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 361 (5th Cir. 2008).

[167] The Court understands that the Panache Parties' lead counsel was a solo practitioner who unfortunately passed away suddenly when this case was already fairly advanced, and that may well have played a role in the lack of a request for derivative standing from replacement counsel.

umbrella of equitable subordination.[168] The well-known *Louisiana World* case explored when a creditor committee should have standing to bring claims on behalf of a bankruptcy estate. There, the Fifth Circuit recognized that committees typically have standing to sue on behalf of the trustee or debtor-in-possession where (1) the claim is colorable; (2) the debtor-in-possession unjustifiably refused to pursue the claim; and (3) leave is requested.[169] While agreeing with these "relevant considerations," the Fifth Circuit emphasized they are "not necessarily a formalistic checklist."[170] It went on to find that the committee was pursuing a colorable claim and that, based on the record, the debtor would have refused to pursue the claim.[171] Under the circumstances of that case, the Fifth Circuit found "it inappropriate and unnecessary to now go through the empty, formalistic ritual of remanding the case so that the Committee may more punctiliously seek action from [the debtor] and prior permission from the bankruptcy court, with obviously foreordained results, and then again present its complaint, so that we may deny it on the merits."[172] In other words, although the Fifth Circuit ultimately denied the committee's claim on the merits, it did so after rejecting formalistic requirements to confer derivative standing.

---

[168] *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 818 F.2d 1135, 1148 (5th Cir. 1987) (remanding the case brought by the trustee to the bankruptcy court for further identification of inequitable conduct and extent of harm without questioning trustee's standing to bring the claim); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 353 n.2 (5th Cir.1997) ("A trustee in bankruptcy has standing to bring an equitable subordination claim on behalf of the bankruptcy estate's creditors."); *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 135 (5th Cir.1993) (holding that a secured lender's claim was subject to equitable subordination as brought by the creditors' committee).

[169] *Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987).

[170] *In re Louisiana Exposition, Inc.*, 832 F.2d at 1397.

[171] *In re Louisiana Exposition, Inc.*, 832 F.2d at 1397–98 ("The Committee *did* ask LWE to bring an action for malfeasance against its directors and officers. LWE refused, apparently being unable to act because of the conflict of interest presented to its decision makers . . . . Given LWE's refusal to file that suit, there is no reason to believe that LWE would have begun, or would begin, the present action if requested.").

[172] *In re Louisiana Exposition, Inc.*, 832 F.2d at 1397–98. *See also Louisiana Dep't of Env't Quality v. Tidewater Landfill LLC (In re Tidewater Landfill LLC)*, 674 B.R. 218, 224–25 (Bankr. E.D. La. 2025) (noting that '"[t]here is no explicit authority in the Bankruptcy Code that allows a bankruptcy court to grant an individual creditor or a creditors' committee standing to initiate adversary proceedings in the name of the debtor or trustee"; however, "[t]he Fifth Circuit Court of Appeals and a majority of other Circuit Courts have held that such statutory authority nonetheless is implied"') (quoting *In re On-Site Fuel Serv., Inc.*, No. 18-04196, 2020 WL 3703004, at *9 (Bankr. S.D. Miss. May 8, 2020)).

Although *Louisiana World* involved creditors' committee's claims, courts also apply its test to determine whether to grant derivative standing to claims brought by individual creditors.[173] In terms of the first prong (whether the claim is colorable), the Court need not dwell on it at any length here. Based on the allegations and evidence presented so far in this adversary proceeding, the Panache Parties' recharacterization and equitable subordination causes of action are at least colorable.[174] "Colorable" is defined as a cause of action "appearing to be true, valid, or right."[175] Based on the legal sophistication and litigious history between the parties, the Court also suspects that the Romspen Parties would have filed a motion to dismiss and a motion for summary judgment on the merits regarding the recharacterization and equitable subordination causes of action if they had not been colorable as pled.

Similarly, the second prong is easily satisfied under these facts. Here, as in *Louisiana World*, the Debtor clearly would not have sought recharacterization and equitable subordination if asked. For one, under the Binding Term Sheet, Romspen ultimately controlled the Debtor and would stand to lose its secured position—a catastrophic outcome—if its first lien claim were recharacterized as equity or equitably subordinated.[176] Under the terms of the Debtor's current plan, Reomaster, another entity controlled by Romspen, stands as stalking horse bidder to purchase the equity of the reorganized debtor, in a sale which if approved would further solidify Romspen's control and render the Panache Parties' claims unsecured.[177] If the Debtor (represented by sophisticated counsel and an outside Chief Restructuring Officer)[178] had intended to bring the claims for recharacterization and equitable subordination, it certainly would have done so long before proposing a plan that prioritizes paying Romspen and granting Reomaster stalking horse bidder status.[179] For this reason, although best practices would have recommended that the Panache

---

[173] *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 863–64 (5th Cir. 2013) (applying the analysis in *Louisiana World* to claims brought by an individual creditor); *MLN Co. v. Clear the Air, LLC (In re Clear the Air, LLC)*, 631 B.R. 286, 295–96 (Bankr. S.D. Tex. 2021) (holding that individual creditors had derivative standing to pursue claims on behalf of the estate and applying the *Louisiana World* analysis).
[174] Adversary Proceeding, ECF No. 54-1 ¶¶ 122, 132 (Second Amended Complaint).
[175] Colorable, Black's Law Dictionary (12th ed. 2024).
[176] Adversary Proceeding, ECF No. 139, Ex. I (Romspen Motion for Summary Judgment).
[177] Main Case, ECF 288, p. 8-9.
[178] Main Case, ECF 59-3 (letter engaging Harney Partners and Gregory S. Milligan).
[179] Main Case, ECF 288 (Debtor's Combined Disclosure Statement and Second Am. Plan of Reorganization).

Parties *seek* derivative standing, the Court excuses the Plaintiffs from the second element of the *Louisiana World* test.

Finally, as to the third element, the Court construes the argument in the Panache Parties' Response that a bankruptcy court can grant standing retroactively "where the claims are colorable" as constituting a request for leave.[180]

Thus, even if the Panache Parties would not have had standing to bring claims based on inequitable actions directly against the Debtor (and only indirectly affecting them and other creditors), the Court finds that they should be granted derivative standing to pursue equitable subordination based on these injuries.

[180] Adversary Proceeding, ECF No. 147, p. 15 (Response and Objection to Romspen).

## Conclusion

For these reasons, the Panache Parties had standing to bring their recharacterization and equitable subordination actions, and for this reason, the Court denied summary judgment on this issue.

# # #